UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **MARINA DISTRICT DEVELOPMENT CO., LLC d/b/a BORGATA HOTEL CASINO & SPA,** | : : : | **AMENDED COMPLAINT** |
| Plaintiff, | : | |
| v. | : : | Civil Action No. 1:14-cv-02283 (NLH-AMD) |
| **PHILLIP D. IVEY, JR., GEMACO INC., CHENG YIN SUN, and JANE DOE,** | : : : | *Via ECF* |
| Defendants. | : : | |

Plaintiff Marina District Development Co., LLC d/b/a Borgata Hotel Casino &

Spa ("Borgata"), through its attorneys Agostino & Associates, P.C., as and for its

Complaint against Defendants Phillip D. Ivey, Jr. ("Ivey"), Gemaco Inc. ("Gemaco"),

Cheng Yin Sun ("Sun"), and Jane Doe states as follows:

**Parties**

1.       Borgata is a limited liability company organized and existing pursuant to

the laws of the State of New Jersey, with its principal place of business at One Borgata

Way, Atlantic City, New Jersey.

2.       The members of Borgata are Boyd Atlantic City, Inc. and MAC Corp.

Both Boyd Atlantic City, Inc. and MAC Corp. are corporations organized and existing

pursuant to the laws of the State of New Jersey, and both have their principal places of

business in New Jersey.

3.       At all relevant times, Borgata operated a hotel and casino duly licensed

and operating under the New Jersey Casino Control Act, *N.J.S.A. 5:12-1 et seq.* (the

"Act").

4.       Defendant Ivey is a citizen of the State of Nevada.

5.      Ivey is a professional gambler and holds himself out to be the greatest professional poker player of all time.

6.      Gemaco is a corporation organized and existing pursuant to the laws of the State of Missouri, with its principal place of business at 2925 NW Highway 7, Blue Springs, Missouri.

7.      Gemaco is in the business of providing high quality playing cards and other gaming products to casinos, as well as the promotional products and wholesale gift industries.

8.      Gemaco is registered to do business in the State of New Jersey as a foreign corporation.

9.      Gemaco sells its playing cards to Borgata and multiple other casino licensees in Atlantic City, New Jersey.

10.     Defendant Sun is a citizen of the State of Nevada.

11.     Upon information and belief, Sun is a professional gambler who has been banned from several casinos around the world.

12.     Jane Doe is intended to identify the specific Gemaco employee responsible for inspecting the playing cards delivered to Borgata relevant to the facts of this case.

### Jurisdiction and Venue

13.     Jurisdiction in the United States District Court for the District of New Jersey is appropriate pursuant to *28 U.S.C. § 1332(a)(1)* because all parties are citizens of different states for diversity jurisdiction purposes, and the amount at issue exceeds $75,000.

14.     Jurisdiction in the United States District Court for the District of New Jersey is also appropriate pursuant to *28 U.S.C. §1331* because Count XI (below) arises under the laws of the United States, i.e., *18 U.S.C. §§1961-1962*, and the Court has supplemental jurisdiction over the remaining claims pursuant to *18 U.S.C. §1367* because those claims are so related to Count XI that they form part of the same case or controversy.

15.     Venue in the United States District Court for the District of New Jersey is appropriate pursuant to *28 U.S.C. § 1391(b)* because substantially all the events or omissions giving rise to the claims herein occurred in New Jersey.

### Facts Common to All Counts

16.     Borgata operates a casino in Atlantic City, New Jersey.

### A.     The Playing Cards

17.     On and before April 2012, Borgata purchased all the playing cards used in its casino from Gemaco.

18.     The playing cards purchased from Gemaco by Borgata have a custom-designed back consisting of a dominant background color, on top of which appear edge-to-edge rows of small white circles that are designed to look like the top of a round cut diamond.  The illusion of the diamond facets is created by shading inside the circle with a lighter shade of the dominant background color.  The background color fills the empty spaces between the circles.  Two Borgata Hotel Casino & Spa logos on each card back are placed symmetrically and facing in opposite directions.  An image of the card back at issue in this Complaint is attached as **Exhibit A**.

19.     The pattern used by Borgata on the back of the cards purchased from Gemaco is required to be perfectly symmetrical so that the back of one card is indistinguishable from the backs of all other cards, and the edges of each card are indistinguishable from one another.

20.     Gemaco represents and warrants that its playing cards are tamper proof, sealed and certified by individual and intensive inspection.

21.     Gemaco further warrants that its playing cards are fit for their intended purpose and of "first grade quality," free of any and all defects for use in casino gaming operations.

22.     Prior to April 11, 2012, May 3, 2012, July 26, 2012 and October 7, 2012, Borgata placed orders with Gemaco for decks of playing cards to be used in its casino.

### B.     Mini Baccarat

23.     Mini Baccarat ("Baccarat") is a game of chance in which the players bet on the relative value of two hands of two cards each before the hands are dealt or the cards are revealed.  One hand is referred to as the "player's" hand, the other is known as the "banker's" hand.  The "banker" is not the House, and the "player" does not refer to those playing the game.  Players are free to bet on either hand.

24.     The object of Baccarat is to bet on the hand that will have a total value closest to nine (9).  Tens, face cards, and any cards that total ten are counted as zero.  All other cards are counted at face value.  The scores of hands range from 0 to 9.  Neither hand can "bust."

25.     The game is generally played with six or eight decks of cards placed into a dealing "shoe."  Before the cards are dealt, the players must place one of three bets:

4

"banker," "player," or "tie."  A bet on "banker" is a bet that the banker will hold the hand closest to nine.  A bet on "player" is a bet that the player will have the hand closest to nine.  A bet on "tie" is a bet that the two hands will be tied.

26.     Two hands are then dealt from the shoe, one for the "player" and one for the "banker."  The first card is dealt to the "player's" hand.  In certain circumstances, a third card may be dealt to either or both hands, depending on the score of the hands.

27.     A winning bet on "banker" pays 19 to 20.  A winning bet on "player" pays even money.  A winning bet on "tie" pays 8 to 1.

28.     The house advantage for Baccarat is approximately 1.06% on "banker" bets, 1.24% on "player" bets, and 4.84% on "tie" bets.

29.     Based on mathematical probability, when the first card dealt to the "player" has a value of 6, 7, 8, or 9, the chances of the "player" hand winning are greatly increased.  Conversely, if the "player" hand's first card has a value of 10, 1 (Ace), 2, 3, or 4, the chances of the "banker" hand winning are greatly increased.

30.     Thus, if a player knows the value of the first card in the shoe before it is dealt, the player can reverse the house advantage, and instead have a significant advantage over the house.  The player with this "first card knowledge" has an overall advantage of approximately 6.765% over the house.  The advantage is up to 21.5% for "player" bets and up to 5.5% for "banker" bets.

### C.     Ivey Plays Baccarat at Borgata

31.     In about April 2012, Ivey contacted Borgata to arrange a visit during which he intended to play Baccarat for high stakes.

32.     Because of his notoriety as a high-stakes gambler, and the amount of money he intended to gamble, Ivey was able to negotiate special arrangements to play Baccarat at Borgata.

33.     Ivey agreed to wire a "front money" deposit of $1 million to Borgata.

34.     The maximum bet was established at $50,000 per hand.

35.     At his request, Ivey was provided with a private area or "pit" in which to play.

36.     At his request, Ivey was provided with a casino dealer who spoke Mandarin Chinese.

37.     At his request, Ivey was permitted to have a guest sitting at the table while he played.

38.     At his request, Ivey was provided with one 8-deck shoe of purple Gemaco Borgata playing cards to be used for the entirety of each session of play.

39.     At Ivey's request, an automatic card shuffling device was used to shuffle the cards after each shoe was dealt.

40.     The pretext given for some of these requests was that Ivey was superstitious.

41.     Ivey misrepresented his motive, intention and purpose and did not communicate the true reason for his requests to Borgata at any relevant time.

42.     Ivey's true motive, intention, and purpose in negotiating these playing arrangements was to create a situation in which he could surreptitiously manipulate what he knew to be a defect in the playing cards in order to gain an unfair advantage over Borgata.

43.     At all relevant times, Borgata was not aware of the defect in the playing cards or Ivey's true motive for negotiating special arrangements.

44.     Ivey arrived at Borgata on or about April 11, 2012.

45.     Ivey played Baccarat for approximately 16 hours on April 11, 2012.

46.     During Ivey's Baccarat play on April 11, 2012 he purportedly won $2,416,000.

47.     During Ivey's Baccarat play on April 11, 2012, his average bet was $25,000.

48.     Borgata used purple Gemaco playing cards in all the Baccarat games played between Borgata and Ivey on April 11, 2012.

49.     Ivey was accompanied by Sun at the table while he played Baccarat.

50.     Sun spoke to the dealer in Mandarin Chinese.

51.     As explained below, Sun gave instructions to the dealer on how to flip over and lay the cards out on the table.

52.     It is not uncommon for Baccarat players to make special requests for how the cards are dealt based on individual superstitions.

