UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

MARINA DISTRICT DEVELOPMENT
CO., LLC doing business as
BORGATA HOTEL CASINO & SPA,         CIVIL NO. 14-2283(NLH/AMD)
        Plaintiff,

                                    **OPINION**

v.


PHILLIP D. IVEY, JR., GEMACO
INC., and CHENG YIN SUN,
Defendants.

---

**Appearances**:

JEREMY M. KLAUSNER
AGOSTINO & ASSOCIATES, PC
14 WASHINGTON PLACE
HACKENSACK, NJ 07601
        On behalf of plaintiff

JEFFREY W. MAZZOLA
LAW OFFICES OF WILLIAM E. STAEHLE
445 South Street
P.O. BOX 1938
MORRISTOWN, NJ 07962-1938
        On behalf of defendant Gemaco, Inc.

EDWIN JOSEPH JACOBS, JR.
MICHAEL F. MYERS
LOUIS M. BARBONE
ERIC H. LUBIN
JACOBS & BARBONE
1125 PACIFIC AVENUE
ATLANTIC CITY, NJ 08401
        On Behalf of defendants Phillip D. Ivey and Cheng Yin Sun

**HILLMAN**, District Judge

        This matter concerns the claims of plaintiff, Marina

District Development Co., LLC, which does business as Borgata

Hotel Casino & Spa in Atlantic City, New Jersey, against "high-

stakes" professional gamblers, defendants Phillip D. Ivey and Cheng Yin Sun, as well as playing card manufacturer, Gemaco, Inc.  The claims arise out of Ivey and Sun's alleged deceptive "edge sorting" scheme to manipulate the odds of the casino game Baccarat in their favor.  Presently before the Court is Ivey and Sun's motion to dismiss Borgata's claims against them.  For the reasons expressed below, defendants' motion will be denied.

## BACKGROUND

Borgata's detailed complaint sets forth the following background information and alleged facts.  In April 2012, Ivey contacted Borgata to arrange a visit to play high-stakes Baccarat.[1]  Ivey made five requests: (1) a private area or "pit"

---

[1] Borgata explains the rules of Baccarat in its complaint. (Docket No. 5 at ¶¶ 23-30.) Mini Baccarat ("Baccarat") is a game of chance in which the players bet on the relative value of two hands of two cards each before the hands are dealt or the cards are revealed.  One hand is referred to as the "player's" hand, the other is known as the "banker's" hand.  The "banker" is not the House, and the "player" does not refer to those playing the game.  Players are free to bet on either hand.  The object of Baccarat is to bet on the hand that will have a total value closest to nine (9).  Tens, face cards, and any cards that total ten are counted as zero.  All other cards are counted at face value.  The scores of hands range from 0 to 9.  Neither hand can "bust."  The game is generally played with six or eight decks of cards placed into a dealing "shoe."  Before the cards are dealt, the players must place one of three bets: "banker," "player," or "tie."  A bet on "banker" is a bet that the banker will hold the hand closest to nine.  A bet on "player" is a bet that the player will have the hand closest to nine.  A bet on "tie" is a bet that the two hands will be tied.  Two hands are then dealt from the shoe, one for the "player" and one for the "banker." The first card is dealt to the "player's" hand.  In certain circumstances, a third card may be dealt to either or both

in which to play; (2) a casino dealer who spoke Mandarin Chinese; (3) a guest (Ms. Sun) to sit with him at the table while he played; (4) one 8-deck shoe of purple Gemaco Borgata playing cards to be used for the entirety of each session of play; and (5) an automatic card shuffling device to be used to shuffle the cards after each shoe was dealt.  Borgata agreed to Ivey's requests.  In return, Ivey agreed to wire a "front money" deposit of $1 million to Borgata, and that the maximum bet would be $50,000 per hand.

Under these parameters, Ivey played 16 hours on April 11, 2012 and won $2,416,000, with his average bet of $25,000.  With the same terms, Ivey returned to Borgata in May 2012, and over the course of 56 hours of Baccarat play, Ivey won $1,597,400, with his average bet of $36,000.

In July 2012, Ivey again returned to Borgata to play

---

hands, depending on the score of the hands.  A winning bet on "banker" pays 19 to 20.  A winning bet on "player" pays even money.  A winning bet on "tie" pays 8 to 1.  The house advantage for Baccarat is approximately 1.06% on "banker" bets, 1.24% on "player" bets, and 4.84% on "tie" bets.  Based on mathematical probability, when the first card dealt to the "player" has a value of 6, 7, 8, or 9, the chances of the "player" hand winning are greatly increased.  Conversely, if the "player" hand's first card has a value of 10, 1 (Ace), 2, 3, or 4, the chances of the "banker" hand winning are greatly increased.  Thus, if a player knows the value of the first card in the shoe before it is dealt, the player can reverse the house advantage, and instead have a significant advantage over the house.  The player with this "first card knowledge" has an overall advantage of approximately 6.765% over the house.  The advantage is up to 21.5% for "player" bets and up to 5.5% for "banker" bets.

