## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

MARINA DISTRICT DEVELOPMENT
CO., LLC doing business as
BORGATA HOTEL CASINO & SPA,          CIVIL NO. 14-2283(NLH/AMD)
    Plaintiff,

                             **OPINION**

v.


PHILLIP D. IVEY, JR., GEMACO
INC., and CHENG YIN SUN,
Defendants.

---

**Appearances:**

JEREMY M. KLAUSNER
AGOSTINO & ASSOCIATES, PC
14 WASHINGTON PLACE
HACKENSACK, NJ 07601

    On behalf of plaintiff

JEFFREY W. MAZZOLA
LAW OFFICES OF WILLIAM E. STAEHLE
445 South Street
P.O. BOX 1938
MORRISTOWN, NJ 07962-1938

    On behalf of defendant Gemaco, Inc.

EDWIN JOSEPH JACOBS, JR.
MICHAEL F. MYERS
LOUIS M. BARBONE
JOEL SOLOMON JUFFE
JACOBS & BARBONE
1125 PACIFIC AVENUE
ATLANTIC CITY, NJ 08401

    On Behalf of defendants Phillip D. Ivey and Cheng Yin Sun

> *Every breaking wave on the shore*
> *Tells the next one "there'll be one more"*
> *Every gambler knows that to lose*
> *Is what you're really there for*[1]

**HILLMAN**, District Judge

As a general matter, gambling is illegal.  This is because the law considers gambling *malum per se*, a function of the age-old belief, arising perhaps from Judeo-Christian doctrine, that gambling is an immoral vice.  Hence, it is prohibited by both the state and the federal government.

But like most vices, which would exist in some measure whether banned by governments or not, many states choose to allow, regulate, and tax some versions of it while preserving the ban on unregulated enterprises.  The theory is a simple one.  State-sanctioned gambling will be cleansed of its most unsavory elements and the games will be conducted under a defined set of published rules overseen by an administrative body.

Most importantly, the odds will be set up to benefit the "house", and the state will tax the revenue.  In short, and by design, over time every gambler who plays against the house will eventually bet - and lose - more than they win.  Of course, some games allow for more skill than others and there is always lady

---

[1] U2, "Every Breaking Wave," © 2010-2014 (lyrics only) Bono, the Edge.

luck.  But the principle that the odds are against you is literally true and eventually wins out.  This is something every gambler knows.

In this case, the uncontroverted facts establish that defendants Phillip D. Ivey and Cheng Yin Sun, "high-stakes" professional gamblers, set out to shift the odds of the casino game of Baccarat away from the house and in their favor.  They achieved this, and profited handsomely from it, by the use of an elaborate and hidden "edge-sorting" scheme to create, and thereafter use, a deck of cards aligned in such a way as to reveal to them the face value of a card before it was turned over.  Knowing the value of the card beforehand (here within a range they chose) dramatically increased the odds their resulting bets would beat the house.  And beat the house they did.

Not surprisingly, when the scheme was revealed, the Plaintiff Marina District Development Co., LLC, which does business as Borgata Hotel Casino & Spa in Atlantic City, New Jersey, cried "fraud," among other things, and brought this suit.  Ivey and Sun previously moved to dismiss Borgata's complaint against them, but the Court permitted the case to proceed through discovery.

The outcome of the discovery process reveals that not much has changed since the Court issued the decision denying Ivey and

Sun's motion to dismiss, other than that each side's position is more fully supported by additional facts and testimony.  Ivey and Sun and Borgata agree that the primary issue to be decided by the Court in order to resolve Borgata's claims against Ivey and Sun is whether their use of the edge sorting technique in Baccarat constitutes fair play, breach of contract, or fraud. Accordingly, the parties have each moved for summary judgment in their favor.[2]

Because the Court issued a comprehensive Opinion in resolving Ivey and Sun's motion to dismiss that recounted the timeline of events, the details of the parties' conduct, the nature of Borgata's claims, and Ivey and Sun's arguments in opposition, the Court will fully incorporate that Opinion into this decision.  (See Docket No. 32.)  This Opinion will supplement the contents of the prior decision, and restate facts and law only to the extent necessary to support the Court's findings.

_____

[2] Also pending is Borgata's motion for summary judgment on Ivey and Sun's counterclaims for fraudulent and negligent spoliation of evidence relating to the destruction of the playing cards from the April 2012 and May 2012 sessions.  The Court finds that because an examination of the actual cards that were used during these sessions is not relevant to the Court's resolution of Borgata's claims against Ivey and Sun, the Court will grant Borgata's motion for summary judgment as to Ivey and Sun's counterclaims, as they have not suffered damages as a result of the alleged spoliation.  Separately pending is Gameco, Inc.'s motion for summary judgment.  The Court will address that motion in a separate Opinion.

