UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARINA DISTRICT DEVELOPMENT
CO., LLC doing business as
BORGATA HOTEL CASINO & SPA,        CIVIL NO. 14-2283(NLH/AMD)
     Plaintiff,
                                   **OPINION**
v.

PHILLIP D. IVEY, JR., GEMACO
INC., and CHENG YIN SUN,
Defendants.

**Appearances:**

JEREMY M. KLAUSNER
AGOSTINO & ASSOCIATES, PC
14 WASHINGTON PLACE
HACKENSACK, NJ 07601
     On behalf of plaintiff

JEFFREY W. MAZZOLA
LAW OFFICES OF WILLIAM E. STAEHLE
445 South Street
P.O. BOX 1938
MORRISTOWN, NJ 07962-1938
     On behalf of defendant Gemaco, Inc.

EDWIN JOSEPH JACOBS, JR.
MICHAEL F. MYERS
LOUIS M. BARBONE
JACOBS & BARBONE
1125 PACIFIC AVENUE
ATLANTIC CITY, NJ 08401
     On behalf of defendants Phillip D. Ivey and Cheng Yin Sun

**HILLMAN**, District Judge

     On October 21, 2016, the Court determined that defendants

Phillip D. Ivey and Cheng Yin Sun breached their contract with

plaintiff Marina District Development Co., LLC, which does business as Borgata Hotel Casino & Spa in Atlantic City, New Jersey, to abide by the terms of New Jersey's Casino Control Act, N.J.S.A. 5:12-1, et seq. ("CCA"), when they played Baccarat at Borgata on four occasions in 2012. The Court found that Ivey and Sun breached their contract with Borgata to play Baccarat in compliance with the CCA by violating N.J.S.A. 5:12-115(a)(2) and (b) when they knowingly engaged in a scheme to create a set of marked cards and then used those marked cards to place bets based on the markings.[1]

The scheme is called "edge-sorting," where Sun would identify minute asymmetries on the repeating diamond pattern on the backs of the playing cards to identify certain cards' values, and would have the dealer turn those strategically important cards so that they could be distinguished from all other cards in the deck. Ivey and Sun would then be able to see the leading edge of the first card in the shoe before it was dealt, giving them "first card knowledge," and Ivey would bet accordingly.

To make the edge-sorting scheme work, Ivey and Sun required certain accommodations from Borgata: (1) a private area or "pit"

---

[1] A comprehensive explanation of the edge-sorting scheme and the Court's analysis of Borgata's claims and Ivey and Sun's defenses is contained in the Court's Opinion, Docket No. 107.

2

in which to play; (2) a casino dealer who spoke Mandarin Chinese; (3) a guest (defendant Sun) to sit with him at the table while he played; (4) one 8-deck shoe of purple Gemaco Borgata playing cards to be used for the entirety of each session of play; and (5) an automatic card shuffling device to be used to shuffle the cards after each shoe was dealt, which retained the orientation of each card that Sun requested to be turned.  Borgata agreed to all of Ivey's requests.

In the Opinion resolving the parties' cross-motions for summary judgment, the Court noted that Borgata and Ivey and Sun were obligated to follow the proscriptions of the CCA in order to gamble lawfully in the first place, and then they were also obligated to follow the rules of Baccarat.  The Court determined that Ivey and Sun breached their primary obligation to not use marked cards in violation of the CCA, which constituted a breach of contract to abide by the CCA.[2]  The Court directed Borgata to file a brief in support of its damages on its successful breach of contract claim, and defendants filed their response to Borgata's damages request.

---

[2] The Court found in favor of Ivey and Sun on Borgata's claim that the edge-sorting scheme constituted fraud because Ivey and Sun did not violate the rules of Baccarat, and Borgata did not rely upon a material misrepresentation.

3

Borgata poses two different avenues for assessing its damages. One method is returning the parties to *status quo ante* – the position of the parties prior to the formation of the contract. The other method of assessing damages is expectation damages – what Borgata would have won had Ivey and Sun not engaged in edge-sorting. The Court will adopt the first theory in part because we find the second theory too speculative a remedy.

Ivey and Sun reject Borgata's *status quo ante* position, arguing that the basis for that principle announced in <u>Golden Nugget v. Gemaco, Inc.</u>, ATL-L-5000-12 (N.J. Super. Ct. Law Div. Feb. 9, 2015) is not applicable.[3] The Court finds that the application of the *status quo ante* principle is proper to assess damages in this case, and that Borgata has articulated the amount of damages under this theory to a sufficient reasonable certainty to entitle it to an award without the need for a jury trial.

