**LAW OFFICES OF WILLIAM E. STAEHLE**
**By: Jeffrey W. Mazzola, Esq. (JM 6051)**
**445 South Street**
**P.O. Box 1938**
**Morristown, NJ 07962-1938**
**(973) 631-7300**
**Attorneys for Defendant Gemaco, Inc.**

_____

|   |   |
|---|---|
| MARINA DISTRICT DEVELOPMENT CO., LLC d/b/a BORGATA HOTEL CASINO & SPA, | : UNITED STATES DISTRICT COURT<br>: DISTRICT OF NEW JERSEY<br>:<br>: Civil Action No.: 1:14-cv-2283 (NLH-AMD) |
| Plaintiff, | : |
| vs. | : **DEFENDANT'S RESPONDING**<br>: **STATEMENT OF UNCONTESTED**<br>: **MATERIAL FACTS** |
| PHILLIP D. IVEY, JR., GEMACO INC., CHENG YIN SUN and JANE DOE, | :<br>: **IN SUPPORT OF DEFENDANT'S**<br>: **REPLY TO PLAINTIFF'S OPPOSITION**<br>: **TO GEMACO'S CROSS MOTION FOR**<br>: **SUMMARY JUDGMENT** |
| Defendants. | : |

_____

### Defendant Gemaco's Responding Statement of Uncontested Material Facts

46.     Gemaco's Plant Manager, Mike Fluty, explained that centering the logo on the back of a card means that the pattern on the back is symmetrical on all edges:

> Q. If the logo is *centered*, does that mean that the pattern should be *symmetrical*
> on the back and -- the top, the bottom, and the two sides should be the same?
> A. Yes.

Fluty Tr. 23:5-9 (emphasis added)(**Exhibit 8**).

**Admit in part, deny in part.  Admit that Michael Fluty so testified as demonstrated in the**

**transcript of Mr. Fluty's testimony on 23:5-9. Deny as to the characterization and**

**interpretation of Mr. Fluty's testimony. Deny to the extent that the testimony cited is not**

**complete and does not provide the appropriate context to the question that was being**

**answered.  Michael Fluty, Gemaco, Inc. plant manager, testified that Gemaco's goal in**

**manufacturing playing cards is to have *the logo* perfectly centered. (Exhibit EE, Michael Fluty Dep. 20:20-22; 22:11-25, August 11, 2015; Declaration of Michael Fluty, March 21, 2016, ¶ 5). Gemaco employed a tolerance of deviation of plus or minus 1/32 of an inch.  Id. at 20:20-22; 22:11-25; Declaration of Michael Fluty, March 21, 2016, ¶ 5).Id. at 23:13-18; 24:1-4; Fluty Decl. ¶ 6.  The variance is controlled by the capabilities of the printing press and cutting machines and the overall production process.  (Id. at 23:19-25; Fluty Decl. ¶ 12). The tolerance of plus or minus 1/32 of an inch refers to the circles in the pattern on the back of the card.  (Fluty Decl. ¶ 7).  Each circle in the pattern is approximately an 1/8 of an inch. (Id. at ¶ 8). The variance of plus or minus 1/32 of an inch, ranges from approximately 1/16 of an inch to approximately 1/32 of an inch, based on the diameter of the circle in the pattern. (Id. at ¶ 9). The plus or minus variance is based on the diameter of the circle. So long as approximately half of the circle is present in the pattern, it falls within the plus or minus 1/32 of an inch variance, which ranges from approximately 1/16 of an inch to approximately 1/32 of an inch.  (Id. at ¶ 10). The variance is not measured from the patterns from edge to edge on the cards. (Id. at ¶ 11).**

47.     New Jersey State Police Detective Andrew Koch was performing a criminal investigation as to whether Ivey's and Sun's edge sorting violated criminal prohibitions against cheating in casinos. He was not investigating a violation of the gaming regulations regarding card backs:

> Because it was deemed a criminal investigation, the DGE normally takes a step back and lets us do our investigation. *Then they would come in later and review what we did and do their own for regulation violation or code.*

Koch Tr. 34:17-21 (emphasis added)(**Exhibit 12**).

