## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

MARINA DISTRICT DEVELOPMENT
CO., LLC doing business as
BORGATA HOTEL CASINO & SPA,          CIVIL NO. 14-2283(NLH/AMD)
    Plaintiff,
                                     **OPINION**
v.

PHILLIP D. IVEY, JR., GEMACO
INC., and CHENG YIN SUN,
    Defendants.

---

**Appearances:**

JEREMY M. KLAUSNER
JEREMY KLAUSNER LAW, P.C.
21 SHEFFIELD TER
WEST ORANGE, NJ 07052
    On behalf of Plaintiff

JEFFREY W. MAZZOLA
LAW OFFICES OF WILLIAM E. STAEHLE
445 SOUTH STREET
P.O. BOX 1938
MORRISTOWN, NJ 07962-1938
    On behalf of Defendant Gemaco, Inc.

EDWIN JOSEPH JACOBS, JR.
MICHAEL F. MYERS
LOUIS M. BARBONE
JACOBS & BARBONE
1125 PACIFIC AVENUE
ATLANTIC CITY, NJ 08401
    On behalf of Defendants Phillip D. Ivey and Cheng Yin Sun

**HILLMAN**, District Judge

    Defendants Phillip D. Ivey and Cheng Yin Sun played

Baccarat at the Borgata Hotel Casino & Spa in Atlantic City, on

four occasions in 2012.  They won $9,626,000.  In order to do so, they used a scheme called "edge-sorting," where Sun, after learning the face value of certain strategically important cards, would have the dealer turn those cards so that they could be distinguished from other cards in the deck by minute asymmetries on the repeating pattern on the backs of the cards as they were dealt.  Ivey and Sun would then be able to see the leading edge of the first card in the shoe before it was dealt, giving them "first card knowledge," and Ivey would bet accordingly.

To make the edge-sorting scheme work, Ivey required certain accommodations from Borgata: (1) a private area or "pit" in which to play; (2) a casino dealer who spoke Mandarin Chinese and would follow Sun's directions to turn the cards 180 degrees; (3) a guest (defendant Sun) to sit with him at the table while he played; (4) one 8-deck shoe of purple Gemaco playing cards to be used for the entirety of each session of play; and (5) an automatic card shuffling device to be used to shuffle the cards after each shoe was dealt, which retained the orientation of each card that Sun requested to be turned.  Borgata agreed to all of Ivey's requests.

On October 21, 2016, the Court determined that Ivey and Sun breached their contract with Borgata to abide by the terms of New Jersey's Casino Control Act, N.J.S.A. 5:12-1, et seq.

("CCA"). The Court found that Ivey and Sun breached their contract with Borgata to play Baccarat in compliance with the CCA by violating N.J.S.A. 5:12-115(a)(2) and (b) when they knowingly engaged in a scheme to create a set of marked cards and then used those marked cards to place bets based on the markings.[1] (Docket No. 107.)

On December 15, 2016, the Court determined that the remedy for Ivey and Sun's breach of their contract with Borgata was to restore the parties to the *status quo ante* – i.e., both Borgata and Ivey and Sun would be returned to their pre-contract positions, entitling Borgata to the return of all of Ivey and Sun's winnings, including the sum Ivey won at Craps following his Baccarat play. (Docket No. 117.) Judgment was entered in Borgata's favor on its claims against Ivey and Sun in the amount of $10,130,000. (Docket No. 119.)

Ivey and Sun sought to appeal this Court's decision, but Borgata still had pending claims against Defendant Gemaco, Inc., which manufactured the cards Ivey and Sun specifically requested to be used in their edge-sorting scheme. The Court denied Ivey and Sun's motion for entry of judgment under Federal Civil Procedure Rule 54(b), which requires that, in order to avoid

---

[1] The Court found in favor of Ivey and Sun on Borgata's claim that the edge-sorting scheme constituted fraud because Ivey and Sun did not violate the rules specific to Baccarat and Borgata did not rely upon a material misrepresentation.

piecemeal appeals, a court may only order the entry of final
judgment when fewer than all claims have been resolved upon a
finding that there is "no just reason for delay."  The Court
found that that resolving all of Plaintiff's claims arising out
of the edge-sorting technique used by Ivey and Sun with Gemaco
playing cards, which serves as the basis for all of Plaintiff's
claims against Ivey, Sun and Gemaco, would prevent duplicative
review by the court of appeals.  (Docket No. 122.)