53.     In "Macau" style dealing, for example, players are allowed to touch the cards, and often tear them, bend them, or blow on them.  This is permitted because a new deck is used for each hand.  Ivey's scheme did not require new decks for each hand.  In fact, his scheme depended on the same decks being shuffled and re-used.

54.     Borgata accommodated Sun's request for how cards were to be dealt.

55.     At no time did Sun or Ivey disclose the true purpose behind Sun's request for how the cards were to be dealt.

56.     As explained below, the true purpose of Sun's request was to manipulate a defect in the playing cards to gain an unfair advantage over Borgata.

57.     In May 2012, Ivey made a second trip to Borgata to play Baccarat.

58.     Prior to his second trip in May 2012, Ivey affirmatively requested the same arrangements as his first trip.

59.     Ivey again misrepresented his motive, intention and purpose and did not communicate to Borgata the true reason for the arrangements he requested for the May 2012 trip.

60.     Ivey's true motive, intention, and purpose in negotiating these playing arrangements for the second trip was to create a situation in which he could surreptitiously manipulate what he knew to be a defect in the playing cards in order to gain an unfair advantage over Borgata.

61.     Ivey played Baccarat on the second trip pursuant to the same arrangements he had negotiated for the trip in April 2012.

62.     Ivey arrived at Borgata on or about May 3, 2012.

63.     Ivey played Baccarat for approximately 56 hours during the May 2012 trip.

64.     During Ivey's Baccarat play in May 2012 he purportedly won $1,597,400.

65.     During Ivey's Baccarat play in May 2012, his average bet was $36,000.

66.     Borgata used purple Gemaco playing cards in all the Baccarat games played between Borgata and Ivey in May 2012.

67.     On the May 2012 trip, Ivey was again accompanied by Sun at the table while he played Baccarat.

8

68.     On the May 2012 trip, Sun again spoke to the dealer in Mandarin Chinese, giving him instructions on how to turn the cards as they were dealt.

69.     Borgata again accommodated Sun's request for how cards were to be dealt.

70.     At no time during the May 2012 trip did Sun or Ivey disclose the true purpose behind Sun's request for how the cards were to be dealt.

71.     The true purpose of Sun's request was to manipulate a defect in the playing cards to gain an unfair advantage over Borgata.

72.     In July 2012, Ivey made a third trip to Borgata to play Baccarat.

73.     Prior to the July 2012 trip, Ivey negotiated revised playing terms.

74.     Instead of making a $1 million "front money" deposit, Ivey increased his "front money" deposit to $3 million.

75.     By increasing his "front money" deposit, Ivey negotiated a raise in the maximum bet to $100,000 per hand.

76.     Ivey requested that all other arrangements he had negotiated for the trips in April 2012 and May 2012 remain the same.

77.     Ivey again misrepresented his motive, intention and purpose and did not communicate to Borgata the true reason for the arrangements he requested for the July 2012 trip.

78.     Having been successful during his first two trips, Ivey knew that he could surreptitiously manipulate what he knew to be a defect in the playing cards to gain an unfair advantage over Borgata.

79.     Ivey's true motive, intention, and purpose in negotiating these revised playing arrangements for the third trip was to create a situation in which he could make larger bets while surreptitiously manipulating what he knew to be a defect in the playing cards to gain an unfair advantage over Borgata.

80.     Ivey's requests were accommodated by Borgata.

81.     Ivey arrived at Borgata on or about July 26, 2012.

82.     Ivey played Baccarat for approximately 17 hours during the July 2012 trip.

83.     During Ivey's Baccarat play in July 2012 he purportedly won $4,787,700.

84.     During Ivey's Baccarat play in July 2012, his average bet was $89,000.

85.     Borgata used purple Gemaco playing cards in all the Baccarat games played between Borgata and Ivey in July 2012.

86.     On the July 2012 trip, Ivey was again accompanied by Sun at the table while he played Baccarat.

87.     On the July 2012 trip, Sun again spoke to the dealer in Mandarin Chinese, giving him instructions on how to turn the cards as they were dealt.

88.     Borgata again accommodated Sun's request for how cards were to be dealt.

89.     At no time during the July 2012 trip did Sun or Ivey disclose the true purpose behind Sun's request for how the cards were to be dealt.

90.     The true purpose of Sun's request was to manipulate a defect in the playing cards to gain an unfair advantage over Borgata.

91.     In October 2012, Ivey made a fourth trip to Borgata to play Baccarat.

92.     Ivey affirmatively requested the same betting and playing accommodations as his July 2012 trip.

93.     Ivey played Baccarat on the fourth trip pursuant to the same arrangements he had negotiated for the trip in July 2012.

94.     Ivey misrepresented his motive, intention and purpose and did not communicate to Borgata the true reason for the arrangements he requested for the October 2012 trip.

95.     Ivey's true motive, intention, and purpose in negotiating these playing arrangements for the fourth trip was to create a situation in which he could surreptitiously manipulate what he knew to be a defect in the playing cards in order to gain an unfair advantage over Borgata.

96.     Ivey arrived at Borgata on or about October 5, 2012.

97.     Ivey told Borgata's Executive Director of Relationship Marketing, Greg Kravitz, that he did not intend to play Baccarat until October 7, 2012 because he was tired from travel and had plans on October 6, 2012.

98.     Ivey did not begin playing Baccarat until October 7, 2012.

99.     Sun did not arrive at Borgata until the evening of October 6, 2012.

100.     On October 7, 2012, Borgata received a media report in which it was reported that a casino in London was withholding approximately £7.3 million in gambling winnings from Ivey.

101.     The October 7, 2012 report indicated that the casino, Crockfords, was investigating circumstances surrounding Ivey's playing Punto Banco, which is essentially the same game as Baccarat.

102.     The October 7, 2012 report did not elaborate on what Ivey was accused of doing.

103.     Ivey played Baccarat for 18 hours beginning October 7, 2012 and ending October 8, 2012.

104.     During Ivey's Baccarat play on October 7-8, 2012, he was ahead by as much as $3.5 million.

105.     During Ivey's Baccarat play on October 7-8, 2012 he eventually purportedly won $824,900.

106.     During Ivey's Baccarat play on October 7-8, 2012, his average bet was $93,800.

107.     Upon information and belief, Ivey intentionally lost a portion of his winnings at the end of the October 7-8, 2012 Baccarat session.

108.     Borgata used purple Gemaco playing cards in all the Baccarat games played between Borgata and Ivey on October 7-8, 2012.

109.     On the October 2012 trip, Ivey was again accompanied by Sun at the table while he played Baccarat.

110.     On the October 2012 trip, Sun again spoke to the dealer in Mandarin Chinese, giving him instructions on how to turn the cards as they were dealt.

111.     Borgata again accommodated Sun's request for how cards were to be dealt.

112.     At no time during the October 2012 trip did Sun or Ivey disclose the true purpose behind Sun's request for how the cards were to be dealt.

113.    The true purpose of Sun's request was to manipulate a defect in the playing cards to gain an unfair advantage over Borgata.

114.    At times during Ivey's four trips to Borgata in 2012 to play Baccarat, he requested that another dealer replace a dealer who did not understand the "good card" - "bad card" turns.

115.    After the Baccarat session ended on October 8, 2012, Ivey requested that his "front money" and winnings be wired to a bank account in Mexico.

116.    This was the same request he made with respect to his "front money" and winnings for the trips in April, May, and July 2012.

117.    Before Ivey left Borgata on October 8, 2012, its Executive Director of Relationship Marketing, Greg Kravitz, asked Ivey about the October 7, 2012 report on the Crockfords' incident.

118.    Ivey stated that he did not want to talk about it, that he was disgusted with the situation, that he had done nothing wrong, and that he was going to sue Crockfords to recover his winnings.

119.    Ivey asked Kravitz if anyone else at Borgata was aware of the Crockfords incident and was told that other employees were aware of the report.

120.    After Ivey left Borgata on October 8, 2012, additional information regarding the Crockfords' incident was disseminated via the internet.

121.    It was established that Crockfords was withholding Ivey's winnings because it believed Ivey and Sun perpetrated a scam involving the manipulation of cards to gain "first card knowledge."

122.    Ivey ultimately sued Crockfords in England to recover his winnings.

123.     The Ivey versus Crockfords case is ongoing in England.

124.     Ivey purportedly won a total of $9,626,000 playing Baccarat at Borgata between April 2012 and October 2012.

**D.     Edge Sorting – Borgata/Crockfords Scam**

125.     "Edge sorting" exploits manufacturing defects in playing cards in order to "mark" cards without the player actually touching, defacing, or placing a physical mark on the cards.

126.     The backs of casino playing cards generally contain a repeating diamond or geometrical pattern as seen in **Exhibit A**.

127.     If the cards are not cut symmetrically during the manufacturing process, the two long edges of the cards will not be identical.  In other words, one edge will have more of the geometrical pattern than the other.  *See* **Exhibit B**.