Baccarat with his same five requests, but this time he had prearranged to raise his front money to $3 million, and raise his maximum bet to $100,000 per hand.  Over the course of 17 hours of Baccarat play, Ivey won $4,787,700, with his average bet of $89,000.  Under these same terms, Ivey came back to Borgata in October 2012, and over the course of 18 hours, Ivey won $824,900 (after being up almost $3.5 million) with an average bet of $93,800.[2]  After each visit to Borgata, Ivey requested that his front money and winnings be wired to a bank account in Mexico.  Ivey's total winnings for his four visits to Borgata was $9,626,000.

During his last visit to Borgata on October 7, 2012, Borgata learned through a media report that a casino in London, Crockfords, was withholding £7.3 million won by Ivey playing Punto Banco, which is essentially the same game as Baccarat. After Ivey left Borgata on October 8, 2012, Borgata learned more about the Crockfords matter, and discovered that Ivey had made the same five requests to Crockfords as he did to Borgata. Borgata also discovered that Ivey and Sun committed what it considers to be an "edge sorting scam."

According to Borgata, as well as Ivey's own representations in his suit against Crockfords to recover his winnings as

---

[2] Borgata claims that Ivey intentionally lost a portion of his winnings during his October 2012 play.

described in Borgata's complaint in this case, the mechanics of "edge sorting" are as follows:

126. The backs of casino playing cards generally contain a repeating diamond or geometrical pattern as seen in Exhibit A.

127. If the cards are not cut symmetrically during the manufacturing process, the two long edges of the cards will not be identical. In other words, one edge will have more of the geometrical pattern than the other. See Exhibit B.

128. During play, Ivey and Sun used the accommodations they requested from Borgata to "turn" strategically important cards so that they could be distinguished from all other cards in the deck.

129. The dealer would first lift the card so that Sun could see its value before it was flipped over all the way and placed on the table. If Sun told the dealer "Hao" (pronounced "how"), which translates to English as "good card," he was instructed to continue to flip the card over so that the orientation of the long edges of the card would stay on the same side when flipped. In other words, the right edge of the card as seen by Sun before the card was turned all the way over would still be the right edge of the card as she looked at when it was laid face up on the table.

130. If Sun told the dealer "Buhao" (pronounced "boohow"), which translates into English as "bad card," he was instructed to flip the card side to side, so that the long edges would be reversed when flipped. In other words, the right edge of the card as seen by Sun before the card was turned all the way over would now be the left edge of the card as she looked at it when it was laid face up on the table.

131. By telling the dealer "good card" or "bad card" in Mandarin, the dealer would place the cards on the table so that when the cards were cleared and put in the used card holder, the leading edges of the strategically important cards could be distinguished from the leading edges of the other cards in the deck.

132. Upon information and belief Ivey and Sun "turned" the cards with values of 6, 7, 8, and 9, so that they could be distinguished from all other cards in the deck.

133. The process of "edge sorting" all the cards in the decks took more than one shoe.

134. Ivey and Sun knew that if an automatic card shuffler was used, the edges of the cards would remain facing in the same direction after they were shuffled.

135. Conversely, Ivey and Sun knew that if the cards were shuffled by hand, the dealer would turn part of the deck, rendering their attempts to "turn" the strategically important cards useless.

136. Keeping the edges of the cards facing the same direction is the reason Ivey requested the use of an automatic card shuffler.

137. Ivey also knew that if the same cards were not reused for each shoe, there would be no benefit to "edge sorting."

138. That is why Ivey requested that the same cards be reused for each shoe.

139. The leading edge of the first card in the shoe is visible before the cards are dealt.

140. Once the "edge sorting" was completed, Ivey and Sun were able to see the leading edge of the first card in the shoe before it was dealt, giving them "first card knowledge."

141. If the first card in the shoe was turned, that meant a strategically important card was being dealt to the "player" hand, and Ivey would bet accordingly.

142. If the first card in the shoe was not "turned," that meant that a less advantageous card was being dealt to the "player" hand, and Ivey would again bet accordingly.

143. This "first card knowledge" changed the overall odds of the game from an approximate 1.06% house advantage

to an approximately 6.765% advantage for Ivey.

144. Ivey began each playing session with bets well below the maximum bet.

145. Ivey bet below the maximum bet until he and Sun had completed "edge sorting" all the cards in the shoe.

146. Once all the cards in the shoe were "edge sorted," Ivey "flatlined" at the maximum bet; i.e. he bet the maximum amount on every hand.

147. A review of Ivey's betting pattern shows that once the cards were "edge sorted," when he bet on "player," the first card dealt was significantly more likely to be a strategically important card.

148. Conversely, once the cards were "edge sorted," when Ivey bet on "banker," the first card dealt was significantly more likely to be a strategically unimportant card.

(Amend. Compl., Docket No. 5 at ¶¶ 126-148.)

By way of this alleged "edge sorting scam," Borgata claims that "Ivey's true motive, intention, and purpose in negotiating these playing arrangements was to create a situation in which he could surreptitiously manipulate what he knew to be a defect in the playing cards in order to gain an unfair advantage over Borgata." (Amend. Compl. Docket No. 5 at ¶ 42.) As a result, Borgata has filed a complaint against Ivey and Sun for breach of contract, fraud, conspiracy, and RICO violations, among other related claims.[3]

---

[3] Borgata has lodged several claims against Gameco, including breach of contract, breach of warranty, and indemnification. Gemaco filed its answer to Borgata's complaint, and no motions are pending related to Borgata's claims against Gemaco.