For the reasons expressed below, the Court will grant-in-part and deny-in-part Ivey and Sun's motion for summary judgment and Borgata's cross-motion for summary judgment.

## BACKGROUND

For ease of reference, the following timeline of events and description of the "edge sorting scheme" are restated from the Court's prior Opinion.  In April 2012, Ivey contacted Borgata to arrange a visit to play high-stakes Baccarat.[3]  Ivey made five

---

[3] Borgata explains the rules of Baccarat in its complaint. (Docket No. 5 at ¶¶ 23-30.)  Mini Baccarat ("Baccarat") is a game of chance in which the players bet on the relative value of two hands of two cards each before the hands are dealt or the cards are revealed.  One hand is referred to as the "player's" hand, the other is known as the "banker's" hand.  The "banker" is not the House, and the "player" does not refer to those playing the game.  Players are free to bet on either hand.  The object of Baccarat is to bet on the hand that will have a total value closest to nine (9).  Tens, face cards, and any cards that total ten are counted as zero.  All other cards are counted at face value.  The scores of hands range from 0 to 9.  Neither hand can "bust."  The game is generally played with six or eight decks of cards placed into a dealing "shoe."  Before the cards are dealt, the players must place one of three bets: "banker," "player," or "tie."  A bet on "banker" is a bet that the banker will hold the hand closest to nine.  A bet on "player" is a bet that the player will have the hand closest to nine.  A bet on "tie" is a bet that the two hands will be tied.  Two hands are then dealt from the shoe, one for the "player" and one for the "banker."  The first card is dealt to the "player's" hand.  In certain circumstances, a third card may be dealt to either or both hands, depending on the score of the hands.  A winning bet on "banker" pays 19 to 20.  A winning bet on "player" pays even money.  A winning bet on "tie" pays 8 to 1.  The house advantage for Baccarat is approximately 1.06% on "banker" bets, 1.24% on "player" bets, and 4.84% on "tie" bets.  Based on mathematical probability, when the first card dealt to the "player" has a value of 6, 7, 8, or 9, the chances of the "player" hand winning are greatly increased.  Conversely, if the "player" hand's first

requests: (1) a private area or "pit" in which to play; (2) a casino dealer who spoke Mandarin Chinese; (3) a guest (defendant Sun) to sit with him at the table while he played; (4) one 8-deck shoe of purple Gemaco Borgata playing cards to be used for the entirety of each session of play; and (5) an automatic card shuffling device to be used to shuffle the cards after each shoe was dealt.  Borgata agreed to Ivey's requests.  In return, Ivey agreed to wire a "front money" deposit of $1 million to Borgata, and that the maximum bet would be $50,000 per hand.

Under these parameters, Ivey played sixteen hours on April 11, 2012 and won $2,416,000, with his average bet of $25,000.  With the same terms, Ivey returned to Borgata in May 2012, and over the course of fifty-six hours of Baccarat play, Ivey won $1,597,400, with his average bet of $36,000.

In July 2012, Ivey returned to Borgata a third time to play Baccarat with his same five requests, but this time he had prearranged to raise his front money to $3 million, and raise his maximum bet to $100,000 per hand.  Over the course of seventeen hours of Baccarat play, Ivey won $4,787,700, with his

---

card has a value of 10, 1 (Ace), 2, 3, or 4, the chances of the "banker" hand winning are greatly increased.  Thus, if a player knows the value of the first card in the shoe before it is dealt, the player can reverse the house advantage, and instead have a significant advantage over the house.  The player with this "first card knowledge" has an overall advantage of approximately 6.765% over the house.  The advantage is up to 21.5% for "player" bets and up to 5.5% for "banker" bets.

average bet of $89,000.  Under these same terms, Ivey came back to Borgata one more in October 2012, and over the course of eighteen hours, Ivey won $824,900 (after being up almost $3.5 million) with an average bet of $93,800.[4]  After each visit to Borgata, Ivey requested that his front money and winnings be wired to a bank account in Mexico.  Ivey's total winnings for his four visits to Borgata was $9,626,000.

During his last visit to Borgata on October 7, 2012, Borgata learned through a media report that a casino in London, Crockfords, was withholding £7.3 million won by Ivey playing Punto Banco, which is essentially the same game as Baccarat. After Ivey left Borgata on October 8, 2012, Borgata learned more about the Crockfords matter, and discovered that Ivey had made the same five requests to Crockfords as he had to Borgata. Borgata also discovered that Ivey and Sun committed what it considers to be an "edge sorting scam."

According to Borgata, as well as Ivey's own representations in his suit against Crockfords to recover his winnings as described in Borgata's complaint in this case, the mechanics of "edge sorting" are as follows:

126. The backs of casino playing cards generally contain a repeating diamond or geometrical pattern as seen in Exhibit A.

---

[4] Borgata claims that Ivey intentionally lost a portion of his winnings during his October 2012 play.