In the <u>Golden Nugget</u> case, the court determined that a Baccarat game played with unshuffled cards violated the CCA, and therefore voided the contract between the parties that the game, only permissible by the CCA, would follow the CCA. The court

---

[3] A copy of <u>Golden Nugget v. Gemaco, Inc.</u>, ATL-L-5000-12 (N.J. Super. Ct. Law Div. Feb. 9, 2015) can be accessed at Docket No. 111-1.

4

found that the CCA requires that in order to constitute an authorized game of Baccarat, the cards must be shuffled, either pre-shuffled by the card manufacturer or by the dealer, prior to the start of play.  A game played in violation of the CCA, through the use of unshuffled cards, is not an authorized game under the CCA, and is a breach of the obligation that all games must abide by the CCA.  The court summed up its analysis stating, "[A] contract, pursuant to which winnings are earned in any game authorized by the Act, is neither void nor unenforceable thereunder.  However, if the game is not authorized by the Act, a party must find some other exception to N.J.S.A. 2A:40-1[4] or else the contract including such winnings will be void and unenforceable.  N.J.S.A. 2A:40-3[5] also voids any existing and otherwise valid contract based upon illegal gaming."

---

[4] N.J.S.A. 2A:40-1 ("All wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, shall be unlawful.").

[5] N.J.S.A. 2A:40-3 ("All promises, agreements, notes, bills, bonds, contracts, judgments, mortgages, leases or other securities or conveyances which shall be made, given, entered into or executed by any person, the whole or part of the consideration of which is for any money, property or thing in action whatsoever laid, won or bet in violation of section 2A:40-1 of this title, or for reimbursing or repaying any money knowingly lent or advanced to help or facilitate such violation, shall be utterly void and of no effect.").

The Golden Nugget court granted judgment in favor of the casino on its breach of contract claim, and then determined that the appropriate amount of damages for this type of breach of the CCA was returning the parties to their positions prior to the formation of the contract.  The court explained, "Since the rescission of a contract essentially voids the contract, it follows that the remedy used in situations of rescission should be used in situations of voidance.  Thus, since the contracts entered into here are void, returning the parties to their position prior to the formation of the contracts is the appropriate remedy."

Ivey and Sun argue that the Golden Nugget decision is inapplicable because that case hinges on the finding that the Baccarat game was an "illegal" game, while this Court did not declare the Baccarat games at issue here to be "illegal" under the CCA.  Ivey and Sun's argument is unavailing.

When this Court concluded that Ivey and Sun's use of marked cards violated the CCA, that breach of the CCA's card-marking provision is akin to the breach of the CCA's unshuffled card provision in Golden Nugget.  Thus, by virtue of Ivey and Sun playing games that breached a provision of the CCA, the Baccarat games they played breached their contract to abide by the CCA so that the Baccarat games would be lawful.  Although this Court did not cite to the exact same provisions of the CCA the Golden

6

Nugget court cited, our ruling was essentially the same.  In sum and substance, the use of marked cards rendered the Baccarat games unauthorized under the CCA and voided the contract between Borgata and Ivey and Sun.  Consequently, this Court agrees with the decision in Golden Nugget that the appropriate remedy for Ivey and Sun's breach of contract is returning the parties to *status quo ante*.

This finding implicates Ivey and Sun's argument against Borgata's requested damages.  For each of the four days of play, Borgata provides an accounting of the front money Ivey deposited, the amount of money Ivey and Sun won, and the amount of money Ivey and Sun withdrew from the front money account. (Docket No. 109 at 4.)  Borgata's calculation separates out the $892,200 Ivey lost at Craps, but it includes as damages the $504,000 Ivey won at Craps, because those winnings were directly traceable to his prior Baccarat winnings – i.e., he used Baccarat winnings to play Craps.  Borgata's calculation also notes the chips Ivey redeemed for cash rather than deposited into his front money account.  The total amount Borgata claims constitutes the parties' positions prior to Ivey and Sun's formation of their contract to play Baccarat is $10,130,000. Borgata has also requested the return of the value of complimentary goods and services – "comps" – provided to Ivey and Sun, totaling an additional $249,199.83.

7

Ivey and Sun's primary argument against these requested damages is based on the premise that their edge-sorting technique and first card knowledge did not guarantee that they would win because they had to rely upon chance for the next three to five cards. The Court rejects Ivey and Sun's proposition that because edge-sorting is not foolproof, Borgata cannot establish its damages with the requisite degree of certainty.