**Admit in part, deny in part.  Admit that Detective Koch so testified as demonstrated in the transcript of Detective Koch's testimony on 34:17-21. Deny as to the characterization and**

**interpretation of Detective Koch's testimony. Deny to the extent that the testimony cited is not complete and does not provide the appropriate context to the question that was being answered. The New Jersey State Police conducted its own investigation into Ivey and Sun's 2012 gaming trips. (Exhibit BB, Detective Andrew Koch Dep. 88:24-89:2, August 13, 2015). Detective Koch inspected the playing cards Ivey and Sun used during July 27, 2012 game (Id. at 23:25-24:3). Detective Koch testified that one box of playing cards has eight decks of cards and the cards in each box were cut the same. He further testified that all the cards that all the cards in the box, which was 416 cards, all had substantially the same pattern. (Id. at 29:3-6; 31:12-17). Detective Koch also looked at other cards from other companies and casinos and found that it appeared very few of the cards were cut perfectly. (Id. at 38:7-13).**

48.     Detective Koch believed edge sorting was cheating and wanted charges to be filed. Although Detective Koch can sign a criminal complaint, he was instructed to leave that decision to the New Jersey Attorney General's office in the Ivey case. Despite Detective Koch's efforts, the Attorney General declined to charge. Koch Tr. 84:22-24; 88:24-91:5 (**Exhibit 12**).

**Deny. Plaintiff blatantly mischaracterizes Detective Koch's testimony. Detective Koch never states that he wanted charges to be filed. The referenced deposition testimony repeatedly shows that Detective Koch was instructed to consult with the Attorney General's office and let the Attorney General's office make a determination.**

49.     Two agents from DGE were present in a meeting at Borgata where the cards and Ivey edge sorting incidents were discussed. Koch Tr. 32:21-33:7.

**Admit that Detective Koch so testified.**

50.     Detective Koch testified he "spoke to some people over there [DGE] about it [the issue with the card backs]. Koch Tr. 31:8-32:20.

**Deny.  Deny as to the mischaracterization and interpretation of Detective Koch's testimony.
There is no support for plaintiff's ambiguous assertion as to "the issue with the card backs."
Detective Koch's exact testimony is: I am sure I spoke to some people over there about it.
Deny to the extent that the testimony cited is not complete and does not provide the
appropriate context to the question that was being answered.  The cited deposition testimony
refers to Detective Koch evaluating 416 playing cards and all of the playing cards having
substantially the same pattern differential.**

51.     Detective Koch considered the miscut cards as being marked:

        A. The card is already marked.
        Q. You are talking about the card itself?
        A. *The card itself, yes. You can --it is marked by its cut on the edge*.

Koch Tr. 88:11-13 (emphasis added)(**Exhibit 12**).

**Deny.  Deny as to the mischaracterization and interpretation of Detective Koch's
testimony. Deny to the extent that the testimony cited is not complete and does not provide
the appropriate context to the question that was being answered.  Detective Koch testified
that Sun marked the cards without touching the cards and by directing the dealer to set the
cards in that fashion.  (Id. at 87:7-88:5).**

52.     Gemaco is authorized to sell pre-shuffled, pre-inspected playing cards to casinos in New
Jersey. Summers Tr. at 39:25-42:18 (**Exhibit 11**).

**Admit.**

53.     Pre-inspected, pre-shuffled cards are intended and marketed by Gemaco to allow casinos
to put new cards into play without the lengthy break for inspection and shuffling. **Exhibit 13**.

**Admit.**

54.     Gemaco's advertisement for its pre-inspected, pre-shuffled product known as Gempack® touts the product's ability to enhance casino revenue by generating an additional 50-100 hands per day, per table. **Exhibit 13**.

**Admit.**

55.     The cards at issue in this case are GemPaks®. Summers Tr. at 25:9-14 (**Exhibit 11**); Alfieri Tr. 101:2-102:4 (**Exhibit 7**). *See* example invoice included as **Exhibit 14**.

**Admit.**

56.      Kaye Summers, Gemaco's principal, admits that Gemaco had an independent duty imposed on it separate and apart from contractual obligations to comply with New Jersey gaming regulations, including those regarding pre-shuffled, pre-inspected cards:

> Q: Okay.  Do you understand or is it your understanding that the New Jersey regulation on pre-shuffled, pre-inspected cards includes a provision that the vendor is to perform a visual inspection of the back of each card, to assure that it is not flawed, scratched, or marked in any way that might compromise the integrity or fairness of the game?
>
> A:  I would have to read the regulation again and comment.  The regulation says what it says.
>
> Q:  Okay.  But if that's what the regulation says,  that's correct?
>
> A:  Yes.  If that's what the regulation says, that is correct.
>
> Q: And you understood that to be a duty imposed on Gemaco by the State of New Jersey with respect to these GemPaks?
>
> A:  I understand that Gemaco has the duty to follow the regulations that are in effect at the time the product is provided, so whatever the regulation says is what is our obligation.
>
> Q:  And that obligation is separate and apart from any other obligations you may have had to your customers pursuant to contract or any other agreement?
>
> A: True.