The Court therefore directed Borgata to prosecute its
claims against Gemaco by either refiling its motion for summary
judgment, which, along with Gemaco's cross-motion for summary
judgment, had been previously denied without prejudice when the
Court issued its decision as to Borgata's claims against Ivey
and Sun so that the parties had the benefit of that decision, or
seek other relief that would resolve the claims between Borgata
and Gemaco.  (Id.)

Borgata and Gemaco have renewed their motions for summary
judgment, which are currently pending for resolution.[2]  Borgata
claims that in October 2011, it and Gemaco entered into a

---

[2] Summary judgment is appropriate where the Court is satisfied
that the materials in the record, including depositions,
documents, electronically stored information, affidavits or
declarations, stipulations, admissions, or interrogatory
answers, demonstrate that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S.
317, 330 (1986); Fed. R. Civ. P. 56(a).

contract for (1) "high quality" gaming cards that were suitable for Baccarat and compliant with the CCA and New Jersey Division of Gaming Enforcement ("DGE") regulations, which require that "[a]ll cards used to game at Baccarat shall be of backs of the same color and design," N.J.A.C. 13:69F-3.6, and (2) "first grade quality" gaming cards that were subject to individual and intensive inspection, free of any and all defects, and suitable for use in Borgata's gaming operations. Borgata claims that on the four days Ivey and Sun played Baccarat at Borgata – April 11, May 3, July 26, and October 7, 2012 - Gemaco breached the agreement with Borgata by delivering defective and asymmetrical cards that were unsuitable for Baccarat and noncompliant with the requirements set forth by the CCA.

In addition to its breach of contract claim (Count XIII), Borgata claims that the defective and asymmetrical cards breached Gemaco's express and implied warranties (Counts XIV, XV), and constituted negligence (Count XVI). Borgata has also asserted claims for respondeat superior for a Jane Doe employee whose duty it was to inspect the cards (Count XVII), as well as a claim for declaratory judgment for contribution and indemnification (Count XVIII). Borgata seeks damages in the amount of $9,626,000, representing the amount of Borgata's loss

resulting from Gemaco's breaches.[3] (See Borgata's amended complaint, Docket No. 5 at 38-46.)

**Gemaco's arguments for of summary judgment in its favor**

Gemaco argues that it is entitled to summary judgment on all of Borgata's claims. Its first, overarching argument for judgment in its favor is that Borgata has received full recovery for its losses through the judgment entered in its favor on its claims against Ivey and Sun, and Borgata is not entitled to a duplicate recovery from Gemaco. In addition to that argument, Gemaco contends that the Uniform Commercial Code (U.C.C.), which is a comprehensive system for determining the rights and duties between buyers and sellers of goods,[4] governs the relationship

---

[3] Borgata had sought the same amount in damages against Ivey and Sun, but the Court awarded Borgata $10,130,000, which included $504,000 Ivey won at Craps using his ill-gotten Baccarat winnings.

[4] The New Jersey Supreme Court has explained,

> By enacting the U.C.C., the Legislature adopted a comprehensive system for compensating consumers for economic loss arising from the purchase of defective products. The U.C.C. represents the Legislature's attempt to strike the proper balance in the allocation of the risk of loss between manufacturers and purchasers for economic loss arising from injury to a defective product.

Alloway v. General Marine Industries, L.P., 695 A.2d 264, 268–69 (N.J. 1997) (citing Spring Motors Distribs. v. Ford Motor Co., 489 A.2d 660 (N.J. 1985)) (other citations omitted); see also Pomerantz Paper Corp. v. New Community Corp., 25 A.3d 221, 231 (N.J. 2011) (citing N.J.S.A. 12A:2-101 to -725) (explaining that the U.C.C. fixes the obligations imposed on both buyers and sellers relating to the sale of goods, as well as their

between it and Borgata, and Borgata's common law breach of contract, negligence, respondeat superior, and declaratory judgment for contribution and indemnification claims are barred.

For Borgata's breach of warranty claims that fall under the U.C.C., Gemaco argues that Borgata's damages for its allegedly defective cards – to the extent that the cards are deemed to have breached Gemaco's agreement to provide Borgata with "high" and "first grade" quality cards – are limited by the economic loss rule. That is, if it is determined that Gemaco breached any warranties for the cards it provided to Borgata on the four occasions in 2012, Borgata's damages are limited to contract-type damages.