128.     During play, Ivey and Sun used the accommodations they requested from Borgata to "turn" strategically important cards so that they could be distinguished from all other cards in the deck.

129.     The dealer would first lift the card so that Sun could see its value before it was flipped over all the way and placed on the table.  If Sun told the dealer "Hao" (pronounced "how"), which translates to English as "good card," he was instructed to continue to flip the card over so that the orientation of the long edges of the card would stay on the same side when flipped.  In other words, the right edge of the card as seen by Sun before the card was turned all the way over would still be the right edge of the card as she looked at when it was laid face up on the table.

130.    If Sun told the dealer "Buhao" (pronounced "boohow"), which translates into English as "bad card," he was instructed to flip the card side to side, so that the long edges would be reversed when flipped.  In other words, the right edge of the card as seen by Sun before the card was turned all the way over would now be the left edge of the card as she looked at it when it was laid face up on the table.

131.    By telling the dealer "good card" or "bad card" in Mandarin, the dealer would place the cards on the table so that when the cards were cleared and put in the used card holder, the leading edges of the strategically important cards could be distinguished from the leading edges of the other cards in the deck.

132.    Upon information and belief Ivey and Sun "turned" the cards with values of 6, 7, 8, and 9, so that they could be distinguished from all other cards in the deck.

133.    The process of "edge sorting" all the cards in the decks took more than one shoe.

134.    Ivey and Sun knew that if an automatic card shuffler was used, the edges of the cards would remain facing in the same direction after they were shuffled.

135.    Conversely, Ivey and Sun knew that if the cards were shuffled by hand, the dealer would turn part of the deck, rendering their attempts to "turn" the strategically important cards useless.

136.    Keeping the edges of the cards facing the same direction is the reason Ivey requested the use of an automatic card shuffler.

137.    Ivey also knew that if the same cards were not reused for each shoe, there would be no benefit to "edge sorting."

138.    That is why Ivey requested that the same cards be reused for each shoe.

139.     The leading edge of the first card in the shoe is visible before the cards are dealt.

140.     Once the "edge sorting" was completed, Ivey and Sun were able to see the leading edge of the first card in the shoe before it was dealt, giving them "first card knowledge."

141.     If the first card in the shoe was turned, that meant a strategically important card was being dealt to the "player" hand, and Ivey would bet accordingly.

142.     If the first card in the shoe was not "turned," that meant that a less advantageous card was being dealt to the "player" hand, and Ivey would again bet accordingly.

143.     This "first card knowledge" changed the overall odds of the game from an approximate 1.06% house advantage to an approximately 6.765% advantage for Ivey.

144.     Ivey began each playing session with bets well below the maximum bet.

145.     Ivey bet below the maximum bet until he and Sun had completed "edge sorting" all the cards in the shoe.

146.     Once all the cards in the shoe were "edge sorted," Ivey "flatlined" at the maximum bet; i.e. he bet the maximum amount on every hand.

147.     A review of Ivey's betting pattern shows that once the cards were "edge sorted," when he bet on "player," the first card dealt was significantly more likely to be a strategically important card.

148.     Conversely, once the cards were "edge sorted," when Ivey bet on "banker," the first card dealt was significantly more likely to be a strategically unimportant card.

E.      **Ivey's Admissions**

149.     Ivey made similar playing accommodations and was able to use "edge sorting" to exploit defective playing cards at Crockfords casino in London on or about August 20-21, 2012.

150.     Crockfords withheld Ivey's purported winnings as a result of determining Ivey used "edge sorting."

151.     On July 5, 2013, Ivey sued Gentings Casinos UK Limited t/a Crockfords Club to recover the monies withheld from him on August 20-21, 2012.

152.     In its defense to the action, Crockfords specifically alleged Ivey's use of "edge sorting" by requesting the same playing accommodations he requested from Borgata.

153.     Both publicly and in his reply to Crockfords' defense, Ivey specifically admitted to "edge sorting."

154.     In his reply to Crockfords' defense, Ivey specifically admitted "[d]uring the course of play…Claimant [Ivey] employed a technique known as 'edge sorting' or sometimes 'playing the turn.'"

155.     In his reply to Crockfords' defense, Ivey further admitted "[d]uring the course of the second session on 20 August 2012, [Ivey] (as was his common practice) made various requests including for decks of cards to be changed at the end of hands…. This continued until [Sun] identified a deck or decks of cards where the pattern on the reverse side of the cards was asymmetrical (in that one "long" side was different from the opposite side)."

156.    In his reply to Crockfords' defense, Ivey further admitted "[t]his information allowed [Ivey and Sun] to 'edge sort' the deck or decks…."

157.    In his reply to Crockfords' defense, Ivey further admitted to "edge sorting" by

> [Sun's] asking the dealer…to reveal each card in turn by lifting the edge furthest from the dealer so that [Sun] could identify whether the card was a 7, 8, or 9 (being, in addition to 6, the key cards in Baccarat). The first time that [Sun] identified a key card, she told the dealer that it was a 'good' card which she wanted the dealer to rotate in the opposite direction to all of the other cards, and the dealer complied with that request. In this way, the long edges of the key card became distinguishable from those of the other cards. Thereafter, as the cards were lifted by the dealer, [Sun] would say "good" or "bad", and the dealer would turn the cards one way or the other accordingly.  In this way, over the course of time, the cards in the deck or decks were increasingly orientated so that "good" cards and "bad" cards faced in opposite directions.  The effect of the above was that when the first card was in the shoe before it was dealt and before [Ivey] had to place his bet, [Ivey] had an increased chance of knowing whether that card was (or was not) a key card and would bet accordingly.

158.    In his reply to Crockfords' defense, Ivey further admitted "[i]n order to maintain the advantage he had achieved, [Ivey], alternatively Ms. Sun, asked the dealer to retain the same deck or decks…."

159.    In his reply to Crockfords' defense, Ivey further admitted that he exploited his status as a "high roller" to make certain requests for special treatment, which were actually misrepresentations made to conceal his actual intent to manipulate the game, stating "the refusal to grant such requests creates a serious risk of deterring the very high rollers which the casinos…are anxious to attract."

**Count I**
**(Breach of Contract**
**against Defendants Ivey and Sun)**

160.     Plaintiff repeats the allegations contained in Paragraphs 1-159 as though set forth fully here.

161.     On each of the dates in question, as a condition of their wagering, Ivey and Sun explicitly agreed to abide and be bound by the rules set forth by New Jersey's Division of Gaming Enforcement ("DGE") pursuant to the authority granted to it by the New Jersey legislature.

162.     Borgata, by virtue of New Jersey law, expected that by meticulously following the rules and regulations controlling the conduct of its Baccarat games as intensively prescribed by the Act and DGE rules and regulations, that its game was fair under controlling law that mandates "fair odds" to patrons.

163.     Because of Ivey and Sun's misconduct, unfair play and the use of their influence as "high rollers" to deceive Borgata, Ivey and Sun succeeded in manipulating the Baccarat game to deprive the game of its essential element of chance.

164.     Because of Ivey and Sun's misconduct, unfair play and deception, the Baccarat games at issue did not present the legally required "fair odds" or those assumed attendant circumstances dictated by New Jersey law and regulations that would assure the fairness, integrity and vitality of the casino operation in process pursuant to *N.J.S.A. § 5:12-100(e)*.

165.     The Act further provides that "[i]t shall be unlawful knowingly to use or possess any marked cards." *N.J.S.A. § 5:12-115(b)*.

166.    The Act further provides that to "carry on" with or "expose for play" cards that are marked "in any manner" is expressly prohibited.  *N.J.S.A. § 5:12-115(a)(2)*.

167.    One each date in question, Ivey and Sun played Baccarat with cards that had been manipulated and "marked" so that their value was identifiable to Ivey and Sun before bets had to be placed and before the cards were dealt, in violation of *N.J.S.A. § 5:12-115*.

168.    In surreptitiously manipulating the edges of the playing cards, Ivey and Sun used the automatic card shuffler as a "cheating device" to ensure that the edges of the cards would remain facing the same direction after they were shuffled.   Although the automatic card shuffler is not originally designed, constructed, or programmed specifically for use in obtaining an advantage (it is intended to ensure the randomness of the shuffle), Ivey and Sun used the automatic card shuffler as an integral part of their "edge sorting" scheme, thus converting its use to that of a cheating device.

169.    The use of the automatic card shuffler as a cheating device is a violation of *N.J.S.A. § 5:12-113.1*, which makes it a crime to "use or assist another in the use of, a computerized, electronic, electrical or mechanical device which is designed, constructed, or programmed specifically for use in obtaining an advantage at playing any game in a licensed casino or simulcasting facility."