Ivey and Sun have moved to dismiss all of Borgata's claims against them.  Borgata has opposed their motion.

## DISCUSSION

### A.    Subject Matter Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  Borgata is a limited liability company.  The members of Borgata are Boyd Atlantic City, Inc. and MAC Corp., both corporations organized and existing pursuant to the laws of the State of New Jersey, with their principal places of business in New Jersey.  Defendants Ivey and Sun are citizens of the State of Nevada, and defendant Gemaco is a corporation organized and existing pursuant to the laws of the State of Missouri, with its principal place of business in Blue Springs, Missouri.

### B.    Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is

8

entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. Bogosian v. Gulf Oil Corp., 562 F.2d 434, 446 (3d Cir. 1977). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3 (1984) (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" Bell Atlantic v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before Twombly.").

Following the Twombly/Iqbal standard, the Third Circuit has instructed a two-part analysis in reviewing a complaint under

Rule 12(b)(6).  First, the factual and legal elements of a claim should be separated; a district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Fowler, 578 F.3d at 210 (citing Iqbal, 129 S. Ct. at 1950).  Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" Id. (quoting Iqbal, 129 S. Ct. at 1950).  A complaint must do more than allege the plaintiff's entitlement to relief.  Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (stating that the "Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element").

    A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).  The defendant bears the burden of showing that no claim has been presented.  Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v. Fidelcor,

10

Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).

Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. Fed. R. Civ. P. 12(b).

## C.  Analysis

As an overall response to Borgata's claims, Ivey and Sun maintain,

> The *sine qua non* of plaintiff's theory is that Ivey was possessed of superior knowledge at the time he negotiated the special conditions encouraged and offered by the plaintiff. Specifically that Ivey knew that the backs of Borgata's purple playing cards sometimes contained asymmetrical patterns that could be distinguished. It is the idiosyncratic acumen of Ivey in that keen visual detection that plaintiff claims constitutes illegal conduct. Plaintiff's Complaint belies its own imaginative pleading.  It was Borgata, and only the Borgata, that produced, possessed and maintained absolute control over all of the implements of gambling, from the cards to the shoe to the automatic shuffler at all times while defendant

Ivey remained on its property.  In sum, Ivey's subjective
intent, the use of nothing more than his eyesight and his
reliance upon information that was equally available to
every single casino customer, in no way equates with the
*actus* and *mens rea* required to accomplish any of the
multiple criminal statutes upon which plaintiff relies.
After recruiting, enticing and providing defendant Ivey
with the precise gambling environment it agreed to, Borgata
seeks to take it all back because Ivey saw precisely what
anyone of its pit supervisors or employees apparently
should have seen over the course of more than 100 hours of
play.  Borgata's Complaint is therefore nothing more than
an attempt to justify its own negligence, motivated by its
subjective intent to take as much money from Phil Ivey as
it could during his specially arranged and agreed visits.

(Def. Opp. Br., Docket No. 10 at 5-6.)

More specifically, Ivey and Sun have moved to dismiss
Borgata's claims against them on three bases.  First, Ivey and
Sun argue that Borgata's claims are predicated on violations of
the New Jersey Casino Control Act ("CCA"), N.J.S.A. 5:12-1, et
seq., and that no private cause of action exists under the CCA
for Borgata's claims against them.  Second, Ivey and Sun argue
that if Borgata's claim that they played an "illegal game" is
credited, Borgata was required to file their suit within six
months of its payment to Ivey and Sun of their winnings
resulting from the "illegal game," and Borgata failed to do so.
Third, Ivey and Sun argue that Borgata's RICO claims fail
because Ivey and Sun did not commit any predicate or fraudulent
acts.

In response, Borgata argues that the CCA only precludes
casino patrons' claims against casinos, but not casinos' claims

12

against patrons.  Borgata also argues that the defendants are
mischaracterizing the nature of the amended complaint by viewing
Borgata's claims as an attempt to enforce the CCA and related
regulations.  Instead, Borgata argues that the alleged conduct
by Ivey and Sun may have violated the CCA, but those violations
also demonstrate fraudulent conduct which supports its common
law contract and fraud claims, and its case does not depend on
the application of the CCA.

     With regard to the six-month limitations period raised by
the defendants, Borgata argues that it is not the illegality of
the game that it is alleging, but Ivey and Sun's "illegality of
purpose" in playing an otherwise lawful game.  As for its RICO
claims, advanced under federal and state law, Borgata argues
that it has pleaded the requisite predicate acts, including Ivey
and Sun's scheme to commit fraud, as well as their
communications with Borgata via telephone and email.[4]