127. If the cards are not cut symmetrically during the manufacturing process, the two long edges of the cards will not be identical. In other words, one edge will have more of the geometrical pattern than the other. See Exhibit B.

128. During play, Ivey and Sun used the accommodations they requested from Borgata to "turn" strategically important cards so that they could be distinguished from all other cards in the deck.

129. The dealer would first lift the card so that Sun could see its value before it was flipped over all the way and placed on the table. If Sun told the dealer "Hao" (pronounced "how"), which translates to English as "good card," he was instructed to continue to flip the card over so that the orientation of the long edges of the card would stay on the same side when flipped. In other words, the right edge of the card as seen by Sun before the card was turned all the way over would still be the right edge of the card as she looked at when it was laid face up on the table.

130. If Sun told the dealer "Buhao" (pronounced "boohow"), which translates into English as "bad card," he was instructed to flip the card side to side, so that the long edges would be reversed when flipped. In other words, the right edge of the card as seen by Sun before the card was turned all the way over would now be the left edge of the card as she looked at it when it was laid face up on the table.

131. By telling the dealer "good card" or "bad card" in Mandarin, the dealer would place the cards on the table so that when the cards were cleared and put in the used card holder, the leading edges of the strategically important cards could be distinguished from the leading edges of the other cards in the deck.

132. Upon information and belief Ivey and Sun "turned" the cards with values of 6, 7, 8, and 9, so that they could be distinguished from all other cards in the deck.

133. The process of "edge sorting" all the cards in the decks took more than one shoe.

134. Ivey and Sun knew that if an automatic card shuffler was used, the edges of the cards would remain facing in the same direction after they were shuffled.

135. Conversely, Ivey and Sun knew that if the cards were shuffled by hand, the dealer would turn part of the deck, rendering their attempts to "turn" the strategically important cards useless.

136. Keeping the edges of the cards facing the same direction is the reason Ivey requested the use of an automatic card shuffler.

137. Ivey also knew that if the same cards were not reused for each shoe, there would be no benefit to "edge sorting."

138. That is why Ivey requested that the same cards be reused for each shoe.

139. The leading edge of the first card in the shoe is visible before the cards are dealt.

140. Once the "edge sorting" was completed, Ivey and Sun were able to see the leading edge of the first card in the shoe before it was dealt, giving them "first card knowledge."

141. If the first card in the shoe was turned, that meant a strategically important card was being dealt to the "player" hand, and Ivey would bet accordingly.

142. If the first card in the shoe was not "turned," that meant that a less advantageous card was being dealt to the "player" hand, and Ivey would again bet accordingly.

143. This "first card knowledge" changed the overall odds of the game from an approximate 1.06% house advantage to an approximately 6.765% advantage for Ivey.

144. Ivey began each playing session with bets well below the maximum bet.

145. Ivey bet below the maximum bet until he and Sun had completed "edge sorting" all the cards in the shoe.

146. Once all the cards in the shoe were "edge sorted," Ivey "flatlined" at the maximum bet; i.e. he bet the maximum amount on every hand.

147. A review of Ivey's betting pattern shows that once the cards were "edge sorted," when he bet on "player," the first card dealt was significantly more likely to be a strategically important card.

148. Conversely, once the cards were "edge sorted," when Ivey bet on "banker," the first card dealt was significantly more likely to be a strategically unimportant card.

(Amend. Compl., Docket No. 5 at ¶¶ 126-148.)

## DISCUSSION

### A.   Subject Matter Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  Borgata is a limited liability company.  The members of Borgata are Boyd Atlantic City, Inc. and MAC Corp., both corporations organized and existing pursuant to the laws of the State of New Jersey, with their principal places of business in New Jersey.  Defendants Ivey and Sun are citizens of the State of Nevada, and defendant Gemaco is a corporation organized and existing pursuant to the laws of the State of Missouri, with its principal place of business in Blue Springs, Missouri.

### B.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including

10

depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

   **C.   Analysis**

   **1.   Borgata's Claims for Breach of Contract (Count I), Breach of Implied Contract (Count II), and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)**

   Borgata's contract-based claims are premised on the contention that when Ivey and Sun played Baccarat at Borgata, Borgata agreed to fulfill its obligations to provide a gaming experience in compliance with the New Jersey Casino Control Act ("CCA"), N.J.S.A. 5:12-1, et seq. ("CCA"), and Ivey and Sun agreed to play the game in compliance with the CCA.  Because Borgata complied with the CCA, while Ivey and Sun did not, Ivey and Sun breached their agreement with Borgata.

   In assessing the viability of Borgata's claim when

11

resolving Ivey and Sun's motion to dismiss, the Court observed that the only way gambling at a casino is lawful is if the patrons and the casino follow the strictures of the CCA, and that contractual agreements, whether express or implied, involving casino gambling in New Jersey must therefore include a provision that both parties agree to abide by the CCA.