First, this argument ignores the very nature of restitution damages.  Ivey and Sun's argument focuses on what might have happened in the future.  The remedy of *status quo ante*, by definition, returns the parties to past, restoring the parties to the position they held before the voided contract was entered into.

Second, the application of the remedy should not turn on whether the defendants were successful in their scheme.  The standard set odds for Baccarat is 1.06% or 1.24% in the house's favor, depending on the bet.  Although there may be some dispute over the degree that edge-sorting shifts the odds, the defendants cannot deny that the whole purpose of edge-sorting is to shift the odds to a player's favor from the odds established to favor the casino.  As explained in the Court's October 21, 2016 Opinion, allowing a player to unilaterally adjust the odds of a casino game in his favor – to any degree - would violate

8

the essential purpose of legalized gambling. (Docket No. 107 at 17.) Moreover, it is clear the scheme did work as intended. The defendants not only shifted the odds to their favor, it is undisputed they won and won big.

In sum, the Court agrees with Borgata that both Borgata and Ivey and Sun should be returned to their pre-contract positions. This remedy does not turn on whether the defendants were fully successful or only partially so in the scheme they concocted. It turns, rather, on voiding a contract that was tainted from the beginning and breached as soon as it was executed.

Ivey and Sun's financial position after their four days of play at Borgata, when accounting for the front money, chips redeemed for cash, and Craps winnings and losses, is clearly and precisely documented and undisputed as to amount. Borgata is therefore entitled to the return of all of Ivey and Sun's winnings, including the sum Ivey won at Craps following his Baccarat play.[6]

---

[6] Borgata's alternative basis for damages – expectation damages or lost profits – results in an additional demand for $5,418,311.40 in what Borgata calculates it would have won if the standard 1.06% Banker bet odds and 1.24% Player bet odds were employed for all four playing sessions, totaling $15,548,311.40 in damages. This theory of damages which focuses on the hypothetical – what the Borgata would have won if the game had not been played with marked cards - fails for the reasons articulated by defendants. It is simply too speculative to fashion an appropriate remedy.

A breach of contract provides three remedies: restitution

The Court does not find, however, that Borgata is entitled to the value of the "comps" provided to Ivey and Sun, even though Borgata expended those sums in connection with the Baccarat games which violated the CCA. The very nature of "comps" is that there is no expectation the recipient must return those goods or services if the casino does not obtain

---

returns the innocent party to the condition he or she occupied before the contract was executed; compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed; and performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement. Totaro, Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company, L.L.C., 921 A.2d 1100, 1107 (N.J. 2007) (citations omitted). The goal of contract law is to put the injured party in as good a position as if performance had been rendered, and a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract. Id. (citations omitted). The non-breaching party must demonstrate, however, that in order to be compensable, the loss must be a reasonably certain consequence of the breach. Id. (citations omitted).

Although basic math can calculate Borgata's potential winnings based on the house edge, the number of hands played, and the average bet, this case involves the whims of Lady Luck, who casts uncertainty on every hand, despite the house odds. Indeed, Lady Luck is like nectar to gamblers, because no one would otherwise play a game he knows he will always lose. We simply don't know and will never know whether defendants would have beaten the odds in a normal game over those four days, by luck or otherwise, and by what amount. Any expert calculation is, at best, speculation. Because Borgata's expectation damages are not ascertainable to a sufficient degree, such damages are not available here under the common law of New Jersey. Id. (citations omitted).

some or all of its anticipated benefits.  Borgata's "comps" to Ivey and Sun were provided for many reasons, including to entice a celebrity gambler to its casino to attract more patrons, and to endeavor to win presumably large sums from a high roller.  Because the "comps" were not tied to an obligation that Ivey win or lose, or do anything in particular except to visit Borgata, Borgata is not entitled to the return of the value of those "comps" as part of its breach of contract damages.

## CONCLUSION

We agree with the Plaintiff, that the rule of contract remedies articulated in the Golden Nugget decision, is directly applicable in this case of analogous facts and controlling state regulatory law.  As we previously found, by their own design, Ivey and Sun played games at Borgata that violated important provisions of the CCA and thereby breached their agreement with the casino.  They must disgorge the benefit they received as a direct result of the breached contract, and nothing more, and restore the parties to the *status quo ante*.

An appropriate Order and Judgment will be entered.


Date: December 15, 2016            s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.