Summers Tr. 38:19-39:19 (**Exhibit 11**).

**Deny.  Deny as to the mischaracterization and interpretation of Ms. Summers' testimony. Gemaco has an independent duty to the State of New Jersey and none of the various State of New Jersey entities that evaluated the 2012 gaming incidents found that Gemaco violated any regulations or laws.**

57.     Borgata policy and New Jersey regulations require that certain casino playing cards be inspected for physical tampering by players. Cards in any game that are touched by players and then reshuffled and reused must be inspected. For games in which cards are touched by players but not reshuffled and reused, and for games in which the cards are not touched by players at all, the casino is permitted to select random decks for inspection pursuant to an approved plan. Schultz Dec. at ¶4 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.**

58.     If any evidence of tampering is found, the inspector is required to complete a card discrepancy report, which report is delivered to the New Jersey Division of Gaming Enforcement ("DGE"). Schultz Dec. at ¶5 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.**

59.     Any cards that are identified as showing signs of physical tampering are preserved for review by the DGE. Schultz Dec. at ¶8 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.  Regardless of the reason, plaintiff discarded the April 2012 and May 2012 cards, we acknowledge that Borgata disposed of the cards as set forth in paragraph 65 below.**

60.     New Jersey regulations mandate that casinos to either "cancel" or destroy used cards. Cards are "cancelled" by drilling a hole through the center of the deck; these decks are generally used for promotional purposes. Schultz Dec. at ¶6 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.  Regardless of the reason, plaintiff discarded the April 2012 and May 2012 cards, we acknowledge that Borgata disposed of the cards as set forth in paragraph 65 below.**

61.     Absent finding any cards that have been physically tampered with or altered, all playing cards used by Borgata in its casino are either canceled or shredded after use. Schultz Dec. at ¶7 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.  Regardless of the reason, plaintiff discarded the April 2012 and May 2012 cards, we acknowledge that Borgata disposed of the cards as set forth in paragraph 65 below.**

62.     The cards used during Defendants' play in April and May 2012 were only subject to random inspection pursuant to Borgata's approved inspection plan. This is because the cards were either not touched by the players, or if they were touched, they were not reshuffled and reused after the players touched them. Schultz Dec. at ¶9 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.  Regardless of the reason, plaintiff discarded the April 2012 and May 2012 cards, we acknowledge that Borgata disposed of the cards as set forth in paragraph 65 below.**

63.     Pursuant to Borgata's approved plan, 10% of the total decks used at Baccarat are inspected ("Baccarat Random Selection"). Schultz Dec. at ¶9 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco.  The Schultz's Declaration speaks for itself.   However, the cards at issue were not in regular play, but**

**were instead used specifically under the special arrangements between Borgata, with Sun and Ivey. See Marina Dist. Dev. Co., LLC v. Ivey, 216 F. Supp. 3d 426, 430 (D.N.J. 2016).**

64.     The cards used by Defendants on May 5, 2012, May 7, 2012 and May 9, 2012 used by Mr. Ivey and Ms. Sun were randomly selected for inspection; no evidence of physical tampering was found, no discrepancy reports were filed, and the cards were not preserved for review. Schultz Dec. at ¶¶11-12 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco. The Schultz's Declaration speaks for itself. Regardless of the reason, plaintiff discarded the April 2012 and May 2012 cards, we acknowledge that Borgata disposed of the cards as set forth in paragraph 65 below.**

65.     The playing cards used by Defendants during their trips to Borgata in April and May 2012 were all destroyed in the regular course of Borgata's business and pursuant to applicable regulations in the New Jersey Administrative Code. Schultz Dec. at ¶13 (**Exhibit 9**).

**Neither admit nor deny inasmuch as this is not directed at Gemaco. The Schultz's Declaration speaks for itself. Regardless of the reason, plaintiff discarded the April 2012 and May 2012 cards, we acknowledge that Borgata disposed of the cards.**