"[E]conomic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits," as well as "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." Alloway v. General Marine Industries, L.P., 695 A.2d 264, 267 (N.J. 1997) (citation omitted). In New Jersey, the U.C.C. provides "the exclusive remedy for claims of purely economic loss due to a defective product." Rapid Models & Prototypes, Inc. v. Innovated

_____

respective remedies for nonperformance by the other party).

<u>Solutions</u>, 71 F. Supp. 3d 492, 507 (D.N.J. 2014) (citing <u>Goldson v. Carver Boat Corp.</u>, 707 A.2d 193 (N.J. Super. Ct. App. Div. 1998) ("[W]here the harm suffered is to the product itself, unaccompanied by personal injury or property damage . . . principles of contract, rather than of tort law, [are] better suited to resolve the purchaser's claim." (citations and quotations omitted)).  A tort remedy is available, however, for damages that arise from a contractual relationship when the breaching party owes a duty imposed by law independent of the contract.  <u>Saltiel v. GSI Consultants, Inc.</u>, 788 A.2d 268, 280 (N.J. 2002).

Gemaco argues that it did not owe Borgata any duty separate from their contract, and therefore Borgata's only remedy for the allegedly defective cards comes from their contract.[5]  It points out that the parties' contract provides for a limited warranty where Gemaco warranted that the cards would be fit for their intended purpose and free from defects of workmanship.  Gemaco further points out that the contract provides that its liability is limited to the replacement of the defective cards, or the

---

[5] As discussed below, Borgata argues that Gemaco had an independent duty under the CCA to provide symmetrical cards free of defects, which removes Borgata's claims from the purview of the U.C.C. and the economic loss rule.  Gemaco argues that there is no private cause of action under the CCA that gives rise to an independent duty imposed on Gemaco for the benefit of Borgata, and that a violation of the CCA is not a tort which provides a remedy outside the parties' contract.

refund of the purchase price for the cards, and only if Borgata notified Gemaco in writing within 90 days of its receipt of the cards. The limited warranty provision also provides that there are no other warranties, express or implied, and in no event was Gemaco liable for the loss of profits, indirect, incidental, special, consequential or other similar damages, including but not limited to business interruption, loss or revenue, gaming losses, fines, penalties, loss of use and injury or damage to persons or property arising out of any breach or obligations under their contract.[6] (See Docket No. 5 at 56.)

Gemaco argues that in addition to the fact that Borgata's damages for the allegedly defective cards are limited to the economic loss set forth in their contract – i.e., replacement of the cards or refund of the purchase price – Borgata is not even entitled to that remedy because it failed to comply with the 90-

---

[6] Gemaco argues that Borgata's claim for breach of an implied warranty fails as a matter of law because the contract expressly excludes any implied warranties, and such an exclusion is proper under the U.C.C. The Court agrees. (See Docket No. 5 at 56, the Borgata/Gemaco contract, which provides, "Seller warrants that the goods covered by the Contract are merchantable and fit for their intended purpose and are free from defects of material and workmanship . . . . Except as specifically provided herein, there are no other warranties, express or implied."); see also N.J.S.A. 12A:2-316(2) (providing that "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous").

day notice requirement under the contract.  Moreover, Gemaco
contends that there is no evidence that its cards used during
Ivey and Sun's four visits in 2012 were defective or violated
the CCA.[7]  Based on all of its arguments, it is Gemaco's position
that it is entitled to summary judgment in its favor on all of
Borgata's claims against it.

**Borgata's arguments for summary judgment in its favor**

Unsurprisingly, Borgata views the situation very
differently from Gemaco.  Borgata argues that as a card
manufacturer Gemaco has an independent duty, separate from any
contract with the casinos, imposed upon it under the CCA to
ensure that the backs of the cards are uniform, symmetrical, and
cannot be used to determine the face value of the cards.  See
N.J.A.C. 13.69E-1.17(d), 13.69F-3.6, 13.69E-1.17(a), (d),
13.69E-1.18A.  Borgata contends that Gemaco's failure to inspect
and identify the flawed, marked cards breached an independent
duty giving rise to a negligence claim.  This breach of its

_____

[7] Gemaco asks for a spoliation sanction against Borgata since the
cards from the April and May 2012 visits were inspected by
Borgata employees for defects, and having found none, the cards
were destroyed.  Gemaco further points out the 2012 DGE
investigation into Ivey and Sun's Baccarat play did not result
in any findings that its cards violated the regulations or were
defective.  As discussed below, Borgata argues that the Gemaco
cards were presumptively defective, and in violation of the CCA,
because in May 19, 2017 the DGE sent a letter to casinos
advising them of "off-center" backs on Gemaco playing cards.
Gemaco argues that the May 2017 DGE letter is not relevant to
the cards used in 2012.

independent duty, Borgata argues, takes its claims against Gemaco out of the economic loss rule limitation and the confines of remedies available under the U.C.C.