170.    Ivey also used Sun, whose ability to manipulate the orientation of the cards and then quickly and accurately identify their values later by reading the edges was integral to the fraudulent and dishonest scheme, as a cheating device in violation of *N.J.S.A. § 5:12-114*, which makes it a crime "[k]nowingly to use or possess any cheating device with intent to cheat or defraud."  *Id*.

171.   Each of Ivey and Sun's actions constitutes "swindling and cheating" under *N.J.S.A. § 5:12-115(a)*, which provides that "a person is guilty of swindling and cheating if the person purposely or knowingly by any trick… or by a fraud or fraudulent scheme…wins or attempts to win money or property…in connection to casino gambling."

172.   Borgata fully performed all covenants, conditions, and obligations required to be performed by reason of the contract, except to the extent waived, excused or made impossible by Ivey and Sun's breach of the contract.

173.   As a direct and proximate result of Ivey and Sun's breaches, Borgata was injured.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.     Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Defendants Ivey's and Sun's breaches of their contract with Borgata; and

ii.    The costs and attorneys' fees associated with this action; and

iii.   Such other and further relief as the Court deems just and proper.

**Count II**
**(Breach of Implied Contract**
**against Defendants Ivey and Sun)**

174.   Plaintiff repeats the allegations contained in Paragraphs 1-173 as though set forth fully here.

175.   A contract may be implied by the conduct of the parties to it.

176.    On each of the dates in question, Ivey negotiated specific conditions pursuant to which he would play Baccarat at Borgata.

177.    Each party intended that a contract be formed, and acted as though a contract had been formed.

178.    In exchange for honest play pursuant to the rules of the game, Ivey and Sun were permitted to wager on Baccarat.  When Ivey had the winning bet, it was understood Borgata would pay him at the established odds.  When Ivey had the losing bet, it was understood that he would surrender his bet to Borgata.  An implicit term of this contract was that Ivey would accept the inherent odds of the game, unadjusted by prior knowledge of the cards about to be played.

179.    By making affirmative misrepresentations to manipulate the playing conditions, Ivey and Sun were surreptitiously able to use "edge sorting" to identify strategically important cards before bets were placed and before the cards were dealt and their values revealed.

180.    These affirmative misrepresentations allowed Ivey and Sun to gain an unfair and significant advantage over Borgata.

181.    Borgata fully performed all covenants, conditions, and obligations required to be performed by reason of the contract, except to the extent waived, excused or made impossible by Ivey and sun's breach of the contract.

182.    Ivey and Sun's misrepresentations and "edge sorting" breached the implied contract between the parties.

183.    Ivey and Sun's conduct deprived the Baccarat game of its implied and material element of chance based on the inherent odds of the game for both player and casino without prior knowledge of the cards about to be played.

184.    Because of Ivey's and Sun's misconduct, unfair play and deception, the Baccarat games at issue did not present the legally required "fair odds" or those assumed attendant circumstances dictated by New Jersey statute and regulations that would assure the fairness, integrity and vitality of the casino operation in process pursuant to *N.J.S.A. § 5:12-100(e)*.

185.    Ivey and Sun further breached their implied contract with Borgata to abide by the rules of gaming set forth in the Act, specifically not to use cards that were marked "in any manner."

186.    As a result of Ivy's and Sun's breaches, Borgata was injured.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.      Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Defendants Ivey's and Sun's breaches of their implied contract with Borgata; and

ii.     The costs and attorneys' fees associated with this action; and

iii.    Such other and further relief as the Court deems just and proper.

**Count III**
**(Breach of Implied Covenant of Good Faith and Fair Dealing**
**against Defendants Ivey and Sun)**

187.     Plaintiff repeats the allegations contained in Paragraphs 1-186 as though set forth fully here.

188.     A contract or implied contract existed between Ivey, Sun and Borgata.

189.     The contract between Ivey, Sun and Borgata contained an implied covenant of good faith and fair dealing by and between the parties that prohibited them from engaging in any conduct that would prevent the other party from receiving the benefits to which it was entitled under the contract.

190.     With false pretense, Ivey and Sun surreptitiously used "edge sorting" to identify valuable cards before bets were placed and before the cards were dealt and their values revealed to gain a significant advantage over Borgata.

191.     Ivey and Sun also breached their agreement with Borgata to play by the requirements established by the Act and the DGE regulations promulgated thereunder.

192.     Ivey and Sun acted in bad faith and with the purpose of depriving Borgata of rights and/or benefits under the contract.

193.     Ivey's and Sun's actions breached the implied covenant of good faith and fair dealing.

194.     Borgata fully performed all covenants, conditions, and obligations required to be performed by reason of the contract, except to the extent waived, excused or made impossible by Ivey's and Sun's breaches of the contract.

195.     As a direct and proximate result of Ivey's and Sun's breaches of the implied covenant of good faith and fair dealing, Borgata was injured.

24

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.      Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Defendants Ivey's and Sun's breaches of the implied covenant of good faith and fair dealing; and

ii.     The costs and attorneys' fees associated with this action; and

iii.    Such other and further relief as the Court deems just and proper.

### Count IV
### (Fraudulent Inducement
### against Defendants Ivey and Sun)

196.    Plaintiff repeats the allegations contained in Paragraphs 1-195 as though set forth fully here.

197.    By commencing play, Ivey and Sun implicitly and intentionally misrepresented to Borgata that they intended to abide by the rules of honest play established and required by the Act and the DGE regulations promulgated thereunder.

198.    However, this was not true and was a misrepresentation of a material fact.

199.    Ivey and Sun intentionally misrepresented to Borgata the true reasons, motivation and purpose for the playing accommodations they sought, instead providing false and pretextual reasons to Borgata.

200.    With false pretense, Ivey and Sun surreptitiously used "edge sorting" to identify valuable cards before bets were made and before the cards were dealt and their values revealed to gain a significant advantage over Borgata.

201.    On each date in question, Ivey's and Sun's misrepresentations and failure to disclose their intent induced Borgata to allow Ivey and Sun to wager.

202.     Borgata reasonably, justifiably and detrimentally relied on the misrepresentations.

203.     Had Borgata known that the misrepresentations made by Ivey and Sun were false, misleading, and designed to induce Borgata to allow Ivey and Sun to wager, Borgata would not have permitted Ivey and Sun to wager.

204.     As a result of Borgata's reasonable and justifiable reliance on the material misstatements and omissions of Ivey and Sun, Borgata was injured.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

    i.     Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Defendants Ivey's and Sun's fraudulent inducement; and

    ii.     The costs and attorneys' fees associated with this action; and

    iii.     Such other and further relief as the Court deems just and proper.


**Count V**
**(Declaratory Judgment for Rescission based on Unilateral Mistake against Defendants Ivey and Sun)**

205.     Plaintiff repeats the allegations contained in Paragraphs 1-204 as though set forth fully here.

206.     On the dates in question, Ivey and Sun negotiated and mutually agreed with Borgata to a wagering agreement.  The purpose of the agreement was to engage in Baccarat as lawfully set forth by the Act and DGE rules and regulations.

26

207.    Ivey and Sun knew that "edge sorting," not the lawful wagering on Baccarat as set forth by New Jersey laws, was their true purpose.

208.    Ivey and Sun knew that the playing accommodations they requested were intended to create a situation in which the playing cards could be "edge sorted."

209.    Borgata mistakenly believed that Ivey and Sun intended to engage in the play of Baccarat as lawfully set forth in the Act and DGE rules and regulations.

210.    At the time Borgata agreed to play Baccarat with Ivey, Ivey and Sun knew of or suspected Borgata's mistake as to their true purpose.

211.    Borgata mistakenly believed that the playing accommodations requested by Ivey and Sun were made in good faith and not to create a situation in which the playing cards could be "edge sorted."

212.     At the time Borgata agreed to play Baccarat with Ivey, Ivey and Sun knew of or suspected Borgata's mistake as to the true purpose of the playing accommodations Ivey and Sun requested.

213.    Borgata's mistakes resulted from Ivey's and Sun's false misrepresentations to Borgata.

214.    Ivey and Sun knew their representations were false when made.

215.    Without the knowledge of the true facts and in reasonable and justifiable reliance on Ivey's and Sun's misrepresentations, Borgata was deceived into agreeing to a contract that differed materially from Borgata's understanding.

216.    As a result of Borgata's unilateral mistake, of which Ivey and Sun were aware, Borgata was injured.

**WHEREFORE**, Plaintiff demands declaratory judgment as follows:

i.  Rescinding the express and/or implied contract entered into among Ivey, Borgata, and Sun; and

ii.  Directing that Ivey and Sun return the parties to the *status quo ante* by disgorging the amount of $9,626,000 obtained pursuant to the illegal purpose of the express and/or implied agreement; and

iii.  The costs and attorneys' fees associated with this action; and

iv.  Such other and further relief as the Court deems just and proper.

### Count VI
### (Fraud
### against Defendants Ivey and Sun)

217. Plaintiff repeats the allegations contained in Paragraphs 1-216 as though set forth fully here.

218. Ivey and Sun used Ivey's influence as a professional high stakes gambler to deceive Borgata into accepting their misrepresentations and were able to manipulate the Baccarat game to deprive the game of its essential element of chance.