---

[4] Borgata also requests that the Court afford res judicata effect
to the decision of the English court in the Crockfords matter.
There, Ivey filed suit against the Crockfords Club in London for
his £7.7 million in gambling winnings Crockfords refused to pay
Ivey.  In a game almost identical to Baccarat, Ivey admittedly
used the same "edge-carding" technique as alleged in Borgata's
case here.  Crockfords argued that Ivey was not entitled to his
winnings on three bases: (1) the game, Punto Banco, was not
actually played by Ivey because he knew the first card dealt
when it was supposed to be random and unknown, (2) there was an
implied term that Ivey would not cheat and that term was broken,
and (3) Ivey violated the Gambling Act by cheating, and he
cannot base his claim against Crockfords on his own criminal
conduct.  The judge rejected the first defense, finding that

**1. Borgata's Claims for Breach of Contract (Count I), Breach of Implied Contract (Count II), and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)**

To support its breach of contract and related claims, Borgata makes these allegations:

161. On each of the dates in question, as a condition of their wagering, Ivey and Sun explicitly agreed to abide and be bound by the rules set forth by New Jersey's Division of Gaming Enforcement ("DGE") pursuant to the authority granted to it by the New Jersey legislature.

---

Punto Banco was indeed played. For the second and third defense, the judge noted that there was no case law on what amounts to cheating, and that the criminal laws provided little guidance. The judge also noted that in the civil context there was "no general agreement as to what one might term the industry standard of cheating or not cheating," and that it was ultimately for the judge to decide whether certain conduct amounted to cheating. The judge observed that Ivey was "genuinely convinced that he is not a cheat and even [] that opinion commands considerable support from others." The judge ultimately concluded, however, that Ivey's conduct was "cheating" for the purposes of civil law, because, among other reasons, he manipulated the innocent dealer, gave himself an advantage throughout the whole game, unlike a card-counter who only gains advantage towards the end, and he knew the dealer and the casino management were unaware of the consequences of his instigation. The judge concluded by stating it was unnecessary to resolve whether Ivey's conduct was criminal in nature. (See Ex. A, Docket No. 23, Ivey v. Genting Casinos UK Limited t/a Crockfords Club, (2014 EWHC 3394 (QB).)

The Court cannot give the Crockfords case preclusive effect because not only does it fail to meet the standards for res judicata principles, see Watkins v. Resorts Int'l Hotel & Casino, Inc., 591 A.2d 592, 599 (N.J. 1991); United States v. Athlone Indus., Inc., 746 F.2d 977, 983 (3d Cir. 1984), the judge in Crockfords was tasked to determine whether Ivey's conduct amounted to "cheating" under English common law, which is a different standard than the one applicable here, where the concept of cheating falls under the purview of the CCA and U.S. common law and statutes.

162. Borgata, by virtue of New Jersey law, expected that by meticulously following the rules and regulations controlling the conduct of its Baccarat games as intensively prescribed by the Act and DGE rules and regulations, that its game was fair under controlling law that mandates "fair odds" to patrons.

163. Because of Ivey and Sun's misconduct, unfair play and the use of their influence as "high rollers" to deceive Borgata, Ivey and Sun succeeded in manipulating the Baccarat game to deprive the game of its essential element of chance.

164. Because of Ivey and Sun's misconduct, unfair play and deception, the Baccarat games at issue did not present the legally required "fair odds" or those assumed attendant circumstances dictated by New Jersey law and regulations that would assure the fairness, integrity and vitality of the casino operation in process pursuant to N.J.S.A. 5:12-100(e).

(Amend. Compl. ¶¶ 161-164.)

Borgata also claims that Ivey and Sun's actions violated N.J.S.A. 5:12-115(b) ("It shall be unlawful knowingly to use or possess any marked cards."); N.J.S.A. 5:12-115(a)(2) (to "carry on" with or "expose for play" cards that are marked "in any manner" is expressly prohibited); N.J.S.A. 5:12-113.1 (making it a crime to "use or assist another in the use of, a computerized, electronic, electrical or mechanical device which is designed, constructed, or programmed specifically for use in obtaining an advantage at playing any game in a licensed casino or simulcasting facility"); N.J.S.A. 5:12-114 (a crime "[k]nowingly to use or possess any cheating device with intent to cheat or defraud"); and N.J.S.A. 5:12-115(a) (providing that "a person is

15

guilty of swindling and cheating if the person purposely or knowingly by any trick . . . or by a fraud or fraudulent scheme . . . wins or attempts to win money or property . . . in connection to casino gambling"). (Amend. Compl. ¶¶ 165-171.)

Ultimately, Borgata claims that it "fully performed all covenants, conditions, and obligations required to be performed by reason of the contract, except to the extent waived, excused or made impossible by Ivey and Sun's breach of the contract," and that as "a direct and proximate result of Ivey and Sun's breaches, Borgata was injured" in the amount of $9,626,000, plus attorneys' fees and costs.

It appears to the Court that Borgata's breach of contract claim is that by Ivey and Sun playing Baccarat at Borgata, Borgata agreed to fulfill its obligations to provide a gaming experience in compliance with the CCA, and Ivey and Sun agreed to play the game in compliance with the CCA. Because Borgata complied with the CCA, while Ivey and Sun did not, Ivey and Sun breached their agreement with Borgata.