In their motion to dismiss, Ivey and Sun argued that the CCA preempted or otherwise barred Borgata's contract-based claims.  The Court rejected that argument, but found that although Borgata pleaded a claim for breach of contract, rather than a private cause of action for violations of the CCA, Borgata's contract-based claims were actually just that – a claim that Ivey and Sun committed various violations of the CCA and they are not entitled to their gambling winnings.  The Court also found that even though the CCA did not explicitly preempt Borgata's breach of contract claims against Ivey and Sun, the CCC or the DGE should consider in the first instance whether Ivey and Sun's actions violated any provisions of the CCA.

It has been over four years since Ivey and Sun played their first Baccarat game at the Borgata using the edge sorting strategy, and the CCC and DGE have never issued a decision as to the propriety of Ivey and Sun's actions.[5]  Thus, the Court must

---

[5] After the DGE's investigation, the Attorney General closed the matter after declining to lodge criminal charges against Ivey

decide whether Borgata's contract-based claims premised on CCA violations are viable, and if so, whether Borgata or Ivey and Sun are entitled to judgment on those claims.  See Golden Nugget v. Gemaco, Inc., ATL-L-5000-12 (N.J. Super. Ct. Law Div. Feb. 9, 2015) (recognizing the importance of the CCC or DGE interpreting the CCA, while also recognizing that when the CCC or DGE declines to interpret the CCA, a court must make that determination, and finding that because after two and half years, the DGE investigation resulted in no enforcement and the CCC declined to take any action, the court would determine whether a baccarat game played with unshuffled cards was an "illegal" game under the CCA).

Borgata contends that the turning of the cards was "marking cards," the request to use the automatic shuffling machine constitutes a "cheating device," and that the edge sorting technique is "cheating and swindling."  See N.J.S.A. 5:12-115(b) ("It shall be unlawful knowingly to use or possess any marked cards."); N.J.S.A. 5:12-115(a)(2) (to "carry on" with or "expose for play" cards that are marked "in any manner" is expressly prohibited); N.J.S.A. 5:12-113.1 (making it a crime to "use or assist another in the use of, a computerized, electronic, electrical or mechanical device which is designed, constructed,

---

and Sun.

or programmed specifically for use in obtaining an advantage at playing any game in a licensed casino or simulcasting facility"); N.J.S.A. 5:12-114 (a crime "[k]nowingly to use or possess any cheating device with intent to cheat or defraud"); and N.J.S.A. 5:12-115(a) (providing that "a person is guilty of swindling and cheating if the person purposely or knowingly by any trick . . . or by a fraud or fraudulent scheme . . . wins or attempts to win money or property . . . in connection to casino gambling").

The Court finds that Ivey and Sun breached their contract with Borgata to play Baccarat in compliance with the CCA by violating N.J.S.A. 5:12-115(a)(2) and (b) when they knowingly engaged in a scheme to create a set of marked cards and then used those marked cards to place bets based on the markings. The term "marked cards" is not defined in the CCA, see 5:12-2, but it has traditionally been demonstrated by the physical alteration of the playing card in some way with, for example, darkened lines down the vertical sides,[6] a little red triangle in the middle,[7] a substance only visible to the trained eye applied

---

[6] Kelly v. First Astri Corp., 72 Cal. App. 4th 462, 468, 84 Cal. Rptr. 2d 810, 813 (1999).

[7] Id.

to the backside ("daubing"),[8] or slight folds ("crimping")[9].

The purpose of card marking is so that these cards can later be identified without seeing their faces, which can substantially increase the odds of winning a particular hand. United States v. Jing Bing Liang, 362 F.3d 1200, 1201 (9th Cir. 2004).

In this case, there is no dispute that Ivey and Sun did not mark the cards used in the Baccarat playing sessions in a traditional way.  Ivey and Sun did not physically touch any of the cards at any time, and they did not have access to the card decks prior to their playing sessions.  These factors support Ivey and Sun's argument that they did not mark any cards or knowingly use or possess any marked cards in violations of the CCA.

Ivey and Sun's view of what constitutes a "marked" card is too narrow.  Such an interpretation would undermine in a fundamental way the purpose behind the regulatory ban on marked cards.  "Marking" a card is to surreptitiously identify the value of the card to a player – and that player alone.  The physical acts of a card being drawn on, daubed, or crimped are several ways to inform a player of its value.  But, as

---

[8] United States v. Tschirgi, 65 F.3d 177 (9th Cir. 1995).