Relatedly, Borgata argues that the cards failed for their essential purpose, were the but-for cause of Borgata's losses, and Gemaco's awareness of the inherent asymmetry of its cards and its failure to apprise Borgata of the defect makes any damages limitations unconscionable, particularly considering that the playing cards cost only $0.84 per deck, thus making its economic loss under the terms of the parties' contract significantly disproportionate to the actual losses incurred by Borgata. Borgata further argues that the parties' contract contained two warranty provisions, including one relating to regulatory compliance, which Gemaco breached.

Overall, Borgata argues that Gemaco's liability for the $10,130,000 in losses under the parties' contract and Gemaco's violation of its independent duties[8] has been established by the May 19, 2017 letter the DGE sent to Borgata regarding Gemaco's

---

[8] Borgata argues that contrary to Gemaco's argument that it has been fully compensated for its losses by the judgment against Ivey and Sun and it cannot obtain a double recovery, the $10,130,000 judgment can also be imposed against Gemaco, with the defendants apportioning liability for the total among themselves based on their cross-claims for contribution and indemnification.

cards.  In that letter, the DGE informed the vice-president and
general counsel of Borgata of the following:

> The New Jersey Division of Gaming Enforcement
> ("Division") recently became aware of an issue regarding
> the quality of playing cards produced by Gemaco, Inc.
> ("Gemaco").  The issue came to light when a New Jersey
> casino licensee detected a flaw in the playing cards in use
> at one of its table games.  More specifically, the casino
> licensee observed that the cards were cut so that the
> pattern on the back of the cards was uneven or off-center.
>
> Playing cards used for casino gaming are required to
> consist of 52 cards.  The faces of the cards are to contain
> four suits and thirteen different denominations or
> designations.  See N.J.A.C. 13:69E-1.17(a) through (c).
> The back of the cards "shall be identical and no card shall
> contain any marking, symbol or design that will enable a
> person to know the identity of any element printed on the
> face of the card or that will in any way differentiate the
> back of that card from any other card in the deck".  See
> N.J.A.C. 13:69E-1.17(d).
>
> The design flaw identified above was observed in play
> on two occasions in mid-February.  In the first instance,
> playing cards manufactured by Gemaco were initially put
> into play at a licensed New Jersey casino.  Shortly after
> being placed into service, the personnel assigned to a game
> noticed that the pattern on the back of the cards was
> off-center.  The game supervisor was alerted to the flaw
> and acted to remove the cards from active play.  In the
> second occurrence, Gemaco playing cards were again in play
> when the games personnel noticed the design flaw.  The
> cards were removed from play and retained for further
> analysis.  In both instances, the shipping box from which
> the flawed cards were delivered to the gaming table was
> dated October 19, 2016.
>
> By copy of this correspondence, the Division is
> advising all casinos licensed in New Jersey of the above
> described design flaw.  The Division would ask that each
> licensed casino conduct an inspection of its playing card
> inventories and advise this agency whether or not any
> defective cards are located.  If defective cards are found,
> the licensee is requested to provide details, including but
> not limited to the date of manufacture, shipping date and

invoice number, to this agency within 30 days from the date of this letter. Should you have any questions please contact the undersigned at 441-3449.

(Docket No. 123-3 at 2-3.)

**The Court's Analysis**

There cannot be any credible dispute that the Gemaco cards used by Ivey and Sun in 2012 had patterns on the back that were not perfectly symmetrical. The minute asymmetries in the patterned backs of the purple Gemaco playing cards used in the Ivey games were the very reason Ivey and Sun requested to use those cards. Indeed, as Borgata argues, in one sense Ivey and Sun could not have pulled off their edge-sorting scheme without using cards with backs that could be "marked" and differentiated. But the cards were only one part of the overall scheme. As explained more fully below, the Gemaco asymmetrical cards were necessary – but in and of themselves not sufficient – to accomplish the scheme.