219. With false pretense, Ivey and Sun surreptitiously used "edge sorting" to identify valuable cards before bets were made and before the cards were dealt and their values revealed to gain a significant advantage over Borgata.

220. Ivey and Sun knew at the time that they made the misrepresentations and concealed the material facts alleged above that such misrepresentations were untrue and that Ivey and Sun were concealing material facts from Borgata.

221. Ivey and Sun acted with the intention to deceive and mislead Borgata, to fraudulently induce Borgata to permit them to wager and collect purported winnings.

222.    Borgata acted in reasonable and justifiable reliance on Ivey's and Sun's misrepresentations and material omissions.

223.    As a direct and proximate result of Ivey's and Sun's fraud, Borgata was injured.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.      Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Defendants Ivey's and Sun's fraud; and

ii.     The costs and attorneys' fees associated with this action; and

iii.    Such other and further relief as the Court deems just and proper.

## Count VII
## (Declaratory Judgment for Rescission based on Illegality of Purpose against Defendants Ivey and Sun)

224.    Plaintiff repeats the allegations contained in Paragraphs 1-223 as though set forth fully here.

225.    On the dates in question, Ivey and Sun were engaged in an unauthorized and illegal game, subject to rescission pursuant to *N.J.S.A. § 2A:16-52*.

226.    Borgata seeks a declaratory judgment that:

a.  The Baccarat games that Ivey and Sun engaged in at Borgata between April 2012 and October 2012 were illegal games pursuant to New Jersey law, and that any and all legal rights, interests and obligations purportedly generated thereby are rescinded as a matter of law; and

b.  Ivey and Sun secured purported winnings that are void as a matter of law; and

c.   The Parties shall be returned to the *status quo ante* given the illegality of Ivey's and Sun's use of a fraudulent scheme, marked cards, and cheating devices to gain a significant and unlawful advantage over Borgata.

**WHEREFORE**, Plaintiff demands declaratory judgment as follows:

i.   Rescinding the express and/or implied contract entered into among Ivey, Borgata, and Sun; and

ii.   Directing that Ivey and Sun return the parties to the *status quo ante* by disgorging the amount of $9,626,000 obtained pursuant to the illegal purpose of the express and/or implied agreement; and

iii.   The costs and attorneys' fees associated with this action; and

iv.   Such other and further relief as the Court deems just and proper.

### Count VIII
### (Unjust Enrichment
### against Defendants Ivey and Sun)

227.   Plaintiff repeats the allegations contained in Paragraphs 1-226 as though set forth fully here.

228.   In connection with the Baccarat games at issue, Ivey and Sun received $9,626,000.

229.   But for the foregoing misleading, deceptive and unfair conduct by Ivey and Sun, Borgata would not have permitted Ivey and Sun to wager or receive any proceeds from the Baccarat games at issue.

230.   Ivey and Sun have retained the money that they purportedly made through their misleading, deceptive and fraudulent conduct.

30

231.    As a result of the conduct described above, Ivey and Sun have been unjustly enriched at the expense of Borgata.

232.    Ivey and Sun's retention of that money violates fundamental principles of justice, equity and good conscience.

233.    Ivey and Sun should be required to disgorge all money, profits and gains that they have unjustly obtained at the expense of Borgata, and a constructive trust should be imposed thereon for the benefit of Borgata.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.      Damages in the amount of $9,626,000, representing the amount by which Defendants Ivey and Sun have been unjustly enriched at the Borgata's expense; and

ii.     The costs and attorneys' fees associated with this action; and

iii.    Such other and further relief as the Court deems just and proper.

**Count IX**
**(Conversion**
**against Defendants Ivey and Sun)**

234.    Plaintiff repeats the allegations contained in Paragraphs 1-233 as though set forth fully here.

235.    At all relevant times, Borgata had the right to possession of its casino gaming chips and other monetary instruments.

236.    By engaging in "edge sorting," Ivey and Sun intentionally interfered with Borgata's right to possession of its casino gaming chips and other monetary instruments

31

by wrongfully exercising dominion and control over such casino gaming chips and other monetary instruments.

237.    Ivey's and Sun's intentional interference with Borgata's right to possession of its casino gaming chips and other monetary instruments deprived Borgata of the possession or use of said casino gaming chips and other monetary instruments.

238.    As a direct and proximate result of Ivey's and Sun's intentional interference, Borgata sustained ascertainable economic damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.      Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Defendants Ivey and Sun's wrongful conversion of casino gaming chips and other monetary instruments of Borgata; and

ii.     The costs and attorneys' fees associated with this action; and

iii.    Such other and further relief as the Court deems just and proper.

**Count X**
**(Civil Conspiracy**
**against Defendants Ivey and Sun)**

239.    Plaintiff repeats the allegations contained in Paragraphs 1-238 as though set forth fully here.

240.    A civil conspiracy is an agreement by two or more person to commit a wrongful act.

241.    The agreement constituting a civil conspiracy may be made orally, in writing, or may be implied by the conduct of the parties.

242.     Prior to April 11, 2012, Ivey and Sun were each aware that "edge sorting" playing cards by fraud or fraudulent misrepresentations while playing Baccarat at Borgata was a wrongful act.

243.     Prior to April 11, 2012, Ivey and Sun were each aware that utilizing cheating devices while playing Baccarat at Borgata was a wrongful act.

244.     Ivey and Sun orally agreed and intended that the wrongful acts, including fraud, fraudulent misrepresentation, and the use of cheating devices be committed.

245.     Ivey and Sun agreed orally and/or in writing that the wrongful acts, including fraud, fraudulent misrepresentation, and the use of cheating devices be committed.

246.     By their conduct, it can fairly be implied that Ivey and Sun agreed that the wrongful acts, including fraud, fraudulent misrepresentation, and the use of cheating devices be committed.

247.     Ivey and Sun shared a common intent, plan or design in the preparation of the wrongful acts, including fraud, fraudulent misrepresentation, and the use of cheating devices.

248.     Ivey's and Sun's fraud, fraudulent misrepresentation, and the use of cheating devices furthered their conspiratorial agreement.

249.     As a direct and proximate result of Ivey's and Sun's conspiracy, Borgata was injured.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.  Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from the civil conspiracy entered into by Ivey and Sun to commit wrongful acts against Borgata; and

ii. The costs and attorneys' fees associated with this action; and

iii. Such other and further relief as the Court deems just and proper.

**Count XI**
**(Participation in a RICO Enterprise in**
**Violation of *18 U.S.C. §§ 1961* and *1962***
**against Defendants Ivey and Sun)**

250.  Plaintiff repeats the allegations contained in Paragraphs 1-249 as though set forth fully here.

251.  Ivey and Sun conducted and participated in the affairs of a RICO enterprise through a pattern of racketeering activity in violation of *18 U.S.C. §§ 1961* and *1962*.

252.  Ivey's and Sun's conduct of the activities that constituted "edge sorting," including but not limited to fraud, fraudulent misrepresentations, and the use of cheating devices, constituted an "enterprise" as defined by *18 U.S.C. §§ 1961* and *1962*.

253.  Ivey's and Sun's conduct of the activities that constituted "edge sorting" over the period from April 2012 through October 2012, including but not limited to fraud, fraudulent misrepresentations, and the use of cheating devices, constituted a pattern of activity because they were continuous, repeated, and related to racketeering activity.

254.     Ivey and Sun participated in a RICO enterprise in violation of Federal law when they transferred money that was the proceeds of their fraud against Borgata to a foreign bank account in Mexico, in violation of the Federal wire fraud and anti-money laundering statutes.

255.     By using the telephone and electronic communication to conduct "edge sorting," Ivey and Sun violated the Federal wire fraud statute, *18 U.S.C. § 1343*, which prohibits "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce."

256.     By transferring the proceeds of the conduct of their enterprise to Mexico via wire transfer, Ivey and Sun violated the Federal anti-money laundering statute, *18 U.S.C. § 1956(a)(1)(A)(i)*, which provides that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds or specified unlawful activity with the intent to promote the carrying on of specified unlawful activity" shall be in violation of the anti-money laundering statute.

257.     By transferring the proceeds of the conduct of their enterprise to Mexico via wire transfer, Ivey and Sun violated the Federal anti-money laundering statute which prohibits "transport[ing], transmit[ting], or transfer[ring], or attempt[ing] to transport, transmit or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or

through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity." *18 U.S.C. § 1956(a)(2)(A)*.

258.   As a direct and proximate result of Ivey and Sun's participation in a RICO enterprise, Borgata was injured.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.   Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from the racketeering enterprise conducted by Ivey and Sun; and

ii.   Treble damages; and

iii.   The costs and attorneys' fees associated with this action; and

iv.   Such other and further relief as the Court deems just and proper.