The parties do not dispute that gambling is illegal, except in very specific, highly regulated circumstances as detailed by the CCA. See Miller v. Zoby, 595 A.2d 1104, 1109 (N.J. Super. App. Div. 1991) (citing N.J.S.A. 2A:40-1 ("All wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown

16

or contingent event, shall be unlawful."); N.J.S.A 5:12-124

("The provisions of N.J.S. 2A:40-1 shall not apply to any person

who, as a licensee operating pursuant to the provisions of this

act, or as a player in any game authorized pursuant to the

provisions of this act, engages in gaming as authorized

herein.")); Lomonaco v. Sands Hotel Casino and Country Club, 614

A.2d 634, 635 (N.J. Super. Law Div. 1992)(quoting Knight v.

Margate, 431 A.2d 833 (N.J. 1981)) ("[T]he Casino Control Act

was enacted by the legislature in 1977 ( L.1977, c. 110,

N.J.S.A. 5:12-1 to 152) to authorize casino gaming and establish

the regulatory framework for the casino industry.  The Statutory

and administrative controls over casino operations established

by the Act are extraordinarily pervasive and intensive. . . .

Over 11 statutory articles and almost 200 separate provisions

cover virtually every facet of casino gambling and its potential

impact upon the public.  The regulatory scheme is both

comprehensive and minutely elaborate.").  Thus, the only way

gambling at a casino is lawful is if the patrons and the casino

follow the strictures of the CCA.  It follows then that

contractual agreements, whether express or implied, governing

casino gambling in New Jersey include a provision that both

parties agree to abide by the CCA.

Assuming the validity of the casino/patron contract to

follow the CCA, the question becomes what law governs the breach

17

of that agreement.  Borgata argues that a patron cannot file a
civil suit against a casino if the casino violates the CCA, but
that the casino can file suit against a patron if the patron
violates the CCA.  Conversely, Ivey and Sun argue that the
claims asserted by Borgata against them are preempted by the
CCA, and that there is no support in the law that a casino can
sue a patron, but a patron cannot sue a casino for CCA
violations.  Borgata ultimately side-steps this conflicting
point of view, however, and argues that it is not seeking relief
for Ivey and Sun's CCA violations, but rather for their breach
of the promise not to commit CCA violations.[5]

---

[5] While, as we note _infra_, the CCA does not create a private
right of action, it is also clear that the CCA does not preempt
all common law claims, because certain private causes of action
may still be advanced by patrons or casinos, depending on the
nature of those claims. Lomonaco v. Sands Hotel Casino and
Country Club, 614 A.2d 634, 638 (N.J. Super. Law Div. 1992)
(allowing an action by a patron against a casino to declare the
credit contract he entered into with the casino for $285,000.00
in casino markers void based on the common law contractual
defenses of duress and unconscionability, and finding that
N.J.S.A. 5:12-101 does not abrogate the common law defenses to
contract actions); Smerling v. Harrah's Entertainment, Inc., 912
A.2d 168, 173 (N.J. Super. App. Div. 2006) (citing Campione v.
Adamar of N.J., 714 A.2d 299 (N.J. 1998)) (explaining that
highly technical areas of the rules of either casino games,
casino gaming equipment, or gaming-related advertising, which
are the subject of comprehensive regulation by the CCC, N.J.S.A.
5:12-69, -70(f), -70( o), fall within the special expertise of
the agency, but "[e]ven in the context of New Jersey's highly
regulated casino industry, the Court has held that the
Legislature did not intend to prevent patrons from seeking
vindication of common-law claims in the courts"). Although the
cases cited are patron as plaintiffs cases we see no reason why
casinos should lose all their common rights simply because they

18

The question then becomes how did Ivey and Sun break their promise?  Accepting as true Borgata's claims, Ivey made five requests of Borgata - (1) a private pit, (2) a Mandarin Chinese-speaking dealer, (3) Ms. Sun to sit with him at the table, (4) one 8-deck shoe of purple Gemaco Borgata playing cards, and (5) an automatic card shuffling device - and Sun asked the dealer to turn certain cards revealing their face value, under the premise that they were superstitious.  Ivey and Sun's claims to be superstitious, however, were false, and the true purpose of the five requests and the turning of cards was to facilitate "edge sorting," which altered the normal odds of the game.  Borgata claims that Ivey and Sun's misrepresentation of their purpose is the breach of their promise to play by the established rules and odds of the game.

An establishment engaging patrons in gambling activities, such as Baccarat, is illegal under the common law.  An establishment and a patron cannot enter into an agreement to promise to abide by the rules and odds of an unlawful gambling activity, and one party cannot file suit against the other for breaching that agreement if one party does not abide by the

---

engage in a regulated industry.  For example, as we also discuss more fully infra, we do not believe the New Jersey legislature intended that casinos could be victimized by fraud and thereafter bar them, indirectly, from seeking redress in the courts, even if the fraud arose in the context of a regulated game the rules of which are designed by state regulation.

rules of the game or alters the odds.[6]  The CCA makes this unlawful gambling activity lawful, but the CCA does not create a common law cause of action that does not otherwise exist.  See Campione v. Adamar of New Jersey, Inc., 714 A.2d 299, 309 (N.J. 1998) (citation omitted) ("Given the elaborate regulatory scheme [of the casino industry], we likewise decline to imply a cause of action when no such cause of action exists at common law.").