[9] United States v. Jing Bing Liang, 362 F.3d 1200, 1201 (9th Cir. 2004).

demonstrated by Ivey and Sun's edge sorting technique, a physical act is not necessary to alert a player surreptitiously of a card's value.  Asking a card dealer to turn a card a particular way so that the pattern on the edge of the card will distinguish it from other cards such that it will inform the player of that card's value also constitutes "marking" within the meaning and intent of the regulatory ban.  The term "marking" therefore can be defined as having something done to the card that identifies the value of the card to a player[10] but to no one else.[11]

Moreover, it is not the act of "marking" a card that violates the CCA, but rather the "use" or "possession" of the marked card that violates the CCA.  That is because using or possessing a marked card that reveals the value of that card leads to an artificial adjustment of the set odds in the player's favor.  The State of New Jersey's purpose in enacting

---

[10] Or to anyone who is aware that a card is marked, however accomplished, like a dealer or pit boss who would be advantaged by the marked card.  See, e.g., Kelly, 72 Cal. App. 4th at 468 (patrons were defrauded by the casino when a marked card cheating scheme was perpetrated by casino employees, including cardroom dealers, pit bosses, and the cardroom manager).

[11] The basic dictionary definitions of the verb "mark" support this meaning as well.  See Merriam-Webster Dictionary (defining "mark" as "to take notice of, to take careful notice"); Black's Law Dictionary (10th ed. 2014) ("MARK: A symbol, impression, or feature on something, usu. to identify it or distinguish it from something else.").

laws that permit gambling when it otherwise would be unlawful
was in recognition of "the importance of the tourist, resort,
recreational and convention industry of the State, the need to
restore, rehabilitate and redevelop Atlantic City, and the
potential contribution of this new industry to the economic
structure, general welfare, health and prosperity of the State
and its inhabitants." Knight v. City of Margate, 431 A.2d 833,
836-37 (N.J. 1981) (citing N.J.S.A. 5:12-1(b)(1)-(5)). Allowing
a player to unilaterally adjust the odds of a casino game in his
favor would violate the essential purpose of legalized gambling.
Indeed, since the inception of legalized gambling, the Casino
Control Commission has implemented numerous countermeasures to
prevent threats to the statistical advantage that casinos need
to remain profitable.[12]

By using cards they caused to be maneuvered in order to
identify their value only to them, Ivey and Sun adjusted the
odds of Baccarat in their favor. This is in complete
contravention of the fundamental purpose of legalized gambling,
as set forth by the CCA. Ivey and Sun's violation of the card
marking provision in the CCA constitutes a breach of their

---

[12] Campione v. Adamar of New Jersey, Inc., 714 A.2d 299, 305-06
(N.J. 1998) (discussing CCC's countermeasures to card counting,
which threatens a casino's statistical advantage).

mutual obligation with Borgata to play by the rules of the CCA.[13] Consequently, summary judgment must be entered in Borgata's favor, and against Ivey and Sun, on Borgata's contract-based claims.[14]

### 2.  Borgata's fraud and RICO conspiracy claims (Counts IV, VI, X, XI, XII)

In addition to its breach of contract claims, Borgata has alleged fraud, RICO and conspiracy-based claims against Ivey and Sun arguing that they misrepresented that they intended to abide by the rules of honest play established and required by the CCA, and they intentionally misrepresented their true reasons, motivation and purpose for the playing accommodations they sought.  Borgata claims that Ivey and Sun's misrepresentations of their true motivations constitute fraud and conspiracy to commit fraud in violation of the common law and the federal and New Jersey Racketeer Influence and Corruption Organizations Acts ("RICO").

---

[13] Borgata is equally obligated to follow the CCA.  For example, it would be a breach of contract if Borgata secretly tampered with the cards so that its house advantage was greater than the set odds of the game.

[14] As the Court explains below in assessing Borgata's fraud-based claims, the Court does not find that Ivey and Sun breached their contract with Borgata, or otherwise violated the CCA, with respect to CCA provisions that require a finding of fraud. Additionally, without any direction by the CCC or the DGE to the contrary, the Court finds that Borgata's position strains the other provisions beyond their basic and intended meaning.

To state a claim of fraud under the common law, a plaintiff must allege facts that, if proven, would establish the following: "'(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" Hoffman v. Hampshire Labs, Inc., 963 A.2d 849, 855 (N.J. Super. App. Div. 2009) (quoting Gennari v. Weichert Co. Realtors, 691 A.2d 350 (N.J. 1997))(other citation omitted).

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, together with an act that results in damage. Morgan v. Union Cty. Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993), cert. denied, 135 N.J. 468 (1994).  Even though the unlawful agreement need not be expressed, and the participants need not know all the details of the plan designed to achieve the objective or possess the same motives, they must share the general conspiratorial objective.  Id.

The federal RICO statute, codified at 18 U.S.C. § 1961-68, provides, in relevant part, that:

It shall be unlawful for any person employed by or

19

> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection
> of unlawful debt.