In order to establish that it is entitled to damages for its claims against Gemaco, Borgata must show that the asymmetry caused the cards to be "defective." For its U.C.C.-based claims, Borgata must show that the cards were defective in the sense that they were not the promised "first quality" cards fit for their intended use. To avoid the application of the economic loss rule, which limits Borgata's remedies to the replacement of the defective cards or the refund of the purchase

13

price for the cards (assuming proper notice), Borgata must establish that Gemaco had an independent duty not to provide "defective" cards that could be "marked," and that Gemaco's failure to do so constitutes a tort contemplated by the law governing exceptions to the economic loss rule. If Borgata establishes that Gemaco provided defective cards in violation of its duty of care, as set forth by the CCA or under common law, and that violation transcends the economic loss rule, Borgata must also show that Gemaco's defective cards were the proximate cause of its $10,130,000 loss.

The Court finds that the economic loss rule does not preclude Borgata's negligence claim premised on Gemaco's common law duty of care to Borgata, as well as Gemaco's obligations under the CCA. Borgata's negligence claim is not "a contract claim in tort claim clothing," which "simply seeks to enhance the benefit of the bargain [it] contracted for alleged harm beyond that to the cards themselves." SRC Constr. Corp. v. Atl. City Hous. Auth., 935 F. Supp. 2d 796, 801 (D.N.J. 2013) (citing Saltiel v. GSI Consultants, Inc., 788 A.2d 268, 276 (N.J. 2002)).[9] Through Borgata's allegations against Gemaco for its

---

[9] See also Corestar Intern. Pte. Ltd. v. LPB Communications, Inc., 513 F. Supp. 2d 107, 124 (D.N.J. 2007) (quoting New Jersey Bank, N.A. v. Bradford Sec. Operations, 690 F.2d 339, 346 (3d Cir. 1982)) (explaining that the New Jersey version of "the UCC does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the

negligence, Borgata does not seek damages for the harm that the asymmetry of the cards caused to the cards themselves.  Borgata is not asking that Gemaco replace the asymmetrical cards with symmetrical ones, or refund its purchase price for the cards.  Instead, Borgata seeks a remedy for the harm caused by Gemaco's breach of duty of care that goes beyond the cards themselves – i.e., the integral and necessary part Gemaco's asymmetrical cards played in the edge-sorting scheme that resulted in over $10 million in damage to Borgata.  These allegations readily exclude the application of the economic loss rule to Borgata's negligence claim.

The ability of Borgata's negligence claim to proceed unhindered by the economic loss rule does not, however, ultimately warrant judgment in Borgata's favor on its negligence claim.  Under New Jersey law,[10] in order to prove negligence, the plaintiff must establish: (1) a duty of care owed to the plaintiff by the defendant; (2) defendant breached that duty of care; and (3) plaintiff's injury was proximately caused by defendant's breach.  <u>Smith v. Kroesen</u>, 9 F. Supp. 3d 439, 442 (D.N.J. 2014) (citations omitted).  The burden of proving a negligence claim rests with the plaintiff, and as part of that

---

common law would thwart the purposes of the code").

[10] The parties appear to agree that New Jersey law applies to this case.

burden, it is vital that the plaintiff establish that its injury was proximately caused by the unreasonable acts or omissions of the defendant. Id. (citing Camp v. Jiffy Lube No. 114, 706 A.2d 1193, 1195 (N.J. Super. Ct. App. Div. 1998), cert. denied, 718 A.2d 1215 (N.J. 1998)) (other citation omitted); see also People Exp. Airlines, Inc. v. Consolidated Rail Corp., 495 A.2d 107, 116 (N.J. 1985) (citation and quotations omitted) ("Liability depends not only on the breach of a standard of care but also on a proximate causal relationship between the breach of the duty of care and resultant losses. Proximate or legal causation is that combination of logic, common sense, justice, policy and precedent that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery.").

In routine tort cases, "the law requires proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant." Camp, 706 A.2d at 1195 (citations omitted). In cases where concurrent causes of harm are present, the law requires consideration of the "substantial factor" test. Id. "The 'but for' standard concentrates on one cause that sets the other causes in motion, while the 'substantial factor' test recognizes that a tortfeasor will be held answerable if its negligent conduct was a substantial factor in bringing about the injuries, even where there are

other intervening causes which were foreseeable or were normal incidents of the risk created." Id. at 1195-96 (citations and quotations omitted). Under the substantial factor test, the law of negligence recognizes that there may be any number of concurrent causes of an injury, and it is enough if they are a "substantial factor" in bringing it about, even if those acts by themselves are capable of producing the injury. Id. at 1196 (citations omitted).