### Count XII
### (Participation in a RICO Enterprise in Violation of *N.J.S.A. 2C:41-1 et seq.* against Defendants Ivey and Sun)

259.   Plaintiff repeats the allegations contained in Paragraphs 1-258 as though set forth fully here.

260.   Ivey and Sun conducted and participated in the affairs of a RICO enterprise through a pattern of racketeering activity in violation of the New Jersey Racketeering Act, *N.J.S.A. 2C:41-2(c)*.

261.   Ivey's and Sun's conduct of the activities that constituted "edge sorting," including but not limited to fraud, fraudulent misrepresentations, and the use of cheating devices, constituted an "enterprise" as defined by *N.J.S.A. 2C:41-1 et seq.*

262.     The conduct of the "edge sorting" enterprise by Ivey and Sun affected trade or commerce because the enterprise generated significant proceeds, and those proceeds were transferred out of New Jersey and out of the United States.

263.     Both Ivey and Sun were associated with the "edge sorting" enterprise in that they devised and implemented the conduct of the enterprise.

264.     Both Ivey and Sun directly participated in the activities of the "edge sorting" enterprise by actually conducting the affairs of the enterprise.

265.     Both Ivey and Sun engaged in a pattern of racketeering activity by committing fraudulent practices, making fraudulent misrepresentations, and using cheating devices in a casino in violation of the Act.

266.     Both Ivey and Sun committed at least two acts of fraudulent practices, fraudulent misrepresentation, and/or the use of cheating devices in a casino over the period from April 2012 through October 2012.

267.     The two or more acts of fraud, fraudulent misrepresentation, and/or the use of cheating devices in a casino had the same purpose, result, participants, victim, and method of commission.

268.     The two or more acts of fraud, fraudulent misrepresentation, and/or the use of cheating devices in a casino were not isolated incidents, but were repeated over a period of at least seven months.

269.     As a direct and proximate result of Ivey's and Sun's participation in a RICO enterprise, Borgata sustained ascertainable economic damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants Ivey and Sun as follows:

i.      Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from the racketeering enterprise conducted by Ivey and Sun; and

ii.     Treble damages; and

iii.    The costs and attorneys' fees associated with this action; and

iv.    Such other and further relief as the Court deems just and proper.

## Count XIII
### (Breach of Contract against Defendant Gemaco)

270.     Plaintiff repeats the allegations contained in Paragraphs 1-269 as though set forth fully here.

271.     In or about October 2011, Gemaco and Borgata entered into a contract for "high quality" gaming cards that were suitable for Baccarat and compliant with the Act and the DGE regulations promulgated thereunder.

272.     The DGE regulations require that "[a]ll cards used to game at Baccarat shall be of backs of the same color and design." *N.J.A.C. § 13:69F-3.6*.

273.     Gemaco further agreed to provide cards that were "first grade quality," subject to individual and intensive inspection, free of any and all defects, and suitable for use in Borgata's gaming operations.

274.     On or about April 11, May 3, July 26, and October 7, 2012, Gemaco breached the agreement with Borgata by delivering defective and asymmetrical cards that

were unsuitable for Baccarat and noncompliant with the requirements set forth by the Act and the DGE regulations promulgated thereunder.

275.     Borgata fully performed all covenants, conditions, and obligations required to be performed by reason of the contract, except to the extent waived, excused or made impossible by Gemaco's breach of the contract.

276.     As a direct and proximate result of Gemaco's breach, Borgata sustained ascertainable economic damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gemaco as follows:

i.      Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Gemaco's breach of its contract with Borgata; and

ii.     The costs and attorneys' fees associated with this action; and

iii.    Such other and further relief as the Court deems just and proper.

**Count XIV**
**(Breach of Express Warranty**
**against Defendant Gemaco)**

277.     Plaintiff repeats the allegations contained in Paragraphs 1-276 as though set forth fully here.

278.     Pursuant to *N.J.S.A. § 12A:2-313(1)(a)* and *N.J.S.A. § 12A:32-313(1)(b)-(c)*, an express warranty may be created by a seller of goods by affirmation, promise, description or sample.

279.     Gemaco expressly warranted that the playing cards provided were "first grade quality," subject to individual and intensive inspection, free of any and all defects, and suitable for use in Borgata's gaming operations.

280.     On October 26, 2011, Borgata and Gemaco entered in to a "Playing Card Sale Contract" (the "Contract") whereby Borgata purchased a estimated total of 200,448 decks of gaming cards to be delivered by Gemaco to Borgata at monthly intervals.

281.     Gemaco warranted that "the goods covered by the Contract are merchantable and fit for their intended purpose and are also free from defects of material and workmanship."

282.     DGE regulations require that "[a]ll cards used to game at Baccarat shall be of backs of the same color and design."  *N.J.AC. § 13.69F-3.6.*

283.     The Contract provides that "Seller shall comply with any and all applicable requirements of the New Jersey Casino Control Act and the regulations promulgated thereunder."  *See* **Exhibit C**.

284.     Pursuant to the Contract, Gemaco did expressly warrant, covenant and affirm that the playing cards at issue were symmetrical, certified and ready for use in Borgata's Baccarat games as specifically ordered, intended and directed by New Jersey law.

285.     The express warranty, affirmations, promises, assurances and descriptions provided by Gemaco were the basis of the bargain for Borgata in purchasing the Gemaco products.

286.     Gemaco breached its express warranty to Borgata in that the goods were not in fact "first grade quality," free of any and all defects, or suitable for Baccarat.

287.     The playing cards supplied by Gemaco to Borgata were defective from the day they were sold and were patently unsuitable for use in Borgata's gaming operations.

288.     As a direct and proximate result of the failure of Gemaco to manufacture, symmetrically cut and inspect the playing cards as warranted, Borgata sustained ascertainable economic damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gemaco as follows:

     i.     Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Gemaco's breach of its express warranty; and

     ii.     The costs and attorneys' fees associated with this action; and

     iii.     Such other and further relief as the Court deems just and proper.

**Count XV**
**(Breach of Implied Warranty**
**against Defendant Gemaco)**

289.     Plaintiff repeats the allegations contained in Paragraphs 1-288 as though set forth fully here.

290.     Gemaco is a worldwide and purportedly first grade manufacturer and supplier of playing cards for Baccarat, all of which upon delivery were defective, not merchantable, and otherwise failed to conform to the promises and affirmations of Gemaco with regard to whether those playing cards were suitable for Baccarat and compliant with New Jersey statutes and regulations.

291.     Pursuant to *N.J.S.A. § 12A:2-315*, "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required

41

and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified…an implied warranty that the goods shall be fit for such purpose."

292.    DGE regulations require that "[a]ll cards used to game at Baccarat shall be of backs of the same color and design."  *N.J.A.C. § 13:69F-3.6.*

293.    Gemaco knew or should have known the precise nature and use of its product by Borgata pursuant to New Jersey law, rule and regulation, with which Gemaco agreed to be bound.

294.    Gemaco impliedly warranted to Borgata that the playing cards at issue were free of defects and were merchantable and fit for the ordinary purpose for which such goods are used, including Baccarat.

295.    Gemaco knew or should have known of the potential damages and losses that Borgata could incur by utilizing defective, asymmetrical, non-compliant playing cards.

296.    Borgata reasonably relied on the skill and judgment of Gemaco in using the aforesaid product.

297.    The playing cards supplied by Gemaco to Borgata were defective and did not comply with applicable New Jersey statutes or regulations.

298.    As a result, Gemaco breached the implied warranty that its playing cards would be fit for use by Borgata in its Baccarat games.

299.    Borgata has suffered ascertainable economic damages as a result of Gemaco's breach.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gemaco as follows:

    i.       Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Gemaco's breach of its implied warranty; and

    ii.      The costs and attorneys' fees associated with this action; and

    iii.     Such other and further relief as the Court deems just and proper.

**Count XVI**
**(Negligence**
**against Defendants Gemaco and Jane Doe)**

300.     Plaintiff repeats the allegations contained in Paragraphs 1-299 as though set forth fully here.

301.     Defendants Gemaco and Jane Doe were under a duty to exercise reasonable care in the manufacture and inspection of the playing cards at issue, and maintained at all relevant times the duty to properly manufacture and certify playing cards for use in Borgata's Baccarat games.

302.     Defendants Gemaco and Jane Doe knew or should have known the particular use to be made by Borgata of the playing cards, i.e., that the cards would be used for Baccarat, precisely as the product was intended.

303.     Defendants Gemaco and Jane Doe breached their duty to use reasonable care in the manufacture of the playing cards supplied by Gemaco to Borgata.

304.     Defendants Gemaco and Jane Doe breached their duty to use reasonable care in the inspection of the playing cards supplied by Gemaco to Borgata.

305.     As a result of Defendants Gemaco's and Jane Doe's negligence, defective playing cards were supplied by Gemaco to Borgata.

306.     Defendants Gemaco's and Jane Doe's negligent manufacture and inspection of the playing cards supplied by Gemaco to Borgata directly and proximately caused damages to Borgata.