Borgata contends that its claims against Ivey and Sun do not depend on the determination of whether their actions violated provisions of the CCA.  If, however, it cannot be found that Ivey and Sun's actions violated the CCA, how can it be found that they violated their promise not to violate the CCA? For example, Borgata claims that Ivey and Sun promised to abide by the CCA, and, as specified in its breach of contract claim, not to violate N.J.S.A. 5:12-115(a), which finds that "a person is guilty of swindling and cheating if the person purposely or knowingly by any trick . . . or by a fraud or fraudulent scheme

---

[6] If a party engages in illegal gambling and loses money, the losing party may file a civil action within six months to recover for that loss.  See N.J.S.A. 2A:40-1 ("All wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, shall be unlawful."); N.J.S.A. 2A:40-5 (explaining that if a person loses money pursuant to a violation of N.J.S.A. 2A:40-1, that person may bring a civil action to recover those losses, but he must do so within six months).  There is no statutory or common law cause of action for a breach of an agreement to abide by the rules of an illegal gambling activity.

. . . wins or attempts to win money or property . . . in connection to casino gambling." Thus, Borgata is asking the Court to determine as a matter of law whether Ivey and Sun breached their promise to follow the CCA because their actions constituted "swindling and cheating" as defined by the CCA.

The New Jersey Supreme Court has instructed that a court should not make that determination, because to do so would affect the stability of the casino industry. In Campione, the New Jersey Supreme Court observed that the New Jersey Legislature "intended to invest the CCC with primary jurisdiction to regulate the casino industry," and that the "elaborate legislative and administrative system for regulating casinos suggests [] that the [Casino Control Commission] should exercise primary jurisdiction over issues concerning the interpretation and application of the Act and the regulations." Campione, 714 A.2d at 308. The court directed that "to the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity to provide that interpretation." Id. This is because "[r]etaining primary jurisdiction in the courts could dislocate the intricate regulatory structure governing a sensitive industry," and "[p]ermitting courts and juries across the State to interpret statutory and administrative regulations could introduce

21

confusion where uniformity is needed." <u>Id.</u>  In order to achieve the necessary stability in the interpretations of the CCA, the New Jersey Supreme Court instructed that a court may retain jurisdiction over the dispute, but it should defer action until receipt of the CCC's or DGE's views.[7] <u>Id.</u>

Even though Borgata pleads a claim for breach of contract, rather than a private cause of action for violations of the CCA, Borgata's claim is actually just that – a claim that Ivey and Sun committed various violations of the CCA and they are therefore not entitled to their gambling winnings. Consequently, although the CCA does not explicitly preempt Borgata's breach of contract claims against Ivey and Sun, it appears to the Court that the CCC or the DGE should consider in the first instance whether Ivey and Sun's actions violated any provisions of the CCA.[8]

---

[7] According to the Division of Gaming Enforcement website, the Regulatory Enforcement and Regulatory Prosecutions Bureaus are responsible for enforcing the laws of the Casino Control Act (the Act) and the CCC Rules and Regulations (Regulations) including the rules of the games, gaming equipment, patron complaints, and other matters related to the daily operation of the casino. The Bureaus investigate and prosecute violations of the Act and Regulations. <u>See</u> http://www.nj.gov/oag/ge/mission&duties.htm.

[8] A recent New Jersey Superior Court decision recognizes the importance of the CCC or DGE interpreting the CCA, while it also recognizes that when the CCC or DGE declines to interpret the CCA, a court must make that determination. <u>Golden Nugget v. Gemaco, Inc.</u>, ATL-L-5000-12 (N.J. Super. Ct. Law Div. Feb. 9, 2015) (finding that because after two and half years, the DGE investigation resulted in no enforcement and the CCC declined to

Borgata, however, has filed a motion for leave to file a sur reply to address defendants' statement in their reply brief regarding whether Borgata brought its concerns about Ivey and Sun to the DGE, and Borgata indicates that it reported defendants' alleged conduct to the DGE, but Borgata does not provide any other information on what transpired, if anything, before the DGE.  Thus, the Court will deny Borgata's motion as a procedural matter, but the Court will order Borgata to show cause as to why the Court should not administratively terminate Borgata's breach of contract and related claims against Ivey and Sun, and refer the matter to the appropriate administrative body as directed New Jersey Supreme Court in order to "assure the resolution of the controversy consistent with the views of the entity best positioned to consider the matter."  Campione, 714 A.2d at 308.

---

take any action, the court would determine whether a baccarat game played with unshuffled cards was an "illegal" game under the CCA).  Relatedly, the Court does not find persuasive an unpublished Third Circuit decision that summarily dismissed a plaintiff's claim against a casino because his claims required an interpretation of the CCA.  See Mankodi v. Trump Marina Associates, LLC, 525 F. App'x 161 (3d Cir. 2013) (citing Campione, 714 A.2d at 309) (finding that "Count 5 fails because it attempts to assert a claim based on a violation of the CCA, which does not provide a private right of action," and "[a]lthough Mankodi attempts to frame this claim as a common law breach of contract and conversion, his complaint evidences that he is really alleging a violation of the CCA.").