18 U.S.C. § 1962(c).  In order to adequately plead a violation

of the federal RICO statute, a plaintiff must allege: (1)

conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.  Lum v. Bank of Am., 361 F.3d 217, 223

(3d Cir. 2004) (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473

U.S. 479, 496 (1985)).

　　Similarly, New Jersey's state RICO statute, codified at

N.J.S.A. 2C:41-2a et seq., provides that:

> It shall be unlawful for any person through a pattern of
> racketeering activity or through collection of an
> unlawful debt to acquire or maintain, directly or
> indirectly, any interest in or control of any enterprise
> which is engaged in or activities of which affect trade
> or commerce.

N.J.S.A. 2C:41-2.  To sufficiently allege a violation of the New

Jersey RICO statute, a plaintiff must prove: (1) the existence

of an enterprise; (2) that the enterprise engaged in activities

that affected trade or commerce; (3) that the defendant was

employed by, or associated with the enterprise; (4) that the

defendant participated in the conduct of the affairs of the

enterprise; (5) that the defendant participated through a

pattern of racketeering activity; and (6) that the plaintiff was

injured as a result of the conspiracy.  Ford Motor Co. v.

Edgewood Props., Inc., 2009 WL 150951, at *10 (D.N.J. Jan. 20, 2009) (citing N.J.S.A. 2C:41-2c) (other citations omitted).

It has previously been recognized that, in certain aspects, the New Jersey RICO statute is broader in scope than the federal statute, and that New Jersey courts take a "liberal stance in permitting plaintiffs to plead NJRICO violations, rejecting the narrow construction of the federal statute that many circuits, including this one, have adopted." Edgewood Props., 2009 WL 150951 at * 10 (citing State v. Ball, 661 A.2d 251 (N.J. 1995)).

A valid RICO claim must be based on one of the predicate criminal offenses listed in 18 U.S.C. § 1962, or a conspiracy to commit such an offense. 18 U.S.C. §§ 1962, 1964(c). For a NJ RICO claim, the primary criterion of New Jersey's "pattern of racketeering activity" is "relatedness"; that element calls for the application of a broad standard involving the totality of all relevant circumstances, which may include "continuity." State v. Ball, 661 A.2d 251, 265 (N.J. 1995).

A defendant in a racketeering conspiracy need not itself commit or agree to commit predicate acts. Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001). Rather, "all that is necessary for such a conspiracy is that the conspirators share a common purpose." Id. Thus, if defendants agree to a plan wherein some conspirators will commit crimes and others will provide support, "the supporters are as guilty as the perpetrators." Salinas v.

21

United States, 522 U.S. 52, 64 (1997).   Each defendant must

"agree to commission of two or more racketeering acts," United

States v. Phillips, 874 F.2d 123, 127 n.4 (3d Cir. 1989), and

each defendant must "adopt the goal of furthering or

facilitating the criminal endeavor," Smith, 247 F.3d at 537.

The parties agree that Baccarat is a game, and all games

have rules.   The fundamental tenet of all games is that the

players abide by the rules, otherwise any win garnered through

broken rules would be unfair.   In this case, none of the actual

rules of Baccarat were broken, and nothing except for Ivey and

Sun's motivation for certain requests was hidden from Borgata.

Over four days and dozens of hours of play, observed by Borgata

staff in person and on video surveillance, Ivey and Sun

performed their edge sorting technique without Borgata

determining that Ivey and Sun were violating Baccarat or casino

rules.   Therefore, the ultimate question is whether Ivey and Sun

committed fraud by misrepresenting their true reasons for their

five requests and card turning, even while none of the game's

rules had been technically broken.   The Court finds that the

answer to that question is no.

The rules of Baccarat do not prohibit a player from

manipulating the cards.   In certain Baccarat games, referred to

as "Macau" style, the customers are allowed to squeeze, crease,

bend, or tear the cards.[15]   (Docket No. 78-6 ¶ 64.)   Baccarat is
a casino game well known for unique and superstitious rituals,
including asking dealers to let the players "peek" at cards
before they are placed on the gaming table.   (Docket No. 78-6 ¶
82.)   Thus, Sun telling the dealer to turn a card in a certain
way did not raise any red flags for Borgata.[16]

    Borgata's fraud claims hinge on Ivey and Sun's
misrepresentation that their five requests, along with Sun's
instructions to the dealer on how to turn a card, were because
they were superstitious.   Obviously, if Ivey and Sun had
explained to Borgata that they were directing the dealer to turn
a card a certain way so that they could later identify the
card's value by the pattern on the back of the card, the
"misrepresentation" element of establishing fraud would be
lacking.   And also obviously, if Ivey and Sun had told Borgata
the real reason they wanted the cards turned, Borgata would have
never let them play.

    The Court notes these obvious points for a reason – a

---

[15] These cards cannot be shuffled and reused, and are instead
discarded immediately after each hand.