Borgata argues that Gemaco's defective, asymmetrical cards were the "but for" cause of its losses - that is, if Ivey and Sun had not used Gemaco playing cards, they could not have perpetrated their edge-sorting scheme. Even accepting as true that the Gemaco cards used by Ivey and Sun during their four visits to Borgata in 2012 were defective, and those defects were caused by Gemaco's breach of its duty of care, the Court finds that the requisite proximate cause to hold Gemaco liable for Ivey and Sun's gambling winnings is lacking. This is because Borgata has not shown that the Gemaco cards standing alone were the precipitating cause of the scheme.

As set forth above, in order to be successful in their edge-sorting scheme, Ivey and Sun asked Borgata for five things: (1) a private area or "pit" in which to play; (2) a casino dealer who spoke Mandarin Chinese; (3) Sun to sit with Ivey at the table; (4) one 8-deck shoe of purple Gemaco playing cards to

be used for the entirety of each session of play; and (5) an automatic card shuffling device to be used to shuffle the cards after each shoe was dealt, which retained the orientation of each card that Sun requested to be turned.  The key elements of Ivey and Sun's scheme were cards where Sun could distinguish the backs from each other, a dealer who would turn the necessary cards at Sun's request, an automatic card shuffler that would maintain the orientation of the turned cards, and the retention of those cards for the entire session.  If even one of those key elements were missing, the edge-sorting scheme would not work.

The asymmetry on the backs of the cards were benign without Sun's visual acuity under pressure, the card turning, the automatic shuffler, and the card retention.  Indeed, the asymmetries in Gemaco cards when dealt in their unaltered original alignment cause no ill-effect on the regular play of the game.  It is common sense that a deck of asymmetrical cards that are not turned individually are, despite an asymmetrical pattern, actually symmetrical in effect as they are uniformly asymmetrical.

Moreover, in many Baccarat games, the players bend, tear, and handle the cards, which actions, similar to the cards' asymmetry, render the cards defective.  But those defective cards have no impact on the game because they are thrown away after every hand and not reintroduced in new hands so that the

players would be aware of the cards' value by those defects, something which was done here.

Thus, it is not Gemaco's cards that were the "but for" cause of Borgata's losses, but rather all the subsequent required elements requested by Ivey and agreed to by Borgata, each a required and integral part, which together caused Borgata's losses.[11]  It is true that the scheme would not have worked without asymmetrical cards.  They were necessary for the scheme.  But they were equally insufficient.  Out of the box, asymmetrical cards are symmetrical until strategically turned and maintained in that orientation.  In that sense, it was Borgata's acquiescence in Ivey's accommodations that were the but for cause of Borgata's losses.

The foreseeability requirement of proximate cause is also lacking in this case.  "Foreseeability is a constituent part of proximate cause," and "if an injury is not a foreseeable consequence of a person's act, then a negligence suit cannot prevail."  Komlodi v. Picciano, 89 A.3d 1234, 1251–52 (N.J. 2014) (citations omitted).  If the injury or harm suffered was

_____

[11] Borgata views the asymmetries in the Gemaco cards as the dispositive factor in the scheme, but it appears to ignore its own participation.  Borgata provided the dealer who turned the cards and Borgata permitted her to do so.  Borgata provided the automatic shuffler.  Borgata did not substitute a new deck of cards during the entire play sessions, which lasted for over sixteen hours each time.  Borgata even provided the requested type of playing cards.

within the realm of reasonable contemplation, the injury or harm is foreseeable.  Id. (citations omitted).  But "if an injury or harm was so remote that it could not have been reasonably anticipated, the injury or harm is not foreseeable."  Id. (citations omitted).

While the potential for marking could be said, in the general sense, to be a foreseeable consequence of the asymmetrical cards, what is not foreseeable are the extensive and unusual accommodations extended by the Borgata to Ivey and Sun.  Foreseeability has it limits and it seems to this Court unreasonable to hold that Gemaco should anticipate Ivey's creative, even ingenious, exploitation of the minute differences in its mass produced playing cards, as well as Borgata's unwitting facilitation of the scheme, when so many are used without incident and discarded without harm on a no doubt daily basis.