307.     As a result of Defendants Gemaco's and Jane Doe's negligence, Borgata sustained ascertainable economic damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants Gemaco and Jane Doe as follows:

    i.      damages in the amount of $9,626,000, representing the amount of Borgata's loss caused by Defendants Gemaco's and Jane Doe's negligence; and

    ii.     The costs and attorneys' fees associated with this action; and

    iii.    Such other and further relief as the Court deems just and proper.

**Count XVII**
**(Respondeat Superior**
**against Defendant Gemaco)**

308.     Plaintiff repeats the allegations contained in Paragraphs 1-307 as though set forth fully here.

309.     Gemaco was at all relevant times the superior, employer, manager and superintendant of Jane Doe, and did at all relevant times maintain a duty to exercise reasonable care in the manufacture, inspection, certification and provisions of its gaming cards to Borgata.

310.     Gemaco knew at all relevant times of its legal obligations pursuant to New Jersey statutes and DGE rules and regulations to manufacture, inspect and certify the cards at issue were suitable for use in a casino for Baccarat.

311.     At all times, Jane Doe was acting within the scope of her employment by Gemaco.

312.     By failing to properly manufacture, inspect, and certify the playing cards delivered by Gemaco to Borgata, Jane Doe breached every duty of care owed to Borgata and violated applicable New Jersey statutes and regulations.

313.     As Jane Doe's employer, Gemaco is vicariously liable to Borgata for breaches of duty committed within the scope of Jane Doe's employment

314.     Jane Doe's breaches of her duty of care to Borgata directly and proximately caused Borgata to suffer significant economic damages.

315.     As a result, Gemaco is liable to Borgata for the damages caused by its employee Jane Doe.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gemaco as follows:

    i.     Damages in the amount of $9,626,000, representing the amount of Borgata's loss resulting from Gemaco's vicarious liability for the negligence of its employee; and

    ii.     The costs and attorneys' fees associated with this action; and

    iii.     Such other and further relief as the Court deems just and proper.

**Count XVIII**
**(Declaratory Judgment for Contribution and Indemnification**
**against Defendant Gemaco)**

316.     Plaintiff repeats the allegations contained in Paragraphs 1-315 as though set forth fully here.

317.     At all relevant times, Gemaco and Borgata had a contractual relationship by which Gemaco agreed to supply playing cards to Borgata for use in its casino.

318.     Gemaco breached the contract with Borgata by negligently failing to properly manufacture and inspect the cards at issue.

319.     Gemaco's breach of its contractual duties exposed Borgata to the loss it incurred playing Baccarat with Ivey and Sun.

320.     Borgata's loss was caused solely by Gemaco's breach of its contractual obligations to Borgata.

321.     Gemaco's negligent failure to properly cut and inspect the cards at issue resulted in Borgata's suffering actual losses in the amount of $9,626,000 in the form of purported winnings that Borgata paid to Ivey.

322.     Equity demands that the losses, including costs and attorneys' fees, sustained by Borgata to Ivey resulting from Gemaco's breach be borne by Gemaco.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gemaco as follows:

     i.     Declaring that Gemaco is liable to indemnify Borgata against any and all current or future losses, including costs and attorneys' fees,  resulting from Gemaco's negligent manufacture and inspection of the playing cards supplied to Borgata; and

46

ii.      Declaring that Gemaco is liable to reimburse Borgata for any and all

current or future losses, including costs and attorneys' fees, resulting from

Gemaco's negligent manufacture and inspection of the playing cards

supplied to Borgata;

iii.     Requiring Gemaco to reimburse Borgata in the amount of $9,626,000,

which has already been paid to Ivey.

iv.      The costs and attorneys' fees associated with this action; and

v.       Such other and further relief as the Court deems just and proper.

Dated: Hackensack, NJ
         April 23, 2014

s/Jeremy M. Klausner
Agostino & Associates, P.C.
*Attorneys for Plaintiff*
14 Washington Place
Hackensack, NJ 07601
(201) 488-5400
jklausner@agostinolaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARINA DISTRICT DEVELOPMENT CO.,
LLC d/b/a BORGATA HOTEL CASINO & SPA,

                     Plaintiff,

             v.

PHILLIP D. IVEY, JR., GEMACO INC.,
CHENG YIN SUN, and JANE DOE,

                     Defendants.

**VERIFICATION**

Civil Action No. 1:14-cv-02283
(NLH-AMD)

*Via ECF*

State of New Jersey  )
                  )ss.
County of Bergen    )

Joseph A. Corbo, Jr., being duly sworn, deposes and states the following:

1.     I am the Vice President and General Counsel of Plaintiff, and as such, I am familiar with the facts and circumstances recited in the attached Amended Complaint.

2.     I have read the foregoing Amended Complaint and know the contents thereof.

3.     The contents of the Amended Complaint are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

                                    Joseph A. Corbo, Jr.

Sworn to before me this 23 day of April 2014

MARGARET E. ELEVICH
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires May 11, 2018

# EXHIBIT A



# EXHIBIT B

"Large Design" – More of the circles are visible on this edge.

"Small Design" – Less of the circles are visible on this edge.



# EXHIBIT C



# GEMACO

# PLAYING CARD SALE CONTRACT

us multiple shipment paper

**DATE: October 26, 2011**

**BETWEEN**   Gemaco Inc.
2925 North 7 Highway
Blue Springs MO 64014

**"Seller"**

**AND**   Marina District Development Company, LLC
d/b/a Borgata Hotel Casino & Spa
1 Borgata Way
Atlantic City, NJ. 08401
**"Buyer"**

This Contract is for the purchase and sale of the following playing card product:

**PRODUCT:** standard paper decks
**PRICE:** $.76 per deck
$152,340.48 total price

**APPROX QUAN:** 200,448 decks
**PAYMENT:** Net thirty (30) days from invoice provided invoice is emailed to Buyer on date of invoice.  Otherwise, Buyer shall have thirty (30) days from receipt of invoice

**CARDS/DECK:** 55 cards

**FREIGHT:** FOB destination

Additional terms and specifications for the goods covered by this Contract are:

**SIZE:** 2.5X3.5   **FINISH:** Aqueous coated

**MATERIAL:** Traditional casino stock

**FACES:** Standard face, burgundy hearts/diamonds, Gemaco Ace of spades (2) Gemaco jokers.
Sentinel face, burgundy hearts/diamonds, Gemaco Ace of spades (2) Gemaco jokers.
Jumbo face, burgundy hearts/diamonds, Gemaco Ace of spades (2) Gemaco jokers.

**BACKS:** One (1) color Gemback pattern with approved Borgata logo in the following PMS colors: 266 Purple and 873 Gold.

**DECK PACKAGING:** Purple and gray individual window tuck box, one (1) seal, tearstrip cello wrap.

**SHIPPING CONFIGURATION:** 12 decks per inner pack, 144 decks per master carton; poly-wrapped and steel-banded on skid (PLEASE NOTE: shipment includes any over-runs pursuant to section 2 of Additional Terms and Conditions)

**SHIPPING SCHEDULE:**
**SHIPPING PERIOD:** one (1) year from date of first release
**FIRST RELEASE:** **December 5, 2011**

**RELEASE INTERVAL:** monthly
**RELEASE QUANTITY:** 16,704 decks
116 cases Sentinel

A ten percent (10%) surcharge, not to exceed five hundred dollars ($500.00), will apply to the full amount of any scheduled shipment impacted by a change in the release quantity or schedule requested by Buyer.  If Buyer inquires as to any such change, Seller will inform Buyer if the change will involve a surcharge so that Buyer may decide accordingly. Seller shall not charge surcharge if it does not incur additional cost directly related to the change.

**SHIPPING INSTRUCTIONS:** Direct to casino at above address using a shipper chosen by Seller unless otherwise directed by Buyer.

**Pre-Shuffled Multi-packs:** Pre-shuffled multi-packs available pending approval of New Jersey Division of Gaming Enforcement at $.84 per deck.

The **ADDITIONAL TERMS AND CONDITIONS** PLAYING CARD SALE CONTRACT attached hereto are incorporated by reference and made a part of this Contract.

IN WITNESS WHEREOF, the parties have executed this Contract as of the date shown above.

**GEMACO INC.**

By: _Paul O Dh_

Printed Name: _Paul Quin_

Title: _Executive VP_

**BUYER:** MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a Borgata Hotel Casino & Spa

By: _____

Printed Name: _Joe Lupo_

Title: _Sr VP - Ops_

_10 - 31 - 2011_



GEMACO

# ADDITIONAL TERMS AND CONDITIONS
## PLAYING CARD SALE CONTRACT

1.  <u>Playing Card Sale Contract.</u>  These additional terms and conditions, together with the Playing Card Sale Contract of which it is a part, constitute the "Contract" for all purposes hereunder.