## 2.   Borgata's fraud and RICO conspiracy claims (Counts IV, VI, X, XI, XII)

In addition to its breach of contract claims, Borgata has alleged fraud, RICO and conspiracy based claims against Ivey and Sun based upon its contention that they misrepresented that they intended to abide by the rules of honest play established and required by the CCA,[9] and they intentionally misrepresented their true reasons, motivation and purpose for the playing accommodations they sought.  Borgata claims that Ivey and Sun's misrepresentations of their true motivations constitute fraud and conspiracy to commit fraud in violation of the common law and the federal and New Jersey Racketeer Influence and Corruption Organizations Acts ("RICO").

To state a claim of fraud under the common law, a plaintiff must allege facts that, if proven, would establish the following: "'(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'"  Hoffman v. Hampshire Labs, Inc., 963 A.2d 849, 855 (N.J. Super. App. Div. 2009) (quoting Gennari v.

---

[9] Consistent with our discussion above regarding the breach of contract and related claims, plaintiff will not be allowed to base its fraud claims on assertions of violations of the CCA until such time as the issue of how those regulations should be construed is resolved.

<u>Weichert Co. Realtors</u>, 691 A.2d 350 (N.J. 1997))(other citation omitted).

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, together with an act that results in damage.  <u>Morgan v. Union Cty. Bd. of Chosen Freeholders</u>, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993), <u>cert. denied</u>, 135 N.J. 468 (1994).  Even though the unlawful agreement need not be expressed, and the participants need not know all the details of the plan designed to achieve the objective or possess the same motives, they must share the general conspiratorial objective.  <u>Id.</u>

The federal RICO statute, codified at 18 U.S.C. § 1961-68, provides, in relevant part, that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  In order to adequately plead a violation of the federal RICO statute, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223 (3d Cir. 2004) (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473

U.S. 479, 496 (1985)).

Similarly, New Jersey's state RICO statute, codified at

N.J.S.A. 2C:41-2a et seq., provides that:

> It shall be unlawful for any person through a pattern of
> racketeering activity or through collection of an
> unlawful debt to acquire or maintain, directly or
> indirectly, any interest in or control of any enterprise
> which is engaged in or activities of which affect trade
> or commerce.

N.J.S.A. 2C:41-2.  To sufficiently allege a violation of the New

Jersey RICO statute, a plaintiff must prove: (1) the existence

of an enterprise; (2) that the enterprise engaged in activities

that affected trade or commerce; (3) that the defendant was

employed by, or associated with the enterprise; (4) that the

defendant participated in the conduct of the affairs of the

enterprise; (5) that the defendant participated through a

pattern of racketeering activity; and (6) that the plaintiff was

injured as a result of the conspiracy.  Ford Motor Co. v.

Edgewood Props., Inc., 2009 WL 150951, at *10 (D.N.J. Jan. 20,

2009) (citing N.J.S.A. 2C:41-2c) (other citations omitted).  It

has previously been recognized that, in certain aspects, the New

Jersey RICO statute is broader in scope than the federal

statute, and that New Jersey courts take a "liberal stance in

permitting plaintiffs to plead NJRICO violations, rejecting the

narrow construction of the federal statute that many circuits,

including this one, have adopted."  Edgewood Props., 2009 WL

26

150951 at * 10 (citing State v. Ball, 661 A.2d 251 (N.J. 1995)).

A valid RICO claim must be based on one of the predicate criminal offenses listed in 18 U.S.C. § 1962, or a conspiracy to commit such an offense.  18 U.S.C. §§ 1962, 1964(c).  For a NJ RICO claim, the primary criterion of New Jersey's "pattern of racketeering activity" is "relatedness"; that element calls for the application of a broad standard involving the totality of all relevant circumstances, which may include "continuity." State v. Ball, 661 A.2d 251, 265 (N.J. 1995).

A defendant in a racketeering conspiracy need not itself commit or agree to commit predicate acts.  Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001).  Rather, "all that is necessary for such a conspiracy is that the conspirators share a common purpose."  Id.  Thus, if defendants agree to a plan wherein some conspirators will commit crimes and others will provide support, "the supporters are as guilty as the perpetrators."  Salinas v. United States, 522 U.S. 52, 64 (1997).  Each defendant must "agree to commission of two or more racketeering acts," United States v. Phillips, 874 F.2d 123, 127 n.4 (3d Cir. 1989), and each defendant must "adopt the goal of furthering or facilitating the criminal endeavor," Smith, 247 F.3d at 537.

Claims sounding in fraud or misrepresentation "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The level of particularity required is

sufficient details to put defendants on notice of the "precise misconduct with which they are charged." In re Riddell Concussion Reduction Litigation, --- F. Supp. 3d ---, 2015 WL 224429, *8 (D.N.J. Jan. 15, 2015) (citing Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984)) (other citation omitted). "'This requires a plaintiff to plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means.'" Id. (quoting Grant v. Turner, 505 F. App'x 107, 111 (3d Cir. 2012), cert. denied, --- U.S. ----, 133 S. Ct. 2770, 186 L.Ed.2d 219 (2013)).