[16] It is apparent that Ivey and Sun's other requests – a private
"pit" in which to play; a casino dealer who spoke Mandarin
Chinese; one 8-deck shoe of purple Gemaco Borgata playing cards
to be used for the entirety of each session of play; and an
automatic card shuffling device – did not raise any red flags
for Borgata, either.

reason that is dispositive to the finding that Ivey and Sun did not commit fraud.  Even though Ivey and Sun manufactured an explanation for their instruction to the dealer to turn the cards, the rules of Baccarat do not require an explanation to permit a player to manipulate the cards.  In other words, a player could crease, tear, bend, or have a card turned without any explanation at all and not violate Baccarat's rules of play.

To meet the elements of fraud, Borgata must show that Ivey and Sun made a material misrepresentation and that Borgata relied upon that misrepresentation to its detriment.  Ivey and Sun's five specific requests to Borgata, and their instruction to the dealer to turn the cards a certain way, did not violate any rules or regulations.[17]  Ivey and Sun did not need to claim superstition to make their requests and card turning instructions permissible – they already were.  If Ivey and Sun had simply made their requests without explanation, Borgata was still empowered to grant or deny those requests.  That Borgata chose to believe that Ivey and Sun were superstitions does not amount to detrimental reliance, when no explanation at all could have resulted in the same course of events.[18]

---

[17] Even though Sun's marking of the cards through the observation of the card's patterned edges, as described above, violates the CCA, a request to turn the cards, without more, does not violate the CCA or the rules of Baccarat.

[18] The court in <u>Chen v. Nevada State Gaming Control Bd.</u>, 116 Nev.

Stated differently, Borgata allowed defendants to give a silly, nonsensical reason for the card turning.  That is tantamount to allowing defendants to give no reason at all. Borgata is estopped in such circumstances from alleging that the misrepresentation was material.[19]

Borgata casts itself as an innocent victim who altruistically provided Ivey with his five requests, including allowing Sun to play with him, because it trusted Ivey. Borgata, however, is a for-profit business whose commodity is

_____

282, 285, 994 P.2d 1151, 1152 (2000), made a similar observation on a casino's claims of fraud against a card counter who presented a false passport to buy chips to play blackjack.  The court found that even though the player presented false identification to the casino to obtain chips, the casino did not detrimentally rely upon the player's misrepresentation of his identity when it allowed him to play blackjack because the casino did not require valid identification in order for a patron to play blackjack.  Thus, the court found that the casino did not show the detrimental reliance element of its fraud claim.

[19] Borgata's argument devolves into a contention that defendants acted fraudulently because they did not reveal their fraudulent intent.  Fraud is not so easy to prove.  It is well to remember that fraud is both a crime and a tort and the elements are the same.  While the element of a material misrepresentation may be satisfied by an omission under some circumstances, failing to confess to your victim is not one of them.  Such a legal requirement would certainly be efficient, but it is not our jurisprudence.  Rather the law requires either a misrepresentation that is material or an omission where there is a separate duty to disclose.  Here, no duty to disclose why the defendants wanted to turn the cards was imposed by the CCA, the casino rules of the game, or as a result of the arrangements made with the defendants.

gambling, and whose methodology is to use the odds of casino games in its favor, among other techniques, to win as much money from its patrons as it can.  Ivey is a professional gambler whose business is to play high-stakes casino games to win as much of the casino's money as he can.  In exchange for agreeing to Ivey's five requests, Borgata required millions of dollars in front money from Ivey.  Borgata also wanted Ivey to gamble at its casino so that his celebrity status would attract more gamblers to the casino.  Borgata and Ivey had the same goal when they entered into their arrangement – to profit at the other's expense.  Trust is a misplaced sentiment in this context.[20]

Even though Ivey and Sun did not reveal to Borgata the true purpose behind their requests and actions, they were not

---

[20] Relatedly, Borgata's argument that Ivey made material misrepresentations to Borgata because he did not reveal the identity of Sun is unavailing.  Borgata claims that if it knew that Sun was the same person who had been banned at other casinos for edge sorting, it never would have agreed to let her play along with Ivey.  Sun, however, played Baccarat with Ivey for many hours over four different days, where she participated in speaking with the dealer on hundreds of hands.  She also took notes throughout the play.  There is no evidence in the record that she did not use her real name, or that she wore a disguise, other than wearing a baseball cap.  Ivey and Sun cannot be blamed for Borgata failing to investigate Sun prior to her coming the first time, or for the three subsequent visits.  Ivey and Sun also cannot be blamed for Borgata now claiming to not realize that Sun was playing the game, rather than being a passive observer.  It is clear from the surveillance video that Sun actively participated in playing Baccarat with Ivey on all four occasions.

required to provide a reason.  This does not amount to legal
fraud or a RICO conspiracy.[21]  Ivey and Sun are therefore
entitled to summary judgment on all of Borgata's fraud-based
claims against them.[22]

**CONCLUSION**

Ivey and Sun, and perhaps others, view their actions to be
akin to cunning, but not rule-breaking, maneuvers performed in
many games, such as a play-action pass in American football[23] or
the "Marshall swindle" in chess[24].  Sun's mental acumen in

---

[21] The absence of a sustainable fraud claim dooms any showing of
the commission of the predicate acts required to sustain
Borgata's state and federal RICO claims even if the other
elements could be met.