Proximate cause and foreseeability are also related to superseding cause.  Id.  "A superseding or intervening act is one that breaks the 'chain of causation' linking a defendant's wrongful act and an injury or harm suffered by a plaintiff," and it is one that is the immediate and sole cause of the injury or harm.  Id. (citations omitted).  "Significantly, intervening causes that are 'foreseeable' or the 'normal incidents of the

risk created' will not break the chain of causation and relieve a defendant of liability." Id. (citation omitted).

Even accepting that Gemaco breached its duty by providing defective cards to Borgata, Borgata has not established that Ivey and Sun, and its own decision to extend them extraordinary accommodations, were not the superseding cause that breaks the causal chain of Gemaco's actions. Quite the opposite of Borgata's position, the fact that Ivey and Sun were successful in perpetrating the edge-sorting scheme on four separate occasions in the same exact manner over the course of a year casts doubt on any claims that the harm was foreseeable. Along with the other integral elements of their scheme, Ivey and Sun exploited a "defect" in the Gemaco cards that under regular gambling circumstances would not constitute a defect at all.

Consequently, even accepting that Gemaco breached its duty of care to Borgata through its defective cards, the evidence in the record shows that Ivey and Sun's actions were not foreseeable, and they – not Gemaco - were the ultimate cause of Borgata's losses.

The result of the foregoing analysis, which presumes the Gemaco cards were defective and concludes that Gemaco is not liable for any tort claims advanced by Borgata, still requires an analysis of whether the cards were actually defective in the

sense they were not fit for their intended purpose under the parties' contract.

Borgata rejects Gemaco's contention that the asymmetries in the pattern on the back of Gemaco cards is a result of the card-cutting process and is a known and acceptable industry standard. Even if Gemaco's position is unavailing, Borgata does not explain how those asymmetries would actually be a defect in an ordinary game of Baccarat, or in any other casino card game, without a player's efforts to exploit the asymmetry and "mark" them. Although the DGE notified the casinos in May 2017 regarding a batch of Gemaco cards from October 2016 that appeared to be "off-center," those cards were removed from play in the unidentified game at an unidentified casino. The DGE letter is evidence to confirm the asymmetry of certain Gemaco cards in general, but it does not establish that the particular Gemaco cards used five years earlier were unfit for their purpose absent intervention by Ivey and Sun.

In the Court's Opinion resolving Borgata's claims against Ivey and Sun, the Court determined that Ivey and Sun breached their contract with Borgata to play Baccarat in compliance with the CCA by violating N.J.S.A. 5:12-115(a)(2) and (b) when they knowingly engaged in a scheme to create a set of marked cards and then used those marked cards to place bets based on the markings. By using cards they caused to be maneuvered in order

to identify their value only to them, Ivey and Sun adjusted the odds of Baccarat in their favor, which was in complete contravention of the fundamental purpose of legalized gambling, as set forth by the CCA. The Court concluded that Ivey and Sun's violation of the card marking provision in the CCA constituted a breach of their mutual obligation with Borgata to play by the rules of the CCA. (See Docket No. 107 at 17-18.) The Court determined that the remedy for Ivey and Sun's breach of contract was to return the parties to *status quo ante* – the position of the parties prior to the formation of the contract. (See Docket No. 117 at 8.)

If the Court were to find that Gemaco breached its warranties that its cards would be fit for their intended purpose and comply with CCA regulations, the remedy would be to refund Borgata's purchase price of all the cards used in the Ivey and Sun play sessions (assuming that Borgata would not elect to have the cards replaced, and assuming that the 90-day notice window did not apply because Borgata did not learn of the breach until well after the contractual notice period).[12] This

---

[12] As the Court noted in its most recent prior Opinion, a breach of contract provides three remedies: a) restitution returns the innocent party to the condition he or she occupied before the contract was executed; b) compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed; and c) performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement. <u>Totaro,</u>

remedy is equivalent to the remedy provided to Borgata for Ivey
and Sun's breach of contract, which restored the parties to
their financial positions as if they had never contracted to
abide by the CCA when Ivey and Sun came to Borgata on those four
occasions.  The best remedy Borgata can obtain by proving Gemaco
breached the contractual warranties is the refund of its
payments for the cards in the amount of $26.88.[13]

The Court cannot, however, grant summary judgment in either
parties' favor on Borgata's breach of warranty claims because
disputed issues of material fact exist that require the
assessment of credibility on both sides.  Borgata and Gemaco
present testimony of their corporate representatives and
employees, as well as experts, to opine as to, among other
things, whether the 1/32 of an inch tolerance in the
manufacturing process is an accepted industry standard, whether
Borgata knew and accepted this tolerance, whether Borgata knew
and accepted general asymmetries in the back of all playing
cards, and whether the particular cards used in the Ivey and Sun
Baccarat games exceeded this tolerance.  Only after the

---

Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company,
L.L.C., 921 A.2d 1100, 1107 (N.J. 2007) (citations omitted).