2.  <u>Over-runs or Under-runs.</u>  A ten percent (10%) over-run or under-run is acceptable in fulfilling the terms of the Contract, and the purchase price hereunder shall be adjusted accordingly pursuant to the price per deck of playing cards.

3.  <u>Taxes.</u>  Buyer shall be responsible for any and all sales, use, excise or similar tax or fee imposed by any government, governmental agency or Native American tribe with respect to the manufacture, sale or use by Buyer of the goods under the Contract.

4.  <u>Payment Terms.</u>  If Buyer fails to make timely invoice payments, upon written notification to Buyer by Seller providing ten (10) days to cure, Seller may require prepayment for each shipment, suspend shipments and/or take other action allowed by law.  Buyer shall notify Seller of disputed invoices within ten (10) days of receipt of such invoice by Buyer.  If any payment owed to Seller is not paid when due, it shall bear interest at a rate of twelve percent (12%) per annum or, if lower, the maximum rate permitted by law, from the date on which it is due until it is paid.  Should Buyer's financial condition become unsatisfactory to Seller, cash payments or security satisfactory to Seller may be required by Seller prior to shipment or for future deliveries of goods under the Contract.  If such cash payment or security is not provided, in addition to Seller's other rights and remedies, Seller may discontinue deliveries. Buyer hereby grants Seller a security interest in all goods sold to Buyer by Seller, which security interest shall continue until all such goods are fully paid for in cash, and Buyer, upon Seller's demand, will execute and deliver to Seller such instruments as Seller reasonably requests to protect and perfect such security interest.

5.  <u>Release Schedule; Shipment and Delivery.</u>  If no other release schedule is specified in the Contract, the goods shall be shipped by Seller in equal monthly installments over the life of the Contract, starting sixty (60) days from the date of the Contract.  Notwithstanding any freight terms in this Contract to the contrary, risk of loss or damage shall pass from Seller to Buyer upon delivery to Buyer or to Buyer's designated location.  Apparent shortages or damages must be acknowledged and signed for within 24 hours of delivery.  Buyer shall inspect the goods delivered to it by Seller immediately upon receipt, and, any course of dealing to the contrary notwithstanding, failure of Buyer to give Seller notice of any claim within thirty (30) days after receipt of such goods shall be an unqualified acceptance of such goods.

6.  <u>Limited Warranty.</u>  Seller warrants that the goods covered by the Contract are merchantable and fit for their intended purpose and are also free from defects of material and workmanship and not subject to any lien or encumbrance of any kind or nature.  Seller's liability is limited to the replacement of the defective goods at no cost to Buyer or the refund of the purchase price for such defective goods, as Seller determines in its sole discretion, provided that Seller receives written notice of the specific defect(s) within ninety (90) days of Buyer's receipt of the goods for which the claim is asserted.  Except as specifically provided herein, there are no other warranties, express or implied.  In no event shall Seller be liable for loss of profits, indirect, incidental, special, consequential or other similar damages, including but not limited to business interruption, loss of revenue, gaming losses, fines, penalties, loss of use and injury or damage to persons or property arising out of any breach of or obligations under this Contract.

7.  <u>Regulatory Compliance.</u>  Seller represents and warrants that, if required by law, it is licensed by and in good standing with the gaming commission of the jurisdiction in which Buyer is located.  In the event of an increase after the date of this Contract in the license, investigation or other fees, costs or expenses associated with maintaining such license and good standing with the gaming commission of any Native American nation, Seller shall be entitled to reimbursement by Buyer of any such increase prior to shipment of any goods hereunder.  The parties shall perform all of their respective obligations under this Agreement in compliance with all applicable federal, state and local laws, ordinances, rules, regulations, codes or orders including without limitation all environmental and labor laws.  Without limiting the generality of the foregoing,

Buyer Initials

Seller Initials

masO10809

Seller shall comply with any and all applicable requirements of the New Jersey Casino Control Act and the regulations promulgated there under, including but not limited to, any licensing requirements imposed thereby. In the event of the failure of Seller to obtain and/or maintain any applicable licenses and/or in the event of disapproval by the New Jersey Casino Control Commission ("Commission") of this Agreement, this Agreement is subject to termination without liability to Buyer and Buyer shall also have the right to pursue at law compensation for damages it incurs resulting from such failure by Seller, including seeking reimbursement of any fines imposed by the Commission upon Buyer resulting from Seller's failure to abide by the Commission regulations in connection with this Agreement.

8.   Excuse of Performance.   Seller shall not be liable for delays in performance or for non-performance due to acts of God; war; fire; flood; weather; sabotage; strikes or labor disputes; civil disturbances or riots; governmental requests, restrictions, allocations, laws, regulations, orders or actions; unavailability of or delays in transportation; inability to secure materials; default or delay of suppliers; acts of Buyer; or unforeseen circumstances or any events or causes beyond Seller's reasonable control. Deliveries or other performance may be suspended for an appropriate period of time or canceled by Seller upon notice to Buyer in the event of any of the foregoing, but the balance of the sale shall otherwise remain unaffected as a result of the foregoing. If Seller determines that its ability to supply the total demand for the goods, or to obtain materials used directly or indirectly in the manufacture of the goods, is hindered, limited or made impracticable due to causes set forth in this paragraph, Seller may allocate its available supply of the goods (without obligation to acquire other supplies of any such goods or materials) among its purchasers as Seller determines in its sole discretion to be appropriate without liability for any failure of performance which may result therefrom.

9.   Change in Design.   Buyer acknowledges that Seller manufactures the goods in advance of the Release Schedule and may hold such goods in inventory. Buyer shall pay for all goods as to which Seller has started the manufacturing in the event of any agreed change to the design or other specifications for the goods.

10.   Other Disposition.   If Buyer fails or is unable to pay the purchase price for or to accept delivery of any goods produced pursuant to this Contract due to the bankruptcy or insolvency of Buyer, Seller shall have the right to sell or otherwise dispose of such goods in any manner deemed appropriate by Seller, notwithstanding the use of Buyer's name, logo and/or other proprietary information on such goods.

11.   Credit Balance Service Charges.   Seller shall charge Buyer an administrative service charge of twenty-five dollars ($25.00) per month to carry credit balances for Buyer after such balance has remained open for more than six (6) months after notice of such balance has been provided to Buyer; provided, however, in no event shall such service charge exceed the amount of such credit balance.

12.   Assignment.   Neither party may assign its rights or delegate its duties hereunder or any interest herein without the prior written consent of the other party, said consent not to be unreasonably withheld. Notwithstanding any provision herein to the contrary, either party may, without the prior written consent of the other party, assign this Contract to any entity that purchases all or substantially all of the assets or equity interest of the assigning party.

13.   Amendments.   The Contract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations and agreements, either written or oral between the parties regarding the subject matter hereof. The Contract may be amended only by written instrument signed by both parties hereto.

14.   Legal Fees.   In the event that any legal action of any nature, including but not limited to judicial and/or administrative proceedings, is filed by either party against the other party in relation to the Contract, the unsuccessful party in the action shall pay the prevailing party, in addition to all other sums the unsuccessful party may be required to pay, a reasonable sum for the prevailing party's attorneys' fees and other reasonable costs and expenses incurred in connection with the action or proceeding.

15.   Final Terms.   If the Contract contains terms that differ from or add to those contained in Buyer's request for proposal or purchase order, Seller hereby expressly conditions its acceptance of Buyer's offer on the Buyer's assent to the additional or different terms contained herein. Buyer's acceptance of any of the goods covered by the Contract shall constitute acceptance of the terms of the Contract as the only applicable terms and conditions governing this transaction.

Buyer Initials

Seller Initials

mas010809

16. <u>General Provisions.</u>  The Contract supersedes all other communications, negotiations and prior oral or written statements regarding the subject matter hereof.  No change, modification, rescission, discharge, abandonment or waiver of these terms and conditions shall be binding upon a party unless it is made in writing and signed on behalf of such party by a duly authorized representative.  No condition, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the Contract shall be binding unless it is hereafter made in writing and signed by the party to be bound.  No waiver by either party with respect to any breach or default or of any right or remedy and no course of dealing shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver is expressed in writing and signed by the party to be bound.

17. <u>Governing Law.</u>  This Agreement and all of the rights and obligations of the parties hereto and all of the terms and conditions hereof shall be construed in accordance with and governed by and enforced under the laws of the State of New Jersey (without giving effect to its conflict of laws principles).

18. <u>Venue.</u>  Any action to declare or enforce any rights or obligations under this Agreement shall be brought only before a court of competent jurisdiction in Atlantic County, New Jersey.  Seller hereby consents and submits to the jurisdiction of such courts for such purposes and agrees that any notice, complaint or other legal process delivered to Seller shall constitute adequate notice and service of process for all purposes and shall subject Seller to the jurisdiction of such courts for the purpose of adjudicating any matter relating to this Agreement.

19. <u>WAIVER OF JURY TRIAL.</u>  **BOTH PARTIES ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**