According to Borgata's complaint, Borgata, as it sometimes did for its patrons, indulged Ivey and Sun's apparently innocuous requests based on their contention that they were superstitious. Borgata claims that it relied on their representations, but that on four different occasions, Ivey and Sun knowingly and in concert misrepresented their true motivations in order to perpetrate a scheme to defraud Borgata of millions of dollars, which funds were wired to a bank account in Mexico. Borgata claims that these acts constitute common law fraud and conspiracy to commit fraud, and meet the elements of establishing a pattern of racketeering activity.

Unlike Borgata's breach of contract claims against Ivey and Sun, Borgata's fraud and RICO conspiracy claims, as we construe

28

them, do not rely upon on the interpretation of the CCA.
Regardless of whether Ivey and Sun's actions are found to have
violated the CCA, Borgata's fraud and RICO claims hinge on Ivey
and Sun's misrepresentation of purpose, especially with regard
to their requests for particular Gemaco cards and an automatic
card shuffler, and their instructions to the dealer to turn
cards.  In order for their alleged edge sorting scheme to work,
Ivey and Sun needed playing cards with unsymmetrical edges, the
ability to turn certain cards, and the use of automatic card
shuffler to maintain the sorted order of the cards.  To
effectuate their alleged scheme, they took advantage of a
casino's indulgence in players' proclamations of superstition,
and represented that their requests were made because they were
superstitious.  Borgata's reliance upon the defendants' alleged
misrepresentations duped Borgata into providing Ivey and Sun
with the tools to commit their edge carding scheme, which
resulted in multiple wire transfers of allegedly ill-gotten
funds to bank accounts in Mexico.

Considering these allegations under the Rule 8, Rule 9(b)
and Iqbal/Twombly pleading standards and the required elements
of fraud, conspiracy and RICO claims, it is clear that Borgata
has pleaded its fraud, conspiracy and RICO claims sufficiently
to survive defendants' motion to dismiss.  Accordingly, these
claims against the defendants may proceed.

**3.    Borgata's other claims (Counts V, VII, VIII, IX)**

Based on the same allegations as its breach of contract, fraud, and RICO claims, Borgata has alleged several other claims against Ivey and Sun for rescission for unilateral mistake and illegality of purpose, unjust enrichment, and conversion.  These claims are in the alternative to its breach of contract, fraud and RICO claims.  See Sussex Drug Products v. Kanasco, Ltd., 920 F.2d 1150, 1154 (3d Cir. 1990) ("Alternative theories of recovery based on the same factual situation are but a single claim, not multiple ones."); Hilton Hotels Corp. v. Piper Co., 519 A.2d 368, 372 (N.J. Super. Ch. 1986) (explaining that rescission is an equitable remedy and only available in limited circumstances, and that contracts may only be rescinded where there is either original invalidity, fraud, failure of consideration or a material breach or default); Goldsmith v. Camden Cnty. Surrogate's Office, 975 A.2d 459 (N.J. Super. App. Div. 2009) (internal quotation marks and citations omitted) ("Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability.  We have recognized, however, that a claim for unjust enrichment may arise outside the usual quasi-contractual setting."); Chicago Title Ins. Co. v. Ellis, 978 A.2d 281, 288 (N.J. Super. App. Div. 2009) ("The crux of conversion is wrongful exercise of dominion or control over property of another without

authorization and to the exclusion of the owner's rights in that property.").

Because Borgata's fraud and RICO claims may stand, Borgata may also proceed with these alternative theories of recovery. See Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc., --- F. Supp. 3d. ---, 2015 WL 381038, *9 (D.N.J. 2015) (citing Fed. R. Civ. P. 8(d)(2)) ("[A] party may plead in the alternative and prevail on one of its two theories.").

## CONCLUSION

Borgata alleges that Ivey and Sun won $9 million at Baccarat by manipulating the standard odds of the game through cheating techniques disguised as innocuous requests.  Ivey and Sun argue that Borgata willingly agreed to all of their requests and provided all the implements of gambling, and that all of those requests, along with their observation of the patterns on the playing cards, were lawful.  Ivey and Sun also note that even though Borgata wishes to cast itself as a victim of deceptive intentions, the "essential mission of Borgata's casino operation is to encourage patrons to lose money by orchestrating a plethora of deceptive practices, such as loud noises and flashing lights on slot machines, hiding the clocks, making exit signs almost impossible to find, having cocktail waitresses wear revealing clothing, and comping copious amounts of alcohol to 'loosen up' their patrons."  (Docket No. 12 at 13.)

31

There is no doubt that much of the defendants'
characterization of the casino milieu is accurate, as tangential
a defense as it may be.  And there is also the begged and
largely ignored question inherent in Plaintiff's allegations of
why the casino – especially its own card dealer – took so long
to figure out the defendants' alleged scheme.  But at this stage
of the proceedings Borgata has pled plausible claims sounding in
fraud.  The Court will therefore allow the case, in addition to
Borgata's claims against Gemaco, to proceed through discovery,
and it will be for the CCC, DGE, and perhaps this Court or a
jury to consider the validity of Borgata's claims and the
propriety of Ivey and Sun's actions.

An appropriate Order will be entered.


Date: __March 12, 2015_____          __s/ Noel L. Hillman_____
At Camden, New Jersey                 NOEL L. HILLMAN, U.S.D.J.