[22] Borgata has alleged several other claims against Ivey and Sun
for rescission for unilateral mistake and illegality of purpose,
unjust enrichment, and conversion.  These claims are in the
alternative to its breach of contract, fraud and RICO claims.
Because of the Court's resolution of Borgata's contract-based
and fraud-based claims, the Court determines these alternative
claims become either redundant or legally barred as derivative
of dismissed claims.

[23] The intention of a play-action pass is to deceive the defense
by appearing to perform a running play.  A quarterback fakes a
handoff to a running back, who, as part of the deceit, pretends
to run with the ball.  While the defense is tricked into
guarding against the running play, the quarterback seeks to pass
the ball to an undefended receiver.  A play-action pass requires
deceit over the other team to be successful, but the success of
the play-action pass depends on how adept the offense is in
executing the deception within the constraints of football's
rules of play.

[24] Even though the word "swindle" connotes "a diabolically clever
move or combination that turns the tables on the opponent," a
swindle "is not a kind of cheating or a contravening of the

distinguishing the minute differences in the patterns on the back of the playing cards is remarkable.

But, even though Ivey and Sun's cunning and skill did not break the rules of Baccarat, what sets Ivey and Sun's actions apart from deceitful maneuvers in other games is that those maneuvers broke the rules of gambling as defined in this state. Borgata and Ivey and Sun were obligated to follow the proscriptions of the CCA in order to lawfully gamble in the first place, and then they were also obligated to follow the rules of Baccarat.[25]   Ivey and Sun breached their primary obligation.

Ivey and Sun's actions violated the rules of the CCA, a

---

rules of the game."   Robert Byrne, <u>Chess; The Marshall Swindle</u>, N.Y. Times, January 4, 1987.   In order to effect a "Marshall swindle," a player plays a move which is designed to - and does - provoke an error from his opponent, and this error makes possible a profitable combination for the player.   Jonathan Rogers, <u>The Fine Art of Swindling – Defined</u>, Kingpin Chess Magazine, Issue 27, Sept. 4, 2013.   In order to make this combination, however, the swindler must surreptitiously enlist his opponent's help.   <u>Id.</u>

[25] Ivey and Sun argue that the edge sorting technique is just like card counting, which has not been held to be a violation of the CCA or any casino games.   "A card counter is [] a highly skilled player who analyzes the statistical probabilities associated with blackjack and, based upon those probabilities, develops playing strategies which may afford him an advantage over the casino."   <u>Bartolo v. Boardwalk Regency Hotel Casino, Inc.</u>, 449 A.2d 1339, 1341–42 (N.J. Super. Law. Div. 1982).   The difference between card counting and edge sorting is that a card counter uses memory and statistics, not a manipulation of the cards, to create an advantage for himself.

necessary, material, and mutual term of their contract with the
Borgata, which undermined and defeated the New Jersey
Legislature's intent when it legalized gambling and enacted the
CCA.  In order to fulfill the goal of providing economic
structure, general welfare, health and prosperity to the State
of New Jersey through legalized gambling, the casinos and the
patrons must all abide by the CCA.  Ivey and Sun breached this
obligation when they marked the cards to shift the odds of
Baccarat in their favor.

However, it is axiomatic that a breach of contract alone is
not fraud.  Nor does every act of deceit meet the elements of
fraud.  Fraud, whether as codified or at common law, requires a
higher showing.  Ivey and Sun did not defraud Borgata in the
legal sense, just as a football team that runs a pass play
instead of a running play does not defraud the other team.  This
is because their representations did not violate Baccarat's
rules, were not material to Borgata, and no independent
obligation to disclose existed under the circumstances.  Their
conduct is far from admirable, but fraud requires more.

Accordingly, Ivey and Sun's motion for summary judgment on
Borgata's claims against them are granted on all claims except
for Borgata's claims for breach of contract.  Borgata's cross-
motion for summary judgment in its favor is granted on its
breach of contract claims, but denied as to all other claims.

Within 20 days of the date of this Opinion, Borgata shall submit a brief setting forth its damages resulting from Ivey and Sun's breach of contract, along with a proposed form of judgment. Ivey and Sun shall have 20 days thereafter to file a response to Borgata's submission.

An appropriate Order will be entered.


Date: October 21, 2016                    s/ Noel L. Hillman
At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.