[13] Borgata explains that each pack of Gemaco cards consists of 8
decks at $0.84 each, totaling $6.72 per pack.  One pack was used
for each of Ivey and Sun's four visits to the Borgata, thus
totaling $26.88 in Gemaco cards.  (Docket No.  123-1 at 20.)

assessment of the evidence at trial[14] can it be determined whether the cards were not "first quality" as warranted by Gemaco or violative of the CCA.[15]

## CONCLUSION

Ivey and Sun won over $9.6 million playing Baccarat at Borgata in April, May, July and October 2012 by using an edge-sorting scheme made possible, in part, because of asymmetries on the backs of Gemaco playing cards. Even if those Gemaco playing cards were determined to be defective, and as a result Gemaco breached its duty of care to Borgata, Borgata has not established that Gemaco's cards were the precipitating factor which enabled Ivey and Sun's scheme. In contrast, it is clear from the record that despite Borgata and Gemaco's own unwitting participation in the scheme, Ivey and Sun's unforeseeable actions were the superseding cause of Borgata's losses.

Without a viable tort remedy against Gemaco, Borgata's only potential relief against Gemaco are U.C.C.-governed breach of

---

[14] The docket reflects that Borgata made a jury demand, but the contract between Borgata and Gemaco contains a jury waiver provision. (Docket No. 5 at 58.) The Court will address whether Borgata's claim against Gemaco would result in a bench or jury trial at another time if necessary.

[15] It is unclear to the Court whether Borgata stopped using the same type of Gemaco playing cards in its casino card games after it uncovered Ivey and Sun's edge-sorting scheme.

warranty claims.[16]  The Court cannot enter summary judgment in
either party's favor on those claims, however, because disputed
material facts exist that require the assessment of credibility
on both sides.  If, after trial, Borgata is successful on its
breach of warranty claims against Gemaco, its recovery would be
limited to $26.88.  The Court wonders whether, under such
circumstances, the game is worth the candle.

The Court will therefore provide Borgata and Gemaco with
three options.  The Court can (1) proceed to trial on Borgata's

---

[16] Borgata's common law breach of contract claim is subsumed by
its breach of warranty claims governed by the U.C.C.  See, e.g.,
Pro-Spec Painting, Inc. v. Sherwin-Williams Company, 2017 WL
2106123, at *6 (D.N.J. 2017) ("The Court will dismiss Count I as
duplicative of Count III because Plaintiff alleges only that
Defendant breached the contract . . . by providing a defective
product, which is also the basis for the breach of warranty
claim in Count III," which is governed by the U.C.C.).  Because
Borgata's negligence claim is unsuccessful, its counts for
respondeat superior and declaratory judgment for contribution
and indemnification based on its negligence claim also fail.
See Celestin v. West Deptford Township, 2016 WL 5539584, at *13
(D.N.J. 2016) (dismissing plaintiff's claim against defendant
under a theory of respondeat superior because it was derivative
of the alleged negligence against defendant's employees, which
claim was also dismissed); cf. Dunn v. Praiss, 656 A.2d 413,
420-21 (N.J. 1995) (holding that in certain circumstances there
may be contribution between one whose breach of contractual duty
is a proximate cause of personal injury and one whose negligence
is a proximate cause of the same injury).  Thus, only Count XIV,
breach of express warranty, remains.  The Court refers to
"breach of warranties" to recognize that the contract provides
for a warranty of merchantability, fitness for the intended
purpose, goods free from defects of material and workmanship,
and regulatory compliance.  The Court noted, supra, that
Borgata's claim for breach of the implied warranty is
unsupportable under the U.C.C.

breach of warranty claims, (2) stay Borgata's claims against
Gemaco and certify as final Borgata's judgment against Ivey and
Sun pursuant to Rule 54(b) so that Ivey and Sun's appeal may
proceed, or (3) afford Borgata and Gemaco a period of time to
enter into a private resolution of Borgata's claims against
Gemaco.  The parties will have 15 days to notify the Court which
path they wish to take, or suggest any other reasonable path
forward not anticipated by the Court.

    An appropriate Order will be entered.


Date:  March 26, 2